**NATIONAL CENTER ON SEXUAL EXPLOITATION**
Benjamin W. Bull*
Peter A. Gentala*
Danielle Bianculli Pinter*
Christen M. Price*
1201 F ST NW, Suite 200
Washington, D.C., 20004
Telephone: (202) 393-7245
lawcenter@ncose.com

**THE HABA LAW FIRM, P.A.**
Lisa D. Haba*
Adam A. Haba*
1220 Commerce Park Dr., Suite 207
Longwood, FL 32779
Telephone: (844) 422-2529
lisahaba@habalaw.com
adamhaba@habalaw.com

**THE MATIASIC FIRM, P.C.**
Paul A. Matiasic (SBN 226448)
Hannah E. Mohr (SBN 294193)
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
matiasic@mjlawoffice.com

*Pro Hac Vice Application Pending*

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, A MINOR CHILD, BY AND THROUGH HIS NEXT FRIEND JANE DOE,<br><br>          Plaintiff,<br><br>vs.<br><br>TWITTER, INC.,<br><br>          Defendant. | **Case No.:**<br><br>**COMPLAINT FOR:**<br><br>**(1)  BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591 and 1595;**<br><br>**(2)  VIOLATION OF DUTY TO REPORT CHILD SEXUAL ABUSE MATERIAL, 18 U.S.C. § 2258A;**<br><br>**(3)  RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY, 18 U.S.C. § 2252A;**<br><br>**(4)  CALIFORNIA PRODUCTS LIABILITY;** |

- 1 -
COMPLAINT

(5)  **NEGLIGENCE;**

(6)  **GROSS NEGLIGENCE;**

(7)  **NEGLIGENCE PER SE;**

(8)  **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;**

(9)  **DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS, CAL. CIV. CODE § 1708.85;**

(10)  **INTRUSION INTO PRIVATE AFFAIRS;**

(11)  **INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, SECTION I.**

**JURY TRIAL DEMANDED**

## COMPLAINT

This is a civil action for damages under the federal Trafficking Victims' Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591 and 1595, Failure to Report Child Sexual Abuse Material, 18 U.S.C. § 2258A, Receipt and Distribution of Child Pornography, 18 U.S.C. §§ 2252A, and related state law claims arising from Defendant's conduct when it knowingly hosted sexual exploitation material, including child sex abuse material (referred to in some instances as child pornography), and allowed human trafficking and the dissemination of child sexual abuse material to continue on its platform, therefore profiting from the harmful and exploitive material and the traffic it draws.

- 2 -
COMPLAINT

**INTRODUCTION**

1.      Sex trafficking is a form of slavery that illegally exists in this world—both throughout the United States and globally—and traffickers have been able to operate under cover of the law through online platforms. Likewise, those platforms have profited from the posting and dissemination of trafficking and the exploitative images and videos associated with it.

2.      The dissemination of child sexual abuse material (CSAM) has become a global scourge since the explosion of the internet, which allows those that seek to trade in this material to equally operate under cover of the law through online platforms.

3.      This lawsuit seeks to shine a light on how Twitter has enabled and profited from CSAM on its platform, choosing profits over people, money over the safety of children, and wealth at the expense of human freedom and human dignity.

4.      With over 330 million users, Twitter is one of the largest social media companies in the world. It is also one of the most prolific distributors of material depicting the sexual abuse and exploitation of children.

5.      Twitter is not a passive, inactive, intermediary in the distribution of this harmful material; rather, Twitter has adopted an active role in the dissemination and knowing promotion and distribution of this harmful material. Twitter's own policies, practices, business model, and technology architecture encourage and profit from the distribution of sexual exploitation material.

6.      Plaintiff John Doe was solicited and recruited for sex trafficking as a minor. After John Doe escaped from the manipulation, child sexual abuse material depicting John

Doe was disseminated on Twitter.  When Twitter was first alerted to this fact and John Doe's age, Twitter refused to remove the illegal material and instead continued to promote and profit from the sexual abuse of this child.

7.      In 1996, Congress passed the Communications Decency Act of 1996 ("CDA of 1996") which included Section 230 ("CDA 230").[1]  Congress intended the CDA to accomplish several things, including: (1) to promote the free exchange of information and ideas over the Internet and (2) to encourage voluntary monitoring for offensive or obscene material.[2]

8.      In 2018, in a direct response to online platforms knowingly allowing human trafficking to occur and both promoting and profiting from it, Congress passed a bill known as Fight Online Sex Trafficking Act (FOSTA) and Stop Enabling Sex Traffickers Act (SESTA) (collectively, "FOSTA/SESTA").  As part of this amendment to CDA 230, Congress stated "It is the sense of Congress that –

>       (1) section 230 of the Communications Act of 1934 (47 U.S.C. 230; commonly known as the 'Communications Decency Act of 1996') was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims;
>
>       (2) websites that promote and facilitate prostitution have been reckless in allowing the sale of sex trafficking victims and have done nothing to prevent the trafficking of children and victims of force, fraud, and coercion; and

---

[1] 47 U.S.C. § 230.

[2] *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003). *See also Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003).

- 4 -
COMPLAINT

(3) clarification of such section is warranted to ensure that such section does not provide such protection to such websites.[3]

9.      Defendant has benefited financially and/or received something of value from participation in one or more sex trafficking ventures by allowing Twitter to become a safe haven and a refuge for, "minor attracted people,"[4] human traffickers, and discussion of "child sexual exploitation as a phenomenon,"[5] to include trade and dissemination of sexual abuse material.

## JURISDICTION AND VENUE

10.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties have complete diversity, insofar as John Doe resides in Florida, and Defendant is a business with its main headquarters and operations in California.

11.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought under three federal statutes, to wit: 18 U.S.C. § 1595(a), 18 U.S.C. § 2258A, and 18 U.S.C. § 2252A.

12.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the other claims are related to the claims with original jurisdiction and form part of the same case or controversy.

――――――――――――――――

[3] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253

[4] Twitter, Inc., *Twitter Child Sexual Exploitation Policy of March 2019* (Attached as Exhibit A).

[5] *Id.*

- 5 -
COMPLAINT

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the Defendant business is headquartered in and operates out of San Francisco, which is located in this District.  Venue is also proper in this District under 28 U.S.C. § 1391(b)(3) because Defendant conducted substantial activities in this District and is subject to personal jurisdiction in this District.

## **PARTIES**

### A.  **Plaintiff**

14.     Jane Doe is the parent and legal guardian of Plaintiff John Doe, and in all capacities relevant to this case, is serving as his Next Friend in order to bring this action. In order to preserve the anonymity of her son, Jane Doe requests leave of Court to proceed in this action pseudonymously.

15.     Plaintiff John Doe is a resident of Florida and is a minor child, both at the date of filing this complaint and at all times relevant to the allegations contained within this complaint.

16.     John Doe seeks to proceed in this action pseudonymously because the subject matter of the allegations is of a sensitive and highly personal nature.

17.     Plaintiff John Doe is particularly vulnerable because of the trauma he has endured combined with the fact that he is a minor.

### B.  **Defendant**

18.     Defendant Twitter is a privately-owned, Delaware corporation with its principal office or place of business at 1355 Market Street, Suite 900, San Francisco, CA 94103.

19.     Defendant hosts the social media platform, www.twitter.com.

- 6 -
COMPLAINT

**FACTS**

**THE TWITTER PLATFORM, BUSINESS MODEL,
AND CONTENT MODERATION POLICIES AND PRACTICES**

20.     Twitter is one of the most popular social media platforms in the world, with over 330 million users who send an average of 500 million tweets each day.[6]

21.     Twitter is also a large and profitable company, with around 4,900 employees[7] and a current market capitalization of $40 billion.[8]

22.     Over 80% of Twitter's revenue comes from advertising.  In the third quarter of 2020, Twitter received an estimated $936 million in revenue, of which $808 million was from advertising services and $127 million of which was from data licensing.[9]

23.     Twitter enables users to communicate online in brief posts that are called "tweets." Tweets are limited to 280 characters. Twitter also allows photos, videos, GIFs, voice, and extra characters.

---

[6] Review 42, *Crucial Twitter Statistics, Facts and Predictions in 2020*, https://review42.com/twitter-statistics/ (last viewed on December 20, 2020).

[7] Twitter, Inc., Annual Report (Form 10-K) at 9 (Feb. 18, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001418091/ecd49924-133d-4b2d-ae29-2f066ac39863.pdf.

[8] Macrotrends, *Twitter Market Cap 2011-2020*, https://www.macrotrends.net/stocks/charts/TWTR/twitter/market-cap (Last visited Jan. 12, 2021).

[9] Twitter, Inc., Quarterly Report (Form 10-Q) at 14 (Oct. 30, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001418091/cb1d93d5-13d2-4d03-96b4-c90efe5ac5fc.pdf.

24.     When a Twitter user reposts another user's tweet it is known as "retweeting." Retweeting is a popular feature because it allows users to spread information at a high speed and on a broad scale.

25.     Twitter users may also send direct messages to other users, or follow other users on the platform.

26.     Twitter has been succinctly described as "a blend of instant messaging, blogging, and texting, but with concise content and a broad audience."[10]

27.     Twitter monetizes its platform by selling advertisements and data licensing.

28.     Twitter explains how it makes money from advertising services as follows:

> We generate most of our advertising revenue by selling our
> Promoted Products. Currently, our Promoted Products consist of
> the following:
> • Promoted Tweets. Promoted Tweets, which are labeled as
> "promoted," appear within a timeline, search results or profile
> pages just like an ordinary Tweet regardless of device, whether it
> be desktop or mobile. Using our proprietary algorithms and
> understanding of the interests of each account, we can deliver
> Promoted Tweets that are intended to be relevant to a particular
> account. We enable our advertisers to target an audience based on
> an individual account's interest graph. Our Promoted Tweets are
> pay-for-performance or pay-for-impression delivered advertising
> that are priced through an auction. Our Promoted Tweets include
> objective-based features that allow advertisers to pay only for the
> types of engagement selected by the advertisers, such as Tweet
> engagements (e.g., Retweets, replies and likes), website clicks,
> mobile application installs or engagements, obtaining new
> followers, or video views.

---

[10] Lifewire, *What is Twitter and How Does It Work?*, https://www.lifewire.com/what-exactly-is-twitter-2483331 (last visited on December 15, 2020).

• Promoted Accounts. Promoted Accounts, which are labeled as "promoted," provide a way for our advertisers to grow a community of people who are interested in their business, products or services. Our Promoted Accounts are pay-for-performance advertising priced through an auction.

• Promoted Trends. Promoted Trends, which are labeled as "promoted," appear at the top of the list of trending topics or timeline for an entire day in a particular country or on a global basis. We sell our Promoted Trends on a fixed-fee-per-day basis.

While the majority of the Promoted Products we sell to our advertisers are placed on Twitter, we also generate advertising revenue by placing advertising products that we sell to advertisers on third-party publishers' websites, applications or other offerings.[11]

29.    Twitter explains how it receives revenue from data licensing as follows:

We generate data licensing and other revenue by (i) offering data products and data licenses that allow our data partners to access, search and analyze historical and real-time data on our platform (which consists of public Tweets and their content), and (ii) providing mobile advertising exchange services through our MoPub exchange. Our data partners generally purchase licenses to access all or a portion of our data for a fixed period. We recognize data licensing revenue as our data partners consume and benefit from their use of the licensed data. In addition, we operate a mobile ad exchange and receive service fees from transactions completed on the exchange. Our mobile ad exchange enables buyers and sellers to purchase and sell advertising inventory and matches buyers and sellers. We have determined we are not the principal as it relates to the purchase and sale of advertising inventory in transactions between third-party buyers and sellers on the exchange. Therefore, we report revenue related to our ad exchange services on a net basis.[12]

---

[11] Twitter, Inc., *supra* note 9, at 35.

[12] *Id*. at 36.

- 9 -
COMPLAINT

30.     The data Twitter collects on its users includes IP addresses, browser types, operating systems, locations, mobile carriers, device information, search terms, and cookies.

31.     Twitter uses a web-based Application Program Interface ("API"), which defines the interaction between the software components that make up its platform. Here is Twitter's explanation of the function of APIs:

> To facilitate the fast global dissemination of Tweets to people around the world, we use technology like application programming interfaces (APIs) and embeds to make that information available to websites, apps, and others for their use - for example, displaying Tweets on a news website or analyzing what people say on Twitter. We generally make this content available in limited quantities for free and charge licensing fees for large-scale access.[13]

32.     Twitter's API must be accessed by making requests over the internet to services that Twitter hosts. With a web-based API such as Twitter's, an application sends an HTTP request, just like a web browser does. But instead of the response being delivered as a webpage for human understanding, it is returned in a format that applications can easily parse.

33.     Twitter offers access to its API in the marketplace. Ultimately, Twitter maintains control over which individuals and organizations it will grant access to its API.

34.     Having access to Twitter's API is tremendously advantageous for understanding the activity and usage patterns of Twitter's users.

_____

[13] Twitter, Inc., Privacy Policy at ¶ 1.2, https://twitter.com/en/privacy (Last accessed Jan. 12, 2021) (Attached as Exhibit B).

- 10 -
COMPLAINT

35.     Twitter moderates and otherwise controls third-party user content on its platforms.

36.     Twitter has a variety of mechanisms used to moderate content on the platform. Upon information and belief, Twitter uses software and algorithms to ensure tweets reach a smaller audience, block users from tweeting, hide tweets from users in a specific country, hide user profiles, convert users into read-only mode, temporarily lock users out of their account until account verification, and permanently suspend accounts. [14]

37.     Rather than act decisively by banning certain types of behavior and allowing others, Twitter's policy and engineering teams sometimes de-emphasize content and allow users to hide content that may be offensive but not explicitly against the platform's terms of service.

38.     Twitter's "hateful conduct policy" provides, in relevant part:

> You may not promote violence against or directly attack or threaten other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease. …

> We recognise that if people experience abuse on Twitter, it can jeopardize their ability to express themselves. Research has shown that some groups of people are disproportionately targeted with abuse online. This includes; women, people of color, lesbian, gay, bisexual, transgender, queer, intersex, asexual individuals, marginalized and historically underrepresented communities. For those who identity with multiple underrepresented groups, abuse may be more common, more severe in nature and have a higher impact on those targeted. …

---

[14] Online Censorship.Org, https://onlinecensorship.org/resources/how-to-appeal (last visited December 15, 2020).

> We are committed to combating abuse motivated by hatred,
> prejudice or intolerance, particularly abuse that seeks to silence the
> voices of those who have been historically marginalized. For this
> reason, we prohibit behavior that targets individuals with abuse
> based on protected category. [15]

39.     Twitter specifically notes a "zero tolerance policy against violent threats. Those

deemed to be sharing violent threats will face immediate and permanent suspension of their

account."[16]

40.     Twitter also bans wishing someone harm that does not rise to the level of a

specific violent threat: "We prohibit content that wishes, hopes, promotes, or expresses a

desire for death, serious and lasting bodily harm, or serious disease against an entire protected

category and/or individuals who may be members of that category."[17]

41.     And Twitter additionally bans slurs, epithets, and "sexist tropes, or other content

that degrades someone."

42.     Yet despite Twitter's stated policy, numerous women – especially, women's

rights advocates and sexual exploitation survivors – face harassment, doxxing, other abuse,

and threats of violence, including murder and rape, on Twitter's platform.[18]

---

[15] Twitter, Inc., *Twitter Hateful Conduct Policy of November 2019,*
https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy  (Attached as Exhibit C).

[16] *Id.*

[17] *Id.*

[18] *See, e.g.*, Amnesty International, *Toxic Twitter, A Toxic Place for Women*,
https://www.amnesty.org/en/latest/research/2018/03/online-violence-against-women-chapter-
1/ (last viewed on December 15, 2020).

43.     Twitter does not deploy its extensive content moderation capacities to prevent or significantly reduce this abuse, even though it violates Twitter's own policies on hateful conduct.  Rather, upon information and belief, Twitter selectively removes or prevents some content on its platform, and selectively chooses not to remove or prevent other content.

44.     On January 13, 2021, Jack Dorsey, the Chief Executive Officer of Twitter, Inc. tweeted the following:



In the same thread, or series of tweets, Mr. Dorsey added:



- 13 -
COMPLAINT

## TWITTER AND SEXUAL EXPLOITATION MATERIAL

45.    As described above, Twitter monetizes its platform through advertisements, sale of access to its API, and data collection.

46.    As long as content on Twitter's platform remains live, Twitter monetizes that content regardless of whether it is contrary to Twitter's own policies or promotes illegal conduct.

47.    Twitter thus profits from content on its platform that depicts rape, sex trafficking, child sexual abuse, and other illegal activity.

48.    As of November 2019, Twitter's "sensitive media" policy provides, in relevant part:

> We prohibit violent sexual conduct to prevent the normalization of sexual assault and non-consensual violence associated with sexual acts… You can share graphic violence and consensually produced adult content within your Tweets, provided that you mark this media as sensitive.[19]

49.    As of March 2019, Twitter avers that it had a "zero-tolerance child sexual exploitation policy," and forbids the following:

> Any content that depicts or promotes child sexual exploitation including, but not limited to:
>
> • visual depictions of a child engaging in sexually explicit or sexually suggestive acts;

_____

[19] Twitter, Inc., *Twitter Child Sensitive Media Policy of November 2019*, https://help.twitter.com/en/rules-and-policies/media-policy (Attached as Exhibit D).

- illustrated, computer-generated or other forms of realistic depictions of a human child in a sexually explicit context, or engaging in sexually explicit acts;
- sexualized commentaries about or directed at a known or unknown minor; and
- links to third-party sites that host child sexual exploitation material.

The following behaviors are also not permitted:
- sharing fantasies about or promoting engagement in child sexual exploitation;
- expressing a desire to obtain materials that feature child sexual exploitation;
- recruiting, advertising or expressing an interest in a commercial sex act involving a child, or in harboring and/or transporting a child for sexual purposes;
- sending sexually explicit media to a child;
- engaging or trying to engage a child in a sexually explicit conversation;
- trying to obtain sexually explicit media from a child or trying to engage a child in sexual activity through blackmail or other incentives; and
- identifying alleged victims of childhood sexual exploitation by name or image.[20]

50.    Twitter's March 2019 policy also asserts that it will usually permanently suspend accounts with child sexual abuse material, and report any such material to the National Center for Missing & Exploited Children:

In the majority of cases, the consequence for violating our child sexual exploitation policy is **immediate and permanent suspension**. In addition, violators will be prohibited from creating any new accounts in the future. Note: when we're made aware of content depicting or promoting child sexual exploitation, including links to third party sites where this content can be accessed, they

_____

[20] Twitter, Inc., *Twitter Child Sexual Exploitation Policy of March 2019* (Attached as Exhibit A).

- 15 -
COMPLAINT

will be removed without further notice and reported to the National Center for Missing & Exploited Children (NCMEC).[21]

51.     Yet Twitter makes it hard for users to report CSAM.  A recent report by the Canadian Centre for Child Protection® found that Twitter's platform made it "extremely difficult" to report CSAM, specifically:

- Twitter does not allow users to report a tweet for CSAM "through the easily-accessible report function"; one "must first locate the child sexual exploitation report form."

- Twitter does not allow people to "report an image or video sent within a DM on Twitter as CSAM. The child sexual exploitation report form will not accept the URL from an image within a DM."

- Twitter requires an email address for submitting CSAM reports.

- Even though tweets can be viewed without being logged in, Twitter requires a person to be logged in (and therefore have a Twitter account) in order to report CSAM.[22]

52.     Twitter received the lowest overall rating, compared to other platforms – including Bing, Facebook, Pornhub, and XVideos – by the Canadian Centre for Child Protection® for its CSAM reporting structure.

---

[21] *Id*. (emphasis added).

[22] Canadian Centre for Child Protection, "Reviewing Child Sexual Abuse Reporting Functions on Popular Platforms" at 15 (December 2020) https://protectchildren.ca/pdfs/C3P_ReviewingCSAMMaterialReporting_en.pdf.

53.     Twitter is also a signatory to the Five Country Ministerial's Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse.  Two of these Principles are as follows:

> Principle 1: Companies seek to prevent known child sexual abuse material from being made available to users or accessible on their platforms and services, take appropriate action under their terms of service, and report to appropriate authorities.

> Principle 2: Companies seek to identify and combat the dissemination of new child sexual abuse material via their platforms and services, take appropriate action under their terms of service, and report to appropriate authorities.[23]

54.     Notwithstanding its stated policy, Twitter permits large amounts of human trafficking and commercial sexual exploitation material on its platform, despite having both the ability to monitor it, and actual and/or constructive knowledge of its posting on the platform.

55.     Twitter also contains significant pornographic content, including illegal child sexual abuse content.

### *Child Pornography or Child Sexual Abuse Material*

56.     Twitter permits numerous profiles, posts, comments, and other content either advertising, soliciting, or depicting CSAM.

_____

[23] U.S. Dep't of Just., *Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse*, https://www.justice.gov/opa/press-release/file/1256061/download (last visited January 20, 2021).

57.     To take one prominent example, searching the hashtag #megalinks on Twitter

brings up users commenting on CSAM, offering to trade CSAM, and encouraging

communication by direct message where CSAM can be illegally distributed and exchanged.[24]

58.     A search of the hashtag #megalinks on Twitter also brings up promoted tweets

or advertisements, which are displayed intermixed between tweets that include the hashtag

and overwhelmingly pertain to CSAM. Here is an example of advertising sold by Twitter

placed in Twitter search results immediately adjacent to a use of the #megalinks hashtag:



59.     The hashtag #megalinks is one example of many well-known hashtag associated

with the dissemination of CSAM. Other hashtags that are commonly used to trade and

distribute CSAM include #s2r, which stands for "send to receive" and #dropboxlinktrade.

Here is an example of those hashtags used in a tweet soliciting "young" sexually graphic

images:

_____

[24] *See generally*, NBC News, *Child sexual abuse images and online exploitation surge during pandemic*, https://www.nbcnews.com/tech/tech-news/child-sexual-abuse-images-online-exploitation-surge-during-pandemic-n1190506 (noting the use of the #megalinks hashtag on Twitter)(last viewed December 15, 2020).



***Twitter's Search-Suggestion Feature***

60.     Twitter also includes a search-suggestion feature in its platform. This feature reads what the user enters into Twitter's search bar and makes suggestions for other searches that the user might consider.

61.     When a user searches for CSAM on the Twitter platform, the platform will make search suggestions designed to help the user find the illegal, CSAM.

62.     Twitter's software is designed so that a search for the #megalinks hashtag returns suggestions for other hashtags that are related to CSAM and users that use the #megalinks hashtag to discuss or distribute CSAM.

- 19 -
COMPLAINT



63.     Thus, while Twitter claims that it has a "zero-tolerance policy" for CSAM, its platform not only allows the distribution of CSAM, its platform architecture aids in the distribution of CSAM, and Twitter profits from it through advertisements.

**PLAINTIFF JOHN DOE**

64.     Plaintiff John Doe is presently a 17-year-old male child. He is currently a high school student.

65.     In 2017, when John Doe was 13-14 years old, he engaged in a dialog with someone he thought was an individual person on the communications application Snapchat. That person or persons represented to John Doe that they were a 16-year-old female and he believed that person went his school.

66.     After conversing, the person or persons ("Traffickers") interacting with John Doe exchanged nude photos on Snapchat.

67.     After he did so the correspondence changed to blackmail. Now the Traffickers wanted more sexually graphic pictures and videos of John Doe, and recruited, enticed, threatened and solicited John Doe by telling him that if he did not provide this material, then

- 20 -
COMPLAINT

the nude pictures of himself that he had already sent would be sent to his parents, coach, pastor, and others in his community.

68.     Initially John Doe complied with the Traffickers' demands. He was told to provide videos of himself performing sexual acts. He was also told to include another person in the videos, to which he complied.

69.     Because John Doe was (and still is) a minor and the pictures and videos he was threatened and coerced to produce included graphic sexual depictions of himself, including depictions of him engaging in sexual acts with another minor, the pictures and videos constitute CSAM under the law.

70.     The Traffickers also attempted to meet with him in person. Fortunately, an in person meeting never took place.

71.     Eventually John Doe resolved to break free from the control of the Traffickers and attempted to block them.

72.     The Traffickers messaged John Doe under another account, stating that he had made a big mistake in blocking them.

73.     Although afraid, John Doe continued to avoid the Traffickers and eventually the communications ceased.

74.     At some point in 2019, a compilation video of multiple CSAM videos sent by John Doe to the Traffickers surfaced on Twitter.  This compilation video was published by Twitter handles @StraightBross and @fitmalesblog.

- 21 -
COMPLAINT

75.     On December 25, 2019, Twitter was alerted by a concerned citizen that the user

account @StraightBross was posting CSAM. Here is an excerpt of that report that was sent to

Twitter:

| 12/25/2019 | Report a child sexual exploitation issue. | Help Center |

Re: CSE Report to Twitter 12-25-19 and Cybertipline Report

The following accounts were reported individually to Twitter via
https://help.twitter.com/forms/cse . They all Retweeted and/or Liked one or more of the
following child porn pictures or videos. This is OBVIOUS CHILD PORN!!! It's the reason
they were reported. Most of these pedophiles have shared much more than just the one link
but this should be sufficient evidence to warrant further investigation and referral to ICAC for
possible Child Porn Possession.

https://twitter.com/ StraightBross/status/1205557682654109696
https://twitter.com/ StraighterBross/status/1207298223926382596
https://twitter.com/ wanghuangdaily1/status/1179399976314650626
https://twitter.com/ crazyboombaya19/status/1189077730882543616
https://twitter.com/ Haektormai/status/1160787988260909057
https://twitter.com/ macsy21301613/status/1208584279799681024
https://twitter.com/ Jush69/status/1206597689007202306

These links are all GRAPHIC CHILD PORN!!!

Twitter's Child Sexual Exploitation Policy states "We have a zero-tolerance child sexual
exploitation policy on Twitter. Twitter has zero tolerance towards any material that features
or promotes child sexual exploitation, one of the most serious violations of the Twitter Rules.
This may include media, text, illustrated, or computer-generated images. Regardless of the
intent, viewing, sharing, or linking to child sexual exploitation material contributes to the re-
victimization of the depicted children. This also applies to content that may further contribute
to victimization of children through the promotion or glorification of child sexual exploitation.
For the purposes of this policy, a minor is any person under the age of 18."

These accounts are in CLEAR VIOLATION of this policy. There is ABSOLUTELY NO case
to be argued to the contrary. Use the link addresses provided here to verify that they have
retweeted and/or liked one or more of these links and thus, the media is displayed
somewhere on their timeline or under the users Likes.

Twitter's TOS also states "In the majority of cases, the consequence for violating our child
sexual exploitation policy is immediate and permanent suspension." These accounts qualify

76.     Twitter assigned the report claim number 0136403334. It did not take action

against the @StraightBross account.

77.     John Doe was 16 years old and attending high school in January of 2020.

78.     On or about January 19 or 20, 2020, John Doe became aware of the posts when he learned from his classmates that CSAM videos of him and another minor were on Twitter and that many students in the school had viewed them.

79.     Due to the circulation of these videos, he faced teasing, harassment, vicious bullying, and became suicidal.

80.     John Doe spoke to his parents about what was happening and sought their help.

81.     His mother, Jane Doe, took immediate action to have the CSAM removed. She contacted school officials, local law enforcement, and reached out directly to Twitter.

82.     John Doe attempted to contact the Twitter users who had posted the CSAM video depicting him, informed them that the video was of him, that he was a minor in the video, and asked them to remove the posts. One of these Twitter users removed the post, however, the other ignored John Doe's request and kept the video live.

83.     On January 21, 2020, John Doe made a complaint to Twitter about the CSAM depicting himself that was posted by the Twitter user @fitmalesblog. He received a response from Twitter, which assigned his complaint the case number 0139512883.

84.      Twitter's response to John Doe's report on January 21, 2020, read:

Hello,

Thanks for reaching out. As the next step of our review, we need to confirm your identity that you're the person in the photo you've reported.

Please use this link to send us a copy of your valid government-issued photo ID, like a driver's license, passport, or school ID.

This helps to prevent false or unauthorized reports. Your information will remain private and be deleted once we've reviewed it.

- 23 -
COMPLAINT

We appreciate your help.

Thanks,

Twitter

85.    John Doe submitted a picture of his drivers' license to Twitter proving that he is

a minor. He emailed back the same day saying:

> • Yes these tweets are videos of me and a friend taken from 3 years
> ago. these videos were taken from harassment and being
> threatened. It is now spreading around school and we need them
> taken down as we are both minors and we have a police report for
> the situation.
> https://twitter.com/fitmalesblog/status/1213751523097886720
>
> https://twitter.com/straightbross/status/1214673411689140224?s=2
> 1
>
> • These are spreading around school and is causing many issues.
> the police and parents are both aware of it.
> • These videos were taken 3 years ago but are now being
> resurfaced. It started about a week ago going around school.
> • Me, [Name Redacted – John Doe] and also [Name Redacted] are
> in these videos.

86.    On January 22, 2020 Jane Doe made two complaints to Twitter about the CSAM

depicting her son, one for each link of which she was aware. The first complaint was filed

against the Twitter user account @StraightBross. The second complaint was filed against the

Twitter user account @fitmalesblog.

87.    Twitter responded to both complaints with an automatic message. The first

automated-message, which was for CSAM posted by user @StraightBross, assigned the case

number 0139729198 and read as follows:

- 24 -
COMPLAINT

Hello,

Thanks for bringing this to our attention. We don't tolerate child sexual exploitation on Twitter. Through our partnership with the National Center for Missing and Exploited Children (NCMEC), we ensure that appropriate law enforcement agencies are notified when such content is located. We'll review the content you've reported as soon as possible. Please be aware that removed content may remain visible to you until you've refreshed your browser or cleared your browser history or cache.

If you have further information on the content you've reported, you can send it to NCMEC directly through this link: https://report.cybertip.org/. If you are seeing the content on other websites potentially hosted outside the United States, you can report it to the International Association of Internet Hotlines website here: http://www.inhope.org.

For more information on Twitter's policy on child sexual exploitation, please visit: https://support.twitter.com/articles/37370.

Thank you,

Twitter

88.     The second automated-message, which was for CSAM posted by user @fitmalesblog, was assigned the case number 0139730675 and included the same message as the auto message to the first complaint.

89.     John Doe and Jane Doe also reported the situation to a local law enforcement agency and provided Twitter with the report number for that agency.

90.     On January 26, 2020, Jane Doe followed up with email to Twitter after a week of inactivity and lack of response by Twitter that read as follows:

Hello there my name is [Jane Doe]
i'm [John Doe's] mother. I sent two complains in
case #0139730675
case #0139729198

- 25 -
COMPLAINT

without responses from you. He had been a victim in a sex abuse
situation. No one gave permissions for these [videos] to be on your
site. You are allowing child pornography to be in your web site for
over a week now after my compliant on Jan 22nd 2020. The police
case [redacted Police Report case number and jurisdiction]. We
want them removed immediately.
[Jane Doe]

91.    On January 28, 2020, Twitter sent John Doe an email that read as follows:

Hello,

Thanks for reaching out. We've reviewed the content, and didn't
find a violation of our policies, so no action will be taken at this
time.

If you believe there's a potential copyright infringement,
please start a new report.

If the content is hosted on a third-party website, you'll need to
contact that website's support team to report it.

Your safety is the most important thing, and if you believe you are
in danger, we encourage you to contact your local authorities.
Taking screenshots of the Tweets is often a good idea, and we have
more information available for law enforcement about our policies.

Thanks,

Twitter

92.    Here is a thread in which users commented on the CSAM depicting John Doe:



- 26 -
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



93.    If Twitter had reviewed the material as they claimed in their response to John

Doe, they would have seen the comments above, which clearly acknowledge that the material

was depicting minors.

94.    On January 28, 2020, John Doe responded to Twitter's message as follows:

What do you mean you don't see a problem? We both are minors
right now and were minors at the time these videos were taken. We
both were 13 years of age. We were baited, harassed, and
threatened to take these videos that are now being posted without
our permission. We did not authorize these videos AT ALL and
they need to be taken down. We have a case number with the [Law

Enforcement Agency] for these videos and this incident. Please remove this video ASAP and any videos linked to this one. There is a problem with these videos and they are going against my legal rights and they are again at (sic) the law to be on the internet. (capitalized emphasis in original)

95.     Twitter ignored John Doe's final plea and the illegal videos depicting CSAM remained live on Twitter, accruing over 167,000 views and 2,223 retweets. Each viewing is a harmful act to John Doe.



96.     Twitter still did not report the CSAM to NCMEC.

97.     Eventually, through a mutual contact, Jane Doe was able to connect with an agent of the U.S. Department of Homeland Security. The federal agent also initiated contact with Twitter and at the request of the U.S. federal government, the CSAM was finally removed from Twitter on or about January 30, 2020.

98.     Only after this take-down demand from a federal agent did Twitter suspend the user accounts that were distributing the CSAM and report the CSAM to the National Center on Missing and Exploited Children ("NCMEC"). This is directly in contrast to what their automated reply message and User Agreement state they will do to protect children.

99.     One of the Twitter user accounts that posted the CSAM depicting John Doe-- @StraightBross--had already been reported to Twitter for posting CSAM.

100.    On information and belief, Twitter did not block IP addresses, or take other measures, allowing the person or persons behind the @StraightBross account to continue

- 28 -
COMPLAINT

distributing sexually-exploitive material on the Twitter platform from other user accounts. As of the filing of this Complaint, @StraightBross has opened a new account @BrossStraight in which he identifies himself as "Straight Bross."

101.     Defendant's conduct has caused John Doe serious and long-term, if not permanent harm, including, without limitation, psychological, financial, and reputational harm.

## CLAIMS ALLEGED

## COUNT I

**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591 AND 1595**

102.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

103.     Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

104.     Defendant's conduct was in or affected interstate and/or foreign commerce.

105.     Defendant  knowingly benefited from participation in what it knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

106.     Twitter monetizes content on its platform through advertisements and data collection.

107.     Defendant knowingly benefited from, and/or received something of value for its participation in the venture, in which Defendant knew, should have known, or was in reckless disregard of the fact that John Doe was engaged in commercial sexual acts while under the age of 18 years old.

108.     Twitter employees and/or agents had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of a minor child.

109.     The Defendant knowingly benefited financially from the sex-trafficking venture and the exploitation of John Doe.

110.     Twitter's conduct has caused Jane Doe serious harm including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

111.     Twitter's conduct has caused John Doe serious harm including, without limitation, physical, psychological, financial, and reputational harm.

112.     Under 47 U.S.C. § 230(e)(5)(A), Twitter's knowing violations of 18 U.S.C. §§ 1591 and 1595 are not eligible for any immunity granted by 47 U.S.C. § 230.

## <u>COUNT II</u>

### VIOLATION OF DUTY TO REPORT CHILD SEXUAL ABUSE MATERIAL, 18 U.S.C. § 2258A

- 30 -
COMPLAINT

113.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

114.     As an "electronic communication service provider," Twitter is a "provider" under 18 U.S.C. §§ 2258E(6) and 2258A.

115.     Defendant obtained actual knowledge that there was online sexual exploitation material of children being published on its platform, which was an apparent violation of 18 U.S.C. § 2252.

116.     Twitter knowingly engaged in intentional misconduct by ignoring clear notice of the presence of actual online sexual exploitation material of children. 18 U.S.C. § 2258B(b)(1).

117.     Twitter's conduct constitutes a failure to act with reckless disregard to a substantial risk of causing physical injury without legal justification. 18 U.S.C. § 2258B(b)(2)(B).

118.     Twitter's conduct constitutes a failure to act for a purpose unrelated to the performance of any responsibility or function under 18 U.S.C. §§ 2258B(b)(2)(C).

119.     Twitter's conduct has caused John Doe serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT III

## RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY, 18 U.S.C. § 2252A

120.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

121.    Twitter knowingly and intentionally offers, operates, maintains, and advertises on its platform. Twitter also knowingly and intentionally encourages traffic on its platform and encourages advertisers to purchase advertisement space on its platform.

122.    Twitter knowingly received and distributed child pornography depicting John Doe on its platform.

123.    Defendant's receipt and distribution of child pornography occurred in or affected interstate or foreign commerce.

124.    As a proximate result of Twitter's violation of 18 U.S.C. § 2252A John Doe suffered serious harm including, without limitation, physical, psychological, financial, and reputational harm.

125.    Twitter's conduct was malicious, oppressive, or in reckless disregard of John Doe's rights and he is entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

126.    Twitter's liability for knowingly violating 18 U.S.C. § 2252A is not limited by 47 U.S.C. § 230 because nothing in Section 230 "shall be construed to impair the enforcement of [] chapter [] 110 (relating to sexual exploitation of children) [] or any other Federal criminal statute." 47 U.S.C. § 230 (e)(1).

## COUNT IV

## CALIFORNIA PRODUCTS LIABILITY

127.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

- 32 -
COMPLAINT

128.    Twitter created its platform, API, and related products, and distributes them and has placed these products into commerce.

129.    Twitter is designed to enable its users to disseminate information very quickly to large numbers of people.

130.    Twitter is designed so that a user's search for the #megalinks hashtag returns suggestions for other hashtags that are related to CSAM.

131.    Twitter is not designed to enable its users to easily report CSAM, nor is it designed so that CSAM is immediately blocked pending review when reported.

132.    On information and belief, Twitter does not consistently deploy IP blocking, or other measures, to prevent users suspended by Twitter for disseminating CSAM from opening new accounts under different names.

133.    While third parties posted CSAM of John Doe on Twitter's platform, due to the structure of the platform, including Twitter's capacity to monitor, block, or delete content on the platform, the product in question never left Twitter's possession.

134.    After the third parties posted CSAM of John Doe on Twitter's platform, Twitter refused to remove the CSAM when John Doe notified them, allowing and monetizing 167,000 views and 2,220 retweets of the CSAM depicting John Doe.

135.    John Doe was additionally harmed by having 167,000 people view his abuse and 2,220 retweet it, compounding the views, consistent with how Twitter designed its platform to function.

136.    Twitter's products are defective because they do not perform as safely as an ordinary consumer would expect them to perform when used in an intended or reasonably foreseeable way.

137.    Twitter is a product about which consumers should be able to have reasonable minimum safety expectations; namely, that a mainstream, general social media platform will not serve as a mass distribution channel for CSAM.

138.    Having insufficient features to prevent the Twitter platform from being used as a mass distribution channel for CSAM is a defect in the design of the Twitter platform.

139.    Plaintiff was harmed by these defects in Twitter's products and the products failure to perform safely is a substantial factor in causing the harm to Plaintiff.

## COUNT V

## NEGLIGENCE

140.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

141.    The possession and distribution of child pornography (i.e. CSAM) is illegal under both federal law and the laws of California.[25] Additionally, CSAM is illegal in every other state in the United States as well as across the world where Twitter does business.

142.    The CSAM depicting Plaintiff John Doe was a violation of Twitter's own policies and terms of service.

_____

[25] *See generally*, 18 U.S.C. § 2252A *and* Cal. Penal Code § 311.1 (West 2020).

143.    Twitter had a duty to protect John Doe. Twitter had actual knowledge that Plaintiff John Doe was a minor, and that CSAM depicting him and another minor was being distributed on its platform, in violation of both the law and Twitter's own policies.

144.    Twitter breached that duty and continued to disseminate the unlawful CSAM causing it to be viewed over 167,000 times and retweeted 2,220 times for additional views.

145.    The distribution of the CSAM depicting John Doe was monetized by Twitter and it receive financial benefit from its distribution on its platform.

146.    Twitter's broad distribution of the CSAM depicting John Doe has caused him severe harm, including physical, emotional, reputational, and financial harm.

## COUNT VI

## GROSS NEGLIGENCE

147.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

148.    Twitter had a duty to protect John Doe. Twitter had actual knowledge that Plaintiff John Doe was a minor, and that CSAM depicting him and another minor was being distributed on its platform, in violation of both the law and Twitter's own policies.

149.    Twitter breached that duty and continued to disseminate and profit from the unlawful CSAM, causing it to be viewed over 167,000 times and retweeted 2,223 times for additional views.

150.    By permitting the CSAM depicting Plaintiff John Doe to remain on its platform after it was notified of the materials presence by members of the public, by John Doe, and by Jane Doe, Twitter exhibited a lack of any care.

151. Twitter's conduct is an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to others.

152. As a direct result of Twitter's conduct, John Doe has suffered severe harm, including physical, emotional, reputational, and financial harm.

## COUNT VII

### NEGLIGENCE PER SE

153. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

154. Twitter's conduct with respect to Plaintiff John Doe violated numerous laws including but not limited to 18 U.S.C. §§ 1591 and 1595 (benefiting from a sex trafficking venture), 18 U.S.C. § 2258A (failing to report known child sexual abuse material), 18 U.S.C. § 2552A (knowingly distributing child pornography), Cal. Civ. Code § 1708.85 (intentionally distributing non-consensually shared pornography), and Cal. Penal Code § 311.1 (possessing child pornography).

155. Twitter's violation of numerous laws was a substantial factor in bringing about harm to Plaintiff John Doe and as a consequence Twitter is negligent.

## COUNT VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

156. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

- 36 -
COMPLAINT

157.     Twitter's conduct in refusing or failing to remove the CSAM depicting Plaintiff John Doe was outrageous, due to the extreme illegality and abusive nature of the content, and Twitter's large distribution potential.

158.     Severe emotional distress is typical for sexual abuse and human trafficking victims, and it is magnified when depictions of the abuse are made public, especially to large numbers of people.

159.     Twitter acted with reckless disregard of the probability that John Doe would suffer emotional distress from Twitter's continued distribution of sexual abuse material depicting John Doe.

160.     Plaintiff John Doe suffered severe emotional distress and mental anguish due the public depiction of his abuse, which proliferated as Twitter refused to remove it.

161.     Twitter's conduct was both the cause and a substantial factor in causing John Doe's severe emotional distress and mental anguish.

## COUNT IX

**DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS,
CAL. CIV. CODE § 1708.85**

162.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

163.     By refusing to remove or block the photographic images and video depicting him after Plaintiff John Doe notified Twitter that he was a minor, Twitter intentionally distributed on its online platform photographic images and video of Plaintiff John Doe.

164.   Plaintiff John Doe did not consent to the online distribution of the photographic images and video depicting him.

165.   Twitter knew that John Doe had a reasonable expectation that the photographic images and video depicting him would remain private.

166.   The photographic images and video exposed an intimate body part of John Doe.

167.   Plaintiff John Doe was harmed by Twitter's knowing and intentional distribution of the photographic images and video and Twitter's conduct was a substantial factor in cause the harm to John Doe.

## <u>COUNT X</u>

## **INTRUSION INTO PRIVATE AFFAIRS**

168.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

169.   Twitter knew that John Doe had a reasonable expectation that the photographic images and video depicting him would remain private.

170.   Twitter intentionally intruded into John Doe's reasonable expectation of privacy by continuing to distribute the photographic images and video depicting him after Plaintiff notified Twitter that he was a minor and the material had been posted on its platform without his consent.

171.   Twitter's intentional intrusion into John Doe's reasonable expectation of privacy would be highly offensive to a reasonable person.

172.    Plaintiff John Doe was harmed by Twitter's knowing and intentional distribution of the photographic images and video and Twitter's conduct was a substantial factor in cause the harm to John Doe.

## COUNT XI

### INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, SECTION I

173.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

174.    Plaintiff had a legally protected right to privacy under California law.  Article I, Section I of the California Constitution states: "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

175.    Twitter knew that John Doe had a reasonable expectation that the photographic images and video depicting him would remain private.

176.    Twitter intentionally intruded into John Doe's reasonable expectation of privacy by continuing to distribute the photographic images and video depicting him after Plaintiff notified Twitter that he was a minor and the material had been posted on its platform without his consent.

177.    Twitter's intentional intrusion into John Doe's reasonable expectation of privacy would be highly offensive to a reasonable person and was a violation of Plaintiff's right to privacy as set forth in Article I, Section I of the California Constitution.

Plaintiff John Doe was harmed by Twitter's knowing and intentional distribution of the photographic images and video and Twitter's conduct was a substantial factor in cause the harm to John Doe.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor, and against the Defendant, and grant the following relief:

A. That the Court grant preliminary and permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts and practices described herein;

B. That the Court award Plaintiff compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

C. Requiring restitution and disgorgement of all profits and unjust enrichment obtained as a result of Defendant's unlawful conduct;

D. That the Court award punitive or exemplary damages in an amount to be determined at trial;

E. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F. That the Court award statutory damages and penalties;

G. That the Court award pre- and post-judgment interest at the maximum legal rate;

H. Other equitable relief as the Court may deem just and proper; and

I.    That the Court retain jurisdiction of this matter to ensure all forms of relief it

deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 20, 2021                    By:      /s/ *Paul A. Matiasic*
                                                   Paul A. Matiasic
                                                   Hannah E. Mohr
                                                   **THE MATIASIC FIRM, P.C.**
                                                   4 Embarcadero Center, Suite 1400
                                                   San Francisco, CA 94111
                                                   Telephone: (415) 675-1089
                                                   *matiasic@mjlawoffice.com*

                                                   Lisa D. Haba*
                                                   Adam A. Haba*
                                                   **THE HABA LAW FIRM, P.A.**
                                                   1220 Commerce Park Dr., Suite 207
                                                   Longwood, FL 32779
                                                   Telephone: (844) 422-2529
                                                   *lisahaba@habalaw.com*
                                                   *adamhaba@habalaw.com*

                                                   Benjamin W. Bull*
                                                   Peter A. Gentala*
                                                   Dani Bianculli Pinter*
                                                   Christen M. Price*
                                                   **NATIONAL CENTER ON SEXUAL**
                                                   **EXPLOITATION**
                                                   440 First Street, NW, Suite 840
                                                   Washington, D.C. 20001
                                                   Telephone: (352) 266-7989
                                                   *lawcenter@ncose.com*

                                                   *Attorneys for Plaintiff*

                                                   **Pro Hac Vice Application Pending*

- 41 -
COMPLAINT

# Exhibit A

https://help.twitter.com/en/rules-and-policies/sexual-exploitation-policy      [Go]

257 captures
13 Feb 2018 - 8 Dec 2020

APR **JUN** AUG
◄ **07** ►
**2018** 2019 **2020**
▼ About this capture

 Help Center

# Child sexual exploitation policy

## Overview

**March 2019**

**We have a zero-tolerance child sexual exploitation policy on Twitter.**

Twitter has **zero tolerance towards any material that features or promotes child sexual exploitation**, one of the most serious violations of the Twitter Rules (https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/rules-and-policies/twitter-rules). This may include media, text, illustrated, or computer-generated images. Regardless of the intent, viewing, sharing, or linking to child sexual exploitation material contributes to the re-victimization of the depicted children. This also applies to content that may further contribute to victimization of children through the promotion or glorification of child sexual exploitation. For the purposes of this policy, a minor is any person under the age of 18.

## What is in violation of this policy?

Any content that depicts or promotes child sexual exploitation including, but not limited to:

- visual depictions of a child engaging in sexually explicit or sexually suggestive acts;

- illustrated, computer-generated or other forms of realistic depictions of a human child in a sexually explicit context, or engaging in sexually explicit acts;

- sexualized commentaries about or directed at a known or unknown minor; and

- links to third-party sites that host child sexual exploitation material.

The following behaviors are also not permitted:

- sharing fantasies about or promoting engagement in child sexual exploitation;

- expressing a desire to obtain materials that feature child sexual exploitation;

- recruiting, advertising or expressing an interest in a commercial sex act involving a child, or in harboring and/or transporting a child for sexual purposes;

https://help.twitter.com/en/rules-and-policies/sexual-exploitation-policy   Go

**257 captures**
13 Feb 2018 - 8 Dec 2020

APR  JUN  AUG
◀ 07 ▶
2018 2019 2020

▼ About this capture

- engaging or trying to engage a child in a sexually explicit conversation;

- trying to obtain sexually explicit media from a child or trying to engage a child in sexual activity through blackmail or other incentives; and

- identifying alleged victims of childhood sexual exploitation by name or image.

## What is not a violation of this policy?

Discussions related to child sexual exploitation as a phenomenon or attraction towards minors are permitted, provided they don't promote or glorify child sexual exploitation **in any way**. Artistic depictions of nude minors in a non-sexualized context or setting may be permitted in a limited number of scenarios e.g., works by internationally renowned artists that feature minors.

## Who can report violations of this policy?

Anyone can report potential violations of this policy, whether they have a Twitter account or not.

## How can I report violations of this policy?

If you think you've found a Twitter account distributing or promoting child sexual exploitation, you can report it via our child sexual exploitation form (https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/forms/cse). Provide the username and links to all relevant Tweets that led you to believe the account should be reviewed.

## What happens if you violate this policy?

In the majority of cases, the consequence for violating our child sexual exploitation policy is **immediate and permanent suspension**. In addition, violators will be prohibited from creating any new accounts in the future. Note: when we're made aware of content depicting or promoting child sexual exploitation, including links to third party sites where this content can be accessed, they will be removed without further notice and reported to the National Center for Missing & Exploited Children (NCMEC).

In a limited number of situations, where we haven't identified any malicious intent, we will require you to remove this content. We will also temporarily lock you out of your account before you can Tweet again. Further violations will lead to your account being permanently suspended. If you believe that your account was suspended in error, you can submit an appeal. (https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/forms/general?subtopic=suspended)

## Additional resources

https://help.twitter.com/en/rules-and-policies/sexual-exploitation-policy     Go     **APR   JUN   AUG**

**257 captures**                                             ◀  **07**  ▶
13 Feb 2018 - 8 Dec 2020                                    **2018**  2019  **2020**
                                                                    ▼ About this capture

([https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/rules-and-policies/enforcement-options](https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/rules-and-policies/enforcement-options)) and our approach to policy development and enforcement ([https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/rules-and-policies/enforcement-philosophy](https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://help.twitter.com/rules-and-policies/enforcement-philosophy)).

If you've found content elsewhere on the internet that is distributing or promoting child sexual exploitation, you should file a report with NCMEC ([https://help.twitter.comhttps://web.archive.org/web/20190607172211/http://www.missingkids.org/gethelpnow/cybertipline](https://help.twitter.comhttps://web.archive.org/web/20190607172211/http://www.missingkids.org/gethelpnow/cybertipline)), or with your local law enforcement. If you believe the content is hosted on a website outside of the United States, you can report it on the International Association of Internet Hotlines website ([https://help.twitter.comhttps://web.archive.org/web/20190607172211/http://www.inhope.org/gns/our-members.aspx](https://help.twitter.comhttps://web.archive.org/web/20190607172211/http://www.inhope.org/gns/our-members.aspx)).

We partner with multiple organisations whose work is dedicated to fighting child sexual exploitation around the world. Please see the full list of our child protection partners ([https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://about.twitter.com/safety/safety-partners.html#child-protection-partners](https://help.twitter.comhttps://web.archive.org/web/20190607172211/https://about.twitter.com/safety/safety-partners.html#child-protection-partners)).

# Exhibit B



# Twitter
# Privacy Policy



**We believe you should always know what data we collect from you and how we use it, and that you should have meaningful control over both. We want to empower you to make the best decisions about the information that you share with us.**

**That's the basic purpose of this Privacy Policy.**



# You should read this policy in full, but here are a few key things we hope you take away from it:

- Twitter is public and Tweets are immediately viewable and searchable by anyone around the world. We give you non-public ways to communicate on Twitter too, through protected Tweets and Direct Messages. You can also use Twitter under a pseudonym if you prefer not to use your name.

- When you use Twitter, even if you're just looking at Tweets, we receive some personal information from you like the type of device you're using and your IP address. You can choose to share additional information with us like your email address, phone number, address book contacts, and a public profile. We use this information for things like keeping your account secure and showing you more relevant Tweets, people to follow, events, and ads.

- We give you control through your settings to limit the data we collect from you and how we use it, and to control things like account security, marketing preferences, apps that can access your account, and address book contacts you've uploaded to Twitter. You can also download information you have shared on Twitter.

- In addition to information you share with us, we use your Tweets, content you've read, Liked, or Retweeted, and other information to determine what topics you're interested in, your age, the languages you speak, and other signals to show you more relevant content. We give you transparency into that information, and you can modify or correct it at any time.

- If you have questions about this policy, how we collect or process your personal data, or anything else related to our privacy practices, we want to hear from you. You can contact us at any time.



# 1 Information You Share With Us

**We require certain information to provide our services to you. For example, you must have an account in order to upload or share content on Twitter. When you choose to share the information below with us, we collect and use it to operate our services.**

## 1.1 Basic Account Information

You don't have to create an account to use some of our service features, such as searching and viewing public Twitter profiles or watching a broadcast on Periscope's website. If you do choose to create an account, you must provide us with some personal data so that we can provide our services to you. On Twitter this includes a display name (for example, "Twitter Moments"), a username (for example, @TwitterMoments), a password, and an email address or phone number. Your display name and username are always public, but you can use either your real name or a pseudonym. You can also create and manage multiple Twitter accounts[1], for example to express different parts of your identity.

---

[1] **The many sides of you.** Let your imagination run free. Explore your interests with a number of different identities.



## 1.2 Public Information

Most activity on Twitter is public, including your profile information[2], your time zone and language, when you created your account, and your Tweets and certain information about your Tweets like the date, time, and application and version of Twitter you Tweeted from. You also may choose to publish your location in your Tweets or your Twitter profile. The lists you create, people you follow and who follow you, and Tweets you Like or Retweet are also public. If you like, Retweet, reply, or otherwise publicly engage with an ad on our services, that advertiser might thereby learn information about you associated with the ad with which you engaged such as characteristics of the audience the ad was intended to reach. Periscope broadcasts you create, click on, or otherwise engage with, either on Periscope or on Twitter, are public along with when you took those actions. So are your hearts, comments, the number of hearts you've received, which accounts you are a Superfan of, and whether you watched a broadcast live or on replay. Any hearts, comments, or other content you contribute to another account's broadcast will remain part of that broadcast for as long as it remains on Periscope. Information posted about you by other people who use our services may also be public. For example, other people may tag you in a photo[3] (if your settings allow) or mention you in a Tweet.

You are responsible for your Tweets and other information you provide through our services, and you should think carefully about what you make public, especially if it is sensitive information. If you update your public information on Twitter, such as by deleting a Tweet or deactivating your account, we will reflect your updated content on Twitter.com, Twitter for iOS, and Twitter for Android.

By publicly posting content when you Tweet, you are directing us to disclose that information as broadly as possible, including through our APIs, and directing those accessing the information through our APIs to do the same. To facilitate the fast global dissemination of Tweets to people around the world, we use technology like application programming interfaces (APIs) and embeds to make that information available to websites, apps, and others for their use - for example, displaying Tweets on a news website or analyzing what people say on Twitter. We generally make this content available in limited quantities for free and charge licensing fees for large-scale access. We have standard terms that govern how this data can be used, and a compliance program to enforce these terms. But these individuals and companies are not affiliated with Twitter, and their offerings may not reflect updates you make on Twitter. For more information about how we make public data on Twitter available to the world, visit https://developer.twitter.com.

---

[2] **Hello, World!** Your profile information is displayed under your photo and username on your profile page.

[3] **Keep a low profile.** Friends want to tag you in a photo? Lucky you. If you're not into that sort of thing, you can always change your settings.



# 1.3 Contact Information and Address Books

We use your contact information, such as your email address or phone number, to authenticate your account and keep it - and our services - secure, and to help prevent spam, fraud, and abuse. We also use contact information to enable certain account features (for example, for login verification or Twitter via SMS), and to send you information about our services, and to personalize our services, including ads. If you provide us with your phone number, you agree to receive text messages from Twitter to that number as your country's laws allow. Twitter also uses your contact information to market to you as your country's laws allow, and to help others find your account if your settings permit, including through third-party services and client applications. You can use your settings for email and mobile notifications to control notifications you receive from Twitter. You can also unsubscribe from a notification by following the instructions contained within the notification or here.

You can choose to upload and sync your address book on Twitter so that we can help you find and connect with people you know and help others find and connect with you. We also use this information to better recommend content to you and others.

You can sign up for Periscope with an account from another service like Twitter, Google, or Facebook, or connect your Periscope account to these other services. If you do, we will use information from that service, including your email address, friends, or contacts list, to recommend other accounts or content to you or to recommend your account or content to others. You can control whether your Periscope account is discoverable by email through your Periscope settings.

If you email us, we will keep the content of your message, your email address, and your contact information to respond to your request.

# 1.4 Direct Messages and Non-Public Communications

We provide certain features that let you communicate more privately or control who sees your content. For example, you can use Direct Messages to have non-public conversations on Twitter, protect your Tweets, or host private broadcasts on Periscope. When you communicate with others by sending or receiving Direct Messages, we will store and process your communications and information related to them. This includes link scanning for malicious content, link shortening to http://t.co URLs, detection of spam[4], abuse and prohibited images, and use of reported issues. We also use information about whom you have communicated with and when (but not the content of those communications) to better understand the use of our services, to protect the safety and integrity of our platform, and to

---

[4] **Spam stinks.** We scan your Direct Messages to try and prevent spam for you and our service.



show more relevant content. We share the content of your Direct Messages with the people you've sent them to; we do not use them to serve you ads. Note that if you interact in a way that would ordinarily be public with Twitter content shared with you via Direct Message, for instance by liking a Tweet, those interactions will be public. When you use features like Direct Messages to communicate, remember that recipients have their own copy[5] of your communications on Twitter - even if you delete your copy of those messages from your account - which they may duplicate, store, or re-share.

## 1.5 Payment Information

You may provide us with payment information[6], including your credit or debit card number, card expiration date, CVV code, and billing address, in order to purchase advertising or other offerings provided as part of our services.

## 1.6 How You Control the Information You Share with Us

Your Privacy and safety settings let you decide:

- Whether your Tweets are publicly available on Twitter

- Whether others can tag you in a photo

- Whether you will be able to receive Direct Messages from anyone on Twitter or just your followers

- Whether others can find you based on your email or phone number

- Whether you upload your address book to Twitter for storage and use

- When and where you may see sensitive content on Twitter

- Whether you want to block or mute other Twitter accounts

---

[5] **Just like email.** Only send Direct Messages to people you trust. Remember, even though someone can't Retweet your Direct Messages, they still have a copy of your message.

[6] **Approved by you.** We use your payment information to process transactions you've approved and for fraud detection.



# 2 Additional Information We Receive About You

**We receive certain information when you use our services or other websites or mobile applications that include our content, and from third parties including advertisers. Like the information you share with us, we use the data below to operate our services.**

## 2.1 Location Information

We require information about your signup and current location, which we get from signals such as your IP address or device settings, to securely and reliably set up and maintain your account and to provide our services to you.

Subject to your settings, we may collect, use, and store additional information about your location - such as your current precise position or places where you've previously used Twitter - to operate or personalize our services including with more relevant content like local trends, stories, ads, and suggestions for people to follow. Learn more about Twitter's use of location here, and how to set your Twitter location preferences here. Learn more about how to share your location in Periscope broadcasts here.



## 2.2 Links

In order to operate our services, we keep track of how you interact with links across our services. This includes links in emails we send you and links in Tweets that appear on other websites or mobile applications.

If you click on an external link or ad on our services, that advertiser or website operator might figure out that you came from Twitter or Periscope, along with other information associated with the ad you clicked such as characteristics of the audience it was intended to reach. They may also collect other personal data from you, such as cookie identifiers or your IP address.

## 2.3 Cookies

A cookie is a small piece of data that is stored on your computer or mobile device. Like many websites, we use cookies and similar technologies to collect additional website usage data and to operate our services. Cookies are not required for many parts of our services such as searching and looking at public profiles. Although most web browsers automatically accept cookies, many browsers' settings can be set to decline cookies or alert you when a website is attempting to place a cookie on your computer[7]. However, some of our services may not function properly if you disable cookies. When your browser or device allows it, we use both session cookies and persistent cookies to better understand how you interact with our services, to monitor aggregate usage patterns, and to personalize and otherwise operate our services such as by providing account security, personalizing the content we show you including ads, and remembering your language preferences. We do not support the Do Not Track browser option. You can learn more about how we use cookies and similar technologies [here](here).

## 2.4 Log Data

We receive information when you view content on or otherwise interact with our services, which we refer to as "Log Data," even if you have not created an account. For example, when you visit our websites, sign into our services, interact with our email notifications, use your account to authenticate to a third-party service, or visit a third-party service that includes Twitter content, we may receive information about you. This Log Data includes information such as your IP address, browser type, operating system, the referring web page, pages visited, location, your mobile carrier, device information (including device and application IDs), search terms (including those not submitted as queries), and cookie information. We also receive Log Data when you click on, view, or interact with links on our services, including when you install another application through Twitter. We use Log Data to operate our services and ensure their secure, reliable, and robust performance. For example, we use Log Data to protect the security of accounts and to determine what content is popular on our services. We also use this data to improve the content we show you, including ads and to improve the effectiveness of our own marketing.

---

[7] **Not hungry?** You can change your cookie settings in your web browser



We use information you provide to us and data we receive, including Log Data and data from third parties, to make inferences like what topics you may be interested in, how old you are, and what languages you speak. This helps us better promote and design our services for you and personalize the content we show you, including ads.

## 2.5 Twitter for Web Data

When you view our content on third-party websites that integrate Twitter content such as embedded timelines or Tweet buttons, we may receive Log Data that includes the web page you visited. We use this information to better understand the use of our services, to protect the safety and integrity of our platform, and to show more relevant content, including ads. We do not associate this web browsing history with your name, email address, phone number, or username, and we delete, obfuscate, or aggregate it after no longer than 30 days. We do not collect this data from browsers that we believe to be located in the European Union or EFTA States.

## 2.6 Advertisers and Other Ad Partners

Advertising revenue allows us to support and improve our services. We use the information described in this Privacy Policy to help make our advertising more relevant to you, to measure its effectiveness, and to help recognize your devices to serve you ads on and off of Twitter. Our ad partners and affiliates share information with us such as browser cookie IDs, mobile device IDs, hashed email addresses, demographic or interest data, and content viewed or actions taken on a website or app. Some of our ad partners, particularly our advertisers, also enable us to collect similar information directly from their website or app by integrating our advertising technology. Information shared by ad partners and affiliates or collected by Twitter from the websites and apps of ad partners and affiliates may be combined with the other information you share with Twitter and that Twitter receives about you described elsewhere in our Privacy Policy.

Twitter adheres to the Digital Advertising Alliance Self-Regulatory Principles for Online Behavioral Advertising (also referred to as "interest-based advertising") and respects the DAA's consumer choice tool for you to opt out of interest-based advertising at https://optout.aboutads.info. In addition, our ads policies prohibit advertisers from targeting ads based on categories that we consider sensitive or are prohibited by law, such as race, religion, politics, sex life, or health. Learn more about your privacy options for interest-based ads here and about how ads work on our services here.

If you are an advertiser or a prospective advertiser, we process your personal data to help offer and provide our advertising services. You can update your data in your Twitter Ads dashboard or by contacting us directly as described in this Privacy Policy.



## 2.7 Developers

If you access our APIs or developer portal, we process your personal data to help provide our services. You can update your data by contacting us directly as described in this Privacy Policy.

## 2.8 Other Third Parties and Affiliates

We may receive information about you from third parties who are not our ad partners, such as others on Twitter, partners who help us evaluate the safety and quality of content on our platform, our corporate affiliates, and other services you link to your Twitter account.

You may choose to connect your Twitter account to accounts on another service, and that other service may send us information about your account on that service. We use the information we receive to provide you features like cross-posting or cross-service authentication, and to operate our services. For integrations that Twitter formally supports, you may revoke this permission at any time from your application settings; for other integrations, please visit the other service you have connected to Twitter.

## 2.9 Personalizing Based On Your Inferred Identity

When you log into Twitter on a browser or device, we will associate that browser or device with your account for purposes such as authentication, security, and personalization. Subject to your settings, we may also associate your account with browsers or devices other than those you use to log into Twitter (or associate your logged-out device or browser with other browsers or devices). When you provide other information to Twitter, including an email address, we associate that information with your Twitter account. Subject to your settings, we may also use this information in order to infer other information about your identity, for example by associating your account with hashes of email addresses that share common components with the email address you have provided to Twitter. We do this to operate and personalize our services. For example, if you visit websites with sports content on your laptop, we may show you sports-related ads on Twitter for Android and, if the email address associated with your account shares components with another email address, such as shared first name, last name, or initials, we may later match advertisements to you from advertisers that were trying to reach email addresses containing those components.



# 2.10 How You Control Additional Information We Receive

Your Twitter Personalization and data settings let you decide:

- Whether we show you interest-based ads on and off Twitter
- How we personalize based on your inferred identity
- Whether we collect and use your precise location
- Whether we personalize your experience based on where you've been
- Whether we keep track of the websites where you see Twitter content

You can use Your Twitter data to review:

- Advertisers who have included you in tailored audiences to serve you ads
- Demographic and interest data about your account from our ads partners
- Information that Twitter has inferred about you such as your age range, gender, languages, and interests

We also provide a version of these tools on Twitter if you don't have a Twitter account, or if you're logged out of your account. This lets you see the data and settings for the logged out browser or device you are using, separate from any Twitter account that uses that browser or device. On Periscope, you can control whether we personalize your experience based on your watch history through your settings.

Please see here for more details of how we collect and use your data.



# 3 Information We Share and Disclose

**As noted above, Twitter is designed to broadly and instantly disseminate information you share publicly through our services. In the limited circumstances where we disclose your private personal data, we do so subject to your control, because it's important for operating our services, or because it's required by law.**

## 3.1 Sharing You Control

We share or disclose your personal data with your consent or at your direction, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business. If you've shared information like Direct Messages or protected Tweets with someone else who accesses Twitter through a third-party service, keep in mind that the information may be shared with the third-party service.

Subject to your settings, we also provide certain third parties with personal data to help us offer or operate our services. You can learn more about these partnerships in our Help Center, and you can control whether Twitter shares your personal data in this way by using the "Allow additional information sharing with business partners" option in your Personalization and Data settings. (This setting does not control sharing described elsewhere in our Privacy Policy, such as when we share data with our service providers or through partnerships other than as described in our Help Center)



## 3.2 Service Providers

We engage service providers to perform functions and provide services for us in the United States, Ireland, and other countries. For example, we use a variety of third-party services to help operate our services, such as hosting our various blogs and wikis, and to help us understand the use of our services, such as Google Analytics. We may share your private personal data with such service providers subject to obligations consistent with this Privacy Policy and any other appropriate confidentiality and security measures, and on the condition that the third parties use your private personal data only on our behalf and pursuant to our instructions (service providers may use other non-personal data for their own benefit). We share your payment information with payment services providers to process payments; prevent, detect, and investigate fraud or other prohibited activities; facilitate dispute resolution such as chargebacks or refunds; and for other purposes associated with the acceptance of credit and debit cards.

## 3.3 Law, Harm, and the Public Interest

Notwithstanding anything to the contrary in this Privacy Policy or controls we may otherwise offer to you, we may preserve, use, share, or disclose your personal data or other safety data if we believe that it is reasonably necessary to comply with a law, regulation, legal process, or governmental request; to protect the safety of any person; to protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services, or to explain why we have removed content or accounts from our services[8]; to address fraud, security, or technical issues; or to protect our rights or property or the rights or property of those who use our services. However, nothing in this Privacy Policy is intended to limit any legal defenses or objections that you may have to a third party's, including a government's, request to disclose your personal data.

## 3.4 Affiliates and Change of Ownership

In the event that we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your personal data may be sold or transferred as part of that transaction. This Privacy Policy will apply to your personal data as transferred to the new entity. We may also disclose personal data about you to our corporate affiliates in order to help operate our services and our affiliates' services, including the delivery of ads.

## 3.5 Non-Personal Information

We share or disclose non-personal data, such as aggregated information like the total number of times people engaged with a Tweet, demographics, the number of people who clicked on a particular link or voted on a poll in a Tweet (even if only one did), the topics that people are Tweeting about in a particular location, some inferred interests, or reports to advertisers about how many people saw or clicked on their ads.

---

[8] **Transparency matters.** We remove content from our services when it violates our rules, like if it glorifies violence. When that content is gone, we want you to know.



# 4 Managing Your Personal Information With Us

You control the personal data you share with us. You can access or rectify this data at any time. You can also deactivate your account. We also provide you tools to object, restrict, or withdraw consent where applicable for the use of data you have provided to Twitter. And we make the data you shared through our services portable and provide easy ways for you to contact us. Please note, to help protect your privacy and maintain security, we take steps to verify your identity before granting you access to your personal information or complying with deletion, portability, or other related requests.



## 4.1 Accessing or Rectifying Your Personal Data

If you have registered an account on Twitter, we provide you with tools and account settings to access, correct, delete, or modify the personal data you provided to us and associated with your account. You can download certain account information, including your Tweets, by following the instructions here. On Periscope, you can request correction, deletion, or modification of your personal data, and download your account information, by following the instructions here. You can learn more about the interests we have inferred about you in Your Twitter Data and request access to additional information here. To submit a request related to access, modification or deletion of your information, you may also contact us as specified in the How To Contact Us section of our Privacy Policy (Additional Information or Assistance).

## 4.2 Deletion

We keep Log Data for a maximum of 18 months. If you follow the instructions here (or for Periscope here), your account will be deactivated. When deactivated, your Twitter account, including your display name, username, and public profile, will no longer be viewable on Twitter.com, Twitter for iOS, and Twitter for Android. For up to 30 days after deactivation it is still possible to restore your Twitter account if it was accidentally or wrongfully deactivated.

Keep in mind that search engines and other third parties may still retain copies of your public information, like your profile information and public Tweets, even after you have deleted the information from our services or deactivated your account. Learn more here.

## 4.3 Object, Restrict, or Withdraw Consent

When you are logged into your Twitter account, you can manage your privacy settings and other account features here at any time. It may take a short amount of time for privacy settings to be fully reflected throughout our systems.



## 4.4 Portability

Twitter provides you a means to download the information you have shared through our services by following the steps here. Periscope provides you a means to download the information you have shared through our services by following the steps here.

## 4.5 Additional Information or Assistance

Thoughts or questions about this Privacy Policy? Please let us know by contacting us here or writing to us at the appropriate address below.

If you live in the United States or any other country outside of the European Union, EFTA States, or the United Kingdom, the data controller responsible for your personal data is Twitter, Inc. with an address of:

Twitter, Inc.
Attn: Privacy Policy Inquiry
1355 Market Street, Suite 900
San Francisco, CA 94103

If you live in the European Union, EFTA States, or the United Kingdom, the data controller is Twitter International Company, with an address of:

Twitter International Company
Attn: Data Protection Officer
One Cumberland Place, Fenian Street
Dublin 2, D02 AX07 IRELAND

You can confidentially contact Twitter's Data Protection Officer here. If you wish to raise a concern about our use of your information (and without prejudice to any other rights you may have), you have the right to do so with your local supervisory authority or Twitter International Company's lead supervisory authority, the Irish Data Protection Commission. You can find their contact details here.



# 5 Children and Our Services

Our services are not directed to children, and you may not use our services if you are under the age of 13. You must also be old enough to consent to the processing of your personal data in your country (in some countries we may allow your parent or guardian to do so on your behalf). You must be at least 16 years of age to use Periscope.

# 6 Our Global Operations and Privacy Shield

To bring you our services, we operate globally. Where the laws of your country allow you to do so, you authorize us to transfer, store, and use your data in the United States, Ireland, and any other country where we operate. In some of the countries to which we transfer personal data, the privacy and data protection laws and rules regarding when government authorities may access data may vary from those of your country. Learn more about our global operations and data transfer here.

When we transfer personal data outside of the European Union, EFTA States or the United Kingdom we ensure an adequate level of protection for the rights of data subjects based on the adequacy of the receiving country's data protection laws, contractual obligations placed on the recipient of the data (model clauses may be requested by inquiry as described below), or EU-US and Swiss-US Privacy Shield principles.

Twitter, Inc. complies with the EU-US and Swiss-US Privacy Shield principles (the "Principles") regarding the collection, use, sharing, and retention of personal data from the European Union, EFTA States, and the United Kingdom as described in our EU-US Privacy Shield certification and Swiss-US Privacy Shield certification.



If you have a Privacy Shield-related complaint, please contact us here. As part of our participation in Privacy Shield, if you have a dispute with us about our adherence to the Principles, we will seek to resolve it through our internal complaint resolution process, alternatively through the independent dispute resolution body JAMS, and under certain conditions, through the Privacy Shield arbitration process.

Privacy Shield participants are subject to the investigatory and enforcement powers of the US Federal Trade Commission and other authorized statutory bodies. Under certain circumstances, participants may be liable for the transfer of personal data from the EU, EFTA States, or the United Kingdom to third parties outside the EU, EFTA States, and the United Kingdom. Learn more about the EU-US Privacy Shield and Swiss-US Privacy Shield here.

# 7 Changes to This Privacy Policy

We may revise this Privacy Policy from time to time. The most current version of the policy will govern our processing of your personal data and will always be at https://twitter.com/privacy. If we make a change to this policy that, in our sole discretion, is material, we will notify you within Twitter.com, Twitter for iOS, or Twitter for Android, via a Twitter owned and operated Twitter account (for example @TwitterSupport), or by sending an email to the email address associated with your account. By continuing to access or use the Services after those changes become effective, you agree[9] to be bound by the revised Privacy Policy.

**Effective:** June 18, 2020

---

[9] **You're in control.** Even as Twitter evolves, you can always change your privacy settings. The power is yours to choose what you share in the world.

# Exhibit C

 **Help Center**

# Hateful conduct policy

**Hateful conduct:** (https://help.twitter.comhttps://help.twitter.com/rules-and-policies/twitter-rules#hateful-conduct)
(https://help.twitter.comhttps://help.twitter.com/rules-and-policies/twitter-rules#hateful-conduct) You may not promote violence against or directly attack or threaten other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease. We also do not allow accounts whose primary purpose is inciting harm towards others on the basis of these categories.

**Hateful imagery and display names:** You may not use hateful images or symbols in your profile image or profile header. You also may not use your username, display name, or profile bio to engage in abusive behavior, such as targeted harassment or expressing hate towards a person, group, or protected category.

## Rationale

Twitter's mission is to give everyone the power to create and share ideas and information, and to express their opinions and beliefs without barriers. Free expression is a human right – we believe that everyone has a voice, and the right to use it. Our role is to serve the public conversation, which requires representation of a diverse range of perspectives.

We recognise that if people experience abuse on Twitter, it can jeopardize their ability to express themselves. Research has shown that some groups of people are disproportionately targeted with abuse online. This includes; women, people of color, lesbian, gay, bisexual, transgender, queer, intersex, asexual individuals, marginalized and historically underrepresented communities. For those who identify with multiple underrepresented groups, abuse may be more common, more severe in nature and more harmful.

We are committed to combating abuse motivated by hatred, prejudice or intolerance, particularly abuse that seeks to silence the voices of those who have been historically marginalized. For this reason, we prohibit behavior that targets individuals with abuse based on protected category.

Feedback

If you see something on Twitter that you believe violates our hateful conduct policy, please report it to us (https://help.twitter.comhttps://help.twitter.com/forms/abusiveuser).

# When this applies

We will review and take action against reports of accounts targeting an individual or group of people with any of the following behavior, whether within Tweets or Direct Messages.

**Violent threats**
We prohibit content that makes violent threats against an identifiable target. Violent threats are declarative statements of intent to inflict injuries that would result in serious and lasting bodily harm, where an individual could die or be significantly injured, e.g., "I will kill you".

**Note:** we have a zero tolerance policy against violent threats. Those deemed to be sharing violent threats will face immediate and permanent suspension of their account.

**Wishing, hoping or calling for serious harm on a person or group of people**
We prohibit content that wishes, hopes, promotes, incites,  or expresses a desire for death, serious and lasting bodily harm, or serious disease against an entire protected category and/or individuals who may be members of that category. This includes, but is not limited to:

- Hoping that an entire protected category and/or individuals who may be members of that category dies as a result of a serious disease, e.g., "I hope all [nationality] get COVID and die."

- Wishing for someone to fall victim to a serious accident, e.g., "I wish that you would get run over by a car next time you run your mouth."

- Saying that a group of individuals deserve serious physical injury, e.g., "If this group of protesters don't shut up, they deserve to be shot."

- Encouraging others to commit violence against an individual or a group based on their perceived membership in a protected category, e.g., "I'm in the mood to punch a [racial slur], who's with me?"

**References to mass murder, violent events, or specific means of violence where protected groups have been the primary targets or victims**
We prohibit targeting individuals with content that references forms of violence or violent events where a protected category was the primary target or victims, where the intent is to harass. This includes, but is not limited to sending someone:

- media that depicts victims of the Holocaust;

- media that depicts lynchings.

Feedback

**Incitement against protected categories**

We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories. This includes content intended:

- to incite fear or spread fearful stereotypes about a protected category, including asserting that members of a protected category are more likely to take part in dangerous or illegal activities, e.g., "all [religious group] are terrorists".

- to incite others to harass members of a protected category on or off platform, e.g., "I'm sick of these [religious group] thinking they are better than us, if any of you see someone wearing a [religious symbol of the religious group], grab it off them and post pics!"

- to incite discrimination in the form of denial of support to the economic enterprise of an individual or group because of their perceived membership in a protected category, e.g., "If you go to a [religious group] store, you are supporting terrorists, let's stop giving our money to these [religious slur]". This may not include content intended as political in nature, such as political commentary or content relating to boycotts or protests.

Note that content intended to incite violence againsr a protected category is prohibited under **Wishing, hoping, or calling for serious harm on a person or groups of people.**

We prohibit targeting individuals and groups with content intended to incite fear or spread fearful stereotypes about a protected category, including asserting that members of a protected category are more likely to take part in dangerous or illegal activities, e.g., "all [religious group] are terrorists".

**Repeated and/or non-consensual slurs, epithets, racist and sexist tropes, or other content that degrades someone**

We prohibit targeting individuals with repeated slurs, tropes or other content that intends to dehumanize, degrade or reinforce negative or harmful stereotypes about a protected category. This includes targeted misgendering or deadnaming of transgender individuals.

We also prohibit the dehumanization of a group of people based on their religion, caste, age, disability, serious disease, national origin, race, or ethnicity.

**Hateful imagery**

We consider hateful imagery to be logos, symbols, or images whose purpose is to promote hostility and malice against others based on their race, religion, disability, sexual orientation, gender identity or ethnicity/national origin. Some examples of hateful imagery include, but are not limited to:

- symbols historically associated with hate groups, e.g., the Nazi swastika;

Feedback

- images depicting others as less than human, or altered to include hateful symbols, e.g., altering images of individuals to include animalistic features; or

- images altered to include hateful symbols or references to a mass murder that targeted a protected category, e.g., manipulating images of individuals to include yellow Star of David badges, in reference to the Holocaust.

Media depicting hateful imagery is not permitted within live video, account bio, profile or header images. All other instances must be marked as sensitive media. Additionally, sending an individual unsolicited hateful imagery is a violation of our abusive behavior policy (https://help.twitter.comhttps://help.twitter.com/rules-and-policies/abusive-behavior).

## Do I need to be the target of this content for it to be a violation of the Twitter Rules?

Some Tweets may appear to be hateful when viewed in isolation, but may not be when viewed in the context of a larger conversation. For example, members of a protected category may refer to each other using terms that are typically considered as slurs. When used consensually, the intent behind these terms is not abusive, but a means to reclaim terms that were historically used to demean individuals.

When we review this type of content, it may not be clear whether the intention is to abuse an individual on the basis of their protected status, or if it is part of a consensual conversation. To help our teams understand the context, we sometimes need to hear directly from the person being targeted to ensure that we have the information needed prior to taking any enforcement action.

**Note:** individuals do not need to be a member of a specific protected category for us to take action. We will never ask people to prove or disprove membership in any protected category and we will not investigate this information.

## Consequences

Under this policy, we take action against behavior that targets individuals or an entire protected category with hateful conduct, as described above. Targeting can happen in a number of ways, for example, mentions, including a photo of an individual, referring to someone by their full name, etc.

When determining the penalty for violating this policy, we consider a number of factors including, but not limited to the severity of the violation and an individual's previous record of rule violations. For example, we may ask someone to remove the violating content and

serve a period of time in read-only mode before they can Tweet again. Subsequent violations will lead to longer read-only periods and may eventually result in permanent account suspension. If an account is engaging primarily in abusive behavior, or is deemed to have shared a violent threat, we will permanently suspend the account upon initial review.

Learn more about our range of enforcement options (https://help.twitter.comhttps://help.twitter.com/rules-and-policies/enforcement-options).

If someone believes their account was suspended in error, they can submit an appeal (https://help.twitter.comhttps://help.twitter.com/forms/general?subtopic=suspended).

# Was this article helpful?*

 

Submit

Feedback

# Exhibit D

 **Help Center**

# Sensitive media policy

## Overview

**November 2019**

**You may not post media that is excessively gory or share violent or adult content within live video or in profile header, or List banner images. Media depicting sexual violence and/or assault is also not permitted.**

People use Twitter to show what's happening in the world, often sharing images and videos as part of the conversation. Sometimes, this media can depict sensitive topics, including violent and adult content. We recognize that some people may not want to be exposed to sensitive content, which is why we balance allowing people to share this type of media with helping people who want to avoid it to do so.

For this reason, you can't include violent, hateful, or adult content within areas that are highly visible on Twitter, including in live video, profile, header, or List banner images. If you share this content on Twitter, you need to mark your account as sensitive (https://help.twitter.comhttps://help.twitter.com/rules-and-policies/media-settings). Doing so places images and videos behind an interstitial (or warning message), that needs to be acknowledged before your media can be viewed. Using this feature means that people who don't want to see sensitive media can avoid it, or make an informed decision before they choose to view it.

Under this policy, there are also some types of sensitive media content that we don't allow at all, because they have the potential to normalize violence and cause distress to those who view them.

We group sensitive media content into the following categories:

**Graphic violence**
Graphic violence is any media that depicts death, violence, medical procedures, or serious physical injury in graphic detail. Some examples include, but are not limited to, depictions of:

- violent crimes or accidents;

- physical fights;

- physical child abuse;

- bodily fluids including blood, feces, semen etc.;

- serious physical harm, including visible wounds; and

- severely injured or mutilated animals.

**Note:** exceptions may be made for documentary or educational content.

### Adult content
Adult content is any consensually produced and distributed media that is pornographic or intended to cause sexual arousal. Some examples include, but are not limited to, depictions of:

- full or partial nudity, including close-ups of genitals, buttocks, or breasts (excluding content related to breastfeeding);

- simulated sexual acts; and

- sexual intercourse or other sexual acts – this also applies to cartoons, hentai, or anime involving humans or depictions of animals with human-like features.

**Note:** exceptions may be made for artistic, medical, health, or educational content.

For content that was created or distributed without the consent of those featured, please refer to our non-consensual nudity policy (https://help.twitter.comhttps://help.twitter.com/rules-and-policies/intimate-media).

### Violent sexual conduct
Violent sexual conduct is any media that depicts violence, whether real or simulated, in association with sexual acts. Some examples include, but are not limited to, depictions of:

- rape and other forms of violent sexual assault, or sexual acts that occur without the consent of participants, including a simulated lack of consent; and

- sexualized violence – inflicting physical harm on an individual within an intimate setting, where it is not immediately obvious if those involved have consented to take part.

### Gratuitous gore
Gratuitous gore is any media that depicts excessively graphic or gruesome content related to death, violence or severe physical harm, or violent content that is shared for sadistic purposes. Some examples include, but are not limited to, depictions of:

- dismembered or mutilated humans;

- charred or burned human remains;

- exposed internal organs or bones; and

- animal torture or killing. **Note:** exceptions may be made for religious sacrifice, food preparation or processing, and hunting.

**Hateful imagery**

Hateful imagery is any logo, symbol, or image that has the intention to promote hostility against people on the basis of race, religious affiliation, disability, sexual orientation, gender/gender identity or ethnicity/national origin. Some examples of hateful imagery include, but are not limited to:

- symbols historically associated with hate groups, e.g., the Nazi swastika;

- images depicting others as less than human, or altered to include hateful symbols, e.g., altering images of individuals to include animalistic features; or

- images altered to include hateful symbols or references to a mass murder that targeted a protected category, e.g., manipulating images of individuals to include yellow Star of David badges, in reference to the Holocaust.

# What is in violation of this policy?

Our aim is to limit exposure to sensitive images and videos and to prevent the sharing of potentially disturbing types of sensitive media. For this reason, we differentiate our enforcement approach depending on the type of media that has been shared and where it has been shared.

**Graphic violence, adult content, and hateful imagery**

- you can't target people with unsolicited images or videos that contain graphic violence, adult content, or hateful imagery; and

- you can't include graphic violence, adult content, or hateful imagery within live video, profile, header, or List banner images.

**Violent sexual conduct and gratuitous gore**

We prohibit violent sexual conduct to prevent the normalization of sexual assault and non-consensual violence associated with sexual acts. We prohibit gratuitous gore content because research has shown that repeated exposure to violent content online may

Feedback

negatively impact an individual's wellbeing. For these reasons, you can't share images or videos that depict violent sexual conduct or gratuitous gore on Twitter. **Note:** very limited exceptions may be made for gory media associated with newsworthy events.

# What is not a violation of this policy?

You can share graphic violence and consensually produced adult content within your Tweets, provided that you mark this media as sensitive. We may also allow limited sharing of hateful imagery, provided that it is not used to promote a terrorist or violent extremist group, that you mark this content as sensitive and don't target it at an individual (via mentioning someone or including an identifiable individual within such images).

To mark your media as sensitive, navigate to your safety settings (https://help.twitter.comhttps://twitter.com/settings/safety) and select the **Mark media you Tweet as containing material that may be sensitive** option. If you don't mark your media as sensitive, we will do so manually if your content is reported for review.

# Who can report violations of this policy?

Anyone can report potential violations of this policy via our dedicated reporting flows.

# How can I report violations of this policy?

### In-app

You can report this content for review in-app as follows:

1. Select **Report Tweet** from the ⁰⁰⁰ icon.

2. Select **It displays a sensitive photo or video**.

3. Select the relevant option depending on what you are reporting.

### Desktop

You can report this content for review via desktop as follows:

1. Select **Report Tweet** from the ⁰⁰⁰ icon.

2. Select **It displays a sensitive photo or video**.

3. Select the relevant option depending on what you are reporting.

### To report Lists:

Feedback

1. Navigate to the List you'd like to report.

2. Click or tap the **More** icon.

3. Select **Report List**.

# What happens if you violate this policy?

The enforcement action we take depends on the type of media you have shared, and where you have shared it.

**Graphic violence, adult content, and hateful imagery**

- live video and profile images – the first time you violate this policy, we will require you to remove this content. We will also temporarily lock you out of your account before you can Tweet again. If you violate this policy again after your first warning, your account will be permanently suspended;

- sending someone unsolicited violent or adult content – if you target someone with sensitive media in a clearly abusive or unsolicited way, we'll require you to remove it under our abusive behavior policy (https://help.twitter.comhttps://help.twitter.com/rules-and-policies/abusive-behavior); and

- accounts dedicated to posting sensitive media – your account may be permanently suspended if the majority of your activity on Twitter is sharing sensitive media.

If you believe that your account was suspended in error, you can submit an appeal (https://help.twitter.comhttps://help.twitter.com/forms/general?subtopic=suspended).

**Violent sexual conduct and gratuitous gore**

- if you share media that depicts violent sexual conduct or gratuitous gore anywhere on Twitter, we will require you to remove this content.

- if your account is dedicated to posting this type of content, your account will be immediately permanently suspended.

If you believe that your account was suspended in error, you can submit an appeal (https://help.twitter.comhttps://help.twitter.com/forms/general?subtopic=suspended).

# Additional resources

Feedback

Learn more about our range of enforcement options
([https://help.twitter.comhttps://help.twitter.com/rules-and-policies/enforcement-options](https://help.twitter.comhttps://help.twitter.com/rules-and-policies/enforcement-options))
and our approach to policy development and enforcement
([https://help.twitter.comhttps://help.twitter.com/rules-and-policies/enforcement-philosophy](https://help.twitter.comhttps://help.twitter.com/rules-and-policies/enforcement-philosophy)).

Adult content that was created or shared without the consent of those depicted is reviewed
under our non-consensual nudity policy
([https://help.twitter.comhttps://help.twitter.com/rules-and-policies/intimate-media](https://help.twitter.comhttps://help.twitter.com/rules-and-policies/intimate-media)).

# Was this article helpful?*

  

Submit

Feedback

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on January 20, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email address denoted on the Electronic Mail Notice List.

   I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

   Executed this 20th day of January, 2021.


        /s/ *Hannah E. Mohr*
       Paul A. Matiasic
       Hannah E. Mohr
       **THE MATIASIC FIRM, P.C.**
       4 Embarcadero Center, Suite 1400
       San Francisco, CA 94111
       Telephone: (415) 675-1089
       *matiasic@mjlawoffice.com*