**NATIONAL CENTER ON SEXUAL EXPLOITATION**
Benjamin W. Bull*
Peter A. Gentala*
Danielle Bianculli Pinter*
Christen M. Price*
1201 F ST NW, Suite 200
Washington, D.C., 20004
Telephone: (202) 393-7245
lawcenter@ncose.com

**THE HABA LAW FIRM, P.A.**
Lisa D. Haba*
Adam A. Haba*
1220 Commerce Park Dr., Suite 207
Longwood, FL 32779
Telephone: (844) 422-2529
lisahaba@habalaw.com
adamhaba@habalaw.com

**THE MATIASIC FIRM, P.C.**
Paul A. Matiasic (SBN 226448)
Hannah E. Mohr (SBN 294193)
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
matiasic@mjlawoffice.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE #1 AND JOHN DOE #2,<br><br>Plaintiffs,<br><br>vs.<br><br>TWITTER, INC.,<br><br>Defendant. | Case No. 3:21-cv-00485-JCS<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(a)(1) and 1595;**<br><br>**(2) BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2) and 1595;**<br><br>**(3) VIOLATION OF DUTY TO REPORT CHILD SEXUAL ABUSE MATERIAL, 18 U.S.C. §§ 2258A and 2258B;**<br><br>**(4) CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO SEX TRAFFICKING AND RECEIPT AND** |

**DISTRIBUTION OF CHILD PORNOGRAPHY, 18 U.S.C. §§ 1591, 2252A and 2255;**

**(5) CALIFORNIA PRODUCTS LIABILITY;**

**(6) NEGLIGENCE;**

**(7) GROSS NEGLIGENCE;**

**(8) NEGLIGENCE PER SE;**

**(9) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;**

**(10) DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS, CAL. CIV. CODE § 1708.85;**

**(11) INTRUSION INTO PRIVATE AFFAIRS;**

**(12) INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, SECTION I; and**

**(13) VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200**

**JURY TRIAL DEMANDED**

## COMPLAINT

This is a civil action for damages under the federal Trafficking Victims' Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591 and 1595, Failure to Report Child Sexual Abuse Material, 18 U.S.C. §§ 2258A, 2258B, Civil Remedy for Personal Injuries related to Sex Trafficking and Receipt and Distribution of Child Pornography, 18 U.S.C. §§ 1591, 2252A, and 2255, and related state law claims arising from Defendant's conduct when it knowingly hosted

sexual exploitation material, including child sex abuse material (referred to in some instances as child pornography), and allowed human trafficking and the dissemination of child sexual abuse material to continue on its platform, therefore profiting and receiving value from the harmful and exploitive material and the traffic it draws.

## **INTRODUCTION**

1.      Sex trafficking is a form of slavery that illegally exists in this world—both throughout the United States and globally—and traffickers have been able to operate under cover of the law through online platforms. Likewise, those platforms have profited from the posting and dissemination of trafficking and the exploitative images and videos associated with it.

2.      The dissemination of child sexual abuse material ("CSAM") has become a global scourge since the explosion of the internet, which allows those that seek to trade in this material to equally operate under cover of the law through online platforms.

3.      This lawsuit seeks to shine a light on how Twitter has enabled and profited from CSAM on its platform, choosing profits over people, money over the safety of children, and wealth at the expense of human freedom and human dignity.

4.      With over 330 million users, Twitter is one of the largest social media companies in the world. It is also one of the most prolific distributors of material depicting the sexual abuse and exploitation of children.

5.      Twitter is not a passive, inactive, intermediary in the distribution of this harmful material; rather, Twitter has adopted an active role in the dissemination and knowing promotion and distribution of this harmful material. Twitter's own policies, practices, business model, and technology architecture encourage and profit from the distribution of sexual exploitation material.

6.      Plaintiffs John Doe #1 and John Doe #2 were solicited and recruited for sex trafficking as minors.  After they escaped from the manipulation, child sexual abuse material depicting them was disseminated on Twitter.  When Twitter was first alerted to this fact and the ages of the children, Twitter refused to remove the illegal material and instead continued to promote and profit from the sexual abuse of the children.

7.      In 1996, Congress passed the Communications Decency Act of 1996 ("CDA of 1996") which included Section 230 ("CDA 230").[1]  Congress intended the CDA to accomplish several things, including: (1) to promote the free exchange of information and ideas over the Internet and (2) to encourage voluntary monitoring for offensive or obscene material.[2]

8.      In 2018, in a direct response to online platforms knowingly allowing human trafficking to occur and both promoting and profiting from it, Congress passed a bill known as Fight Online Sex Trafficking Act (FOSTA) and Stop Enabling Sex Traffickers Act (SESTA) (collectively, "FOSTA/SESTA").  As part of this amendment to CDA 230, Congress stated "It is the sense of Congress that –

> (1) section 230 of the Communications Act of 1934 (47 U.S.C. 230; commonly known as the 'Communications Decency Act of 1996') was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims;
>
> (2) websites that promote and facilitate prostitution have been reckless in allowing the sale of sex trafficking victims and have done

---

[1] 47 U.S.C. § 230.

[2] *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003). *See also Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003).

- 4 -
FIRST AMENDED COMPLAINT

nothing to prevent the trafficking of children and victims of force, fraud, and coercion; and

(3) clarification of such section is warranted to ensure that such section does not provide such protection to such websites.[3]

9.      Defendant has benefited financially and/or received something of value from participation in one or more sex trafficking ventures by allowing Twitter to become a safe haven and a refuge for, "minor attracted people,"[4] human traffickers, and discussion of "child sexual exploitation as a phenomenon,"[5] to include trade and dissemination of sexual abuse material.

## JURISDICTION AND VENUE

10.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties have complete diversity, insofar as John Doe #1 and John Doe #2 reside in Florida, and Defendant is a business with its main headquarters and operations in California.

11.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought under 18 U.S.C. § 1595(a), 18 U.S.C. § 2258A, 18 U.S.C. § 2252A and 18 U.S.C. 2255.

12.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the other claims are related to the claims with original jurisdiction and form part of the same case or controversy.

---

[3] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253

[4] Twitter, Inc., Twitter Child Sexual Exploitation Policy of March 2019 (Attached as Exhibit A).

[5] *Id.*

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the Defendant business is headquartered in and operates out of San Francisco, which is located in this District.   Venue is also proper in this District under 28 U.S.C. § 1391(b)(3) because Defendant conducted substantial activities in this District and is subject to personal jurisdiction in this District.

## PARTIES

### A.     Plaintiffs

14.     Jane Doe is the parent and legal guardian of Plaintiff John Doe #1, and at the time of the filing of the initial complaint served as his Next Friend in order to bring this action. In order to preserve the anonymity of her son, Jane Doe requested and received leave of Court to proceed in this action pseudonymously. Pl's. Ex Parte Appl. for Prot. Order and Leave to Proc. Anon. (ECF No. 9).

15.     Plaintiff John Doe #1 is a resident of Florida and was a minor child at all times relevant to the allegations contained herein.

16.     John Doe #1 has reached the age of majority. Accordingly, Jane Doe will be withdrawing from this action and no longer be serving as his next friend and the action will be maintained directly by John Doe #1 himself.

17.     Plaintiff John Doe #2 is a resident of Florida and was a minor child at all times relevant to the allegations contained herein. He is now a legal adult.

18.     Both Plaintiffs seek to proceed in this action pseudonymously because the subject matter of the allegations is of a sensitive and highly personal nature.

19.     Both Plaintiffs are particularly vulnerable because of the trauma they have endured, combined with the fact that at the time of the events at issue, they were minors.

20.     The Court has granted John Doe #1's motion to proceed pseudonymously. Pl's. Ex Parte Appl. for Prot. Order and Leave to Proc. Anon. (ECF No. 9). Plaintiffs will be filing a motion to proceed Anonymously for John Doe #2 as well.

**B.     Defendant**

21.     Defendant Twitter is a privately-owned, Delaware corporation with its principal office or place of business at 1355 Market Street, Suite 900, San Francisco, CA 94103.

22.     Defendant hosts the social media platform, www.twitter.com.

## FACTS

**THE TWITTER PLATFORM, BUSINESS MODEL,
AND CONTENT MODERATION POLICIES AND PRACTICES**

23.     Twitter is one of the most popular social media platforms in the world, with over 330 million users who send an average of 500 million tweets each day.[6]

_____

[6] Review 42, *Crucial Twitter Statistics, Facts and Predictions in 2020*, https://review42.com/twitter-statistics/ (last viewed on December 20, 2020).

- 7 -
FIRST AMENDED COMPLAINT

24.     Twitter is also a large and profitable company, with around 4,900 employees[7] and a current market capitalization of $40 billion.[8]

25.     Over 80% of Twitter's revenue comes from advertising.  In the third quarter of 2020, Twitter received an estimated $936 million in revenue, of which $808 million was from advertising services and $127 million of which was from data licensing.[9]

26.     Twitter enables users to communicate online in brief posts that are called "tweets." Tweets are limited to 280 characters. Twitter also allows photos, videos, GIFs, voice, and extra characters.

27.     When a Twitter user reposts another user's tweet it is known as "retweeting." Retweeting is a popular feature because it allows users to spread information at a high speed and on a broad scale.

28.     Twitter users may also send direct messages to other users, or follow other users on the platform.

---

[7]Twitter, Inc., Annual Report (Form 10-K) at 9 (Feb. 18, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001418091/ecd49924-133d-4b2d-ae29-2f066ac39863.pdf.

[8]Macrotrends, *Twitter Market Cap 2011-2020*, https://www.macrotrends.net/stocks/charts/TWTR/twitter/market-cap (Last visited Jan. 12, 2021).

[9] Twitter, Inc., Quarterly Report (Form 10-Q) at 14 (Oct. 30, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001418091/cb1d93d5-13d2-4d03-96b4-c90efe5ac5fc.pdf.

29.     Twitter has been succinctly described as "a blend of instant messaging, blogging, and texting, but with concise content and a broad audience." [10]

30.     Twitter monetizes its platform by selling advertisements, selling access to its API, and through data licensing.

31.     Twitter explains how it makes money from advertising services as follows:

> We generate most of our advertising revenue by selling our Promoted Products. Currently, our Promoted Products consist of the following:
>
> • Promoted Tweets. Promoted Tweets, which are labeled as "promoted," appear within a timeline, search results or profile pages just like an ordinary Tweet regardless of device, whether it be desktop or mobile. Using our proprietary algorithms and understanding of the interests of each account, we can deliver Promoted Tweets that are intended to be relevant to a particular account. We enable our advertisers to target an audience based on an individual account's interest graph. Our Promoted Tweets are pay-for-performance or pay-for-impression delivered advertising that are priced through an auction. Our Promoted Tweets include objective-based features that allow advertisers to pay only for the types of engagement selected by the advertisers, such as Tweet engagements (e.g., Retweets, replies and likes), website clicks, mobile application installs or engagements, obtaining new followers, or video views.
>
> • Promoted Accounts. Promoted Accounts, which are labeled as "promoted," provide a way for our advertisers to grow a community of people who are interested in their business, products or services. Our Promoted Accounts are pay-for-performance advertising priced through an auction.
>
> • Promoted Trends. Promoted Trends, which are labeled as "promoted," appear at the top of the list of trending topics or

---

[10] Lifewire, *What is Twitter and How Does It Work?*, https://www.lifewire.com/what-exactly-is-twitter-2483331 (last visited on December 15, 2020).

FIRST AMENDED COMPLAINT

timeline for an entire day in a particular country or on a global basis. We sell our Promoted Trends on a fixed-fee-per-day basis.

While the majority of the Promoted Products we sell to our advertisers are placed on Twitter, we also generate advertising revenue by placing advertising products that we sell to advertisers on third-party publishers' websites, applications or other offerings.[11]

32.     Twitter explains how advertisements work on its platform as follows:

Your activity on Twitter, the information you provide to Twitter, and our relationships with ad partners all help make promoted content more relevant for you.

When you use Twitter to follow, Tweet, search, view, or interact with Tweets or Twitter accounts, we may use these actions to customize Twitter Ads for you. For example, if you search for a specific term, we may show you promoted content related to that topic. We also might customize ads using other information about you, such as your profile information; your mobile device location (if location features are turned on); your IP address; or the apps installed on your device. This helps us show you local ads and other ads that you might prefer.

Twitter may also personalize ads based on information that Twitter and our affiliates collect and that our ad partners share with us, such as a hashed email address, a mobile device identifier, or browser-related information (a browser cookie ID).

This helps Twitter display ads about things you've already shown interest in from brands and businesses that you may like. For example, you could receive a Promoted Ad about a deal or promotion from a business whose website you frequent, or email newsletter you subscribe to. You could also see this business as a Follower Ad in one of your "Who to Follow" suggestions.[12]

---

[11] Twitter, Inc., *supra* note 9, at 35.

[12] Twitter, Inc., How Twitter Ads work, https://business.twitter.com/en/help/troubleshooting/how-twitter-ads-work.html (last visited March 23, 2021).

FIRST AMENDED COMPLAINT

33.     Twitter explains how it receives revenue from data licensing as follows:

> We generate data licensing and other revenue by (i) offering data products and data licenses that allow our data partners to access, search and analyze historical and real-time data on our platform (which consists of public Tweets and their content), and (ii) providing mobile advertising exchange services through our MoPub exchange. Our data partners generally purchase licenses to access all or a portion of our data for a fixed period. We recognize data licensing revenue as our data partners consume and benefit from their use of the licensed data. In addition, we operate a mobile ad exchange and receive service fees from transactions completed on the exchange. Our mobile ad exchange enables buyers and sellers to purchase and sell advertising inventory and matches buyers and sellers. We have determined we are not the principal as it relates to the purchase and sale of advertising inventory in transactions between third-party buyers and sellers on the exchange. Therefore, we report revenue related to our ad exchange services on a net basis.[13]

34.     The data Twitter collects on its users includes IP addresses, browser types, operating systems, locations, mobile carriers, device information, search terms, and cookies.

35.     Twitter uses a web-based Application Program Interface ("API"), which defines the interaction between the software components that make up its platform. Here is Twitter's explanation of the function of APIs:

> To facilitate the fast global dissemination of Tweets to people around the world, we use technology like application programming interfaces (APIs) and embeds to make that information available to websites, apps, and others for their use - for example, displaying Tweets on a news website or analyzing what people say on Twitter.

---

[13] *Id*. at 36.

- 11 -
FIRST AMENDED COMPLAINT

> We generally make this content available in limited quantities for
> free and charge licensing fees for large-scale access. [14]

36.     Twitter's API must be accessed by making requests over the internet to services that Twitter hosts. With a web-based API such as Twitter's, an application sends an HTTP request, just like a web browser does. But instead of the response being delivered as a webpage for human understanding, it is returned in a format that applications can easily parse.

37.     Twitter offers access to its API in the marketplace. Ultimately, Twitter maintains control over which individuals and organizations it will grant access to its API.

38.     Having access to Twitter's API is tremendously advantageous for understanding the activity and usage patterns of Twitter's users.

39.     Twitter has detailed knowledge of the activities of its user base on its platform. It uses that knowledge to provide insight to its advertising and data-services costumers as to how effective purchases are of reaching active Twitter users.

40.     For example, Twitter has pioneered and implemented a detailed tracking statistic known as "monetizable daily active usage." [15]

41.     Twitter describes its "monetizable daily active usage" statistic as follows:

> Twitter defines monetizable daily active usage or users (mDAU) as
> people, organizations, or other accounts who logged in or were
> otherwise authenticated and accessed Twitter on any given day
> through twitter.com or Twitter applications that are able to show

---

[14] Twitter, Inc., Privacy Policy at ¶ 1.2, https://twitter.com/en/privacy (Last accessed Jan. 12, 2021) (Attached as Exhibit B).

[15] Robert Williams, Marketing Dive, *Twitter debuts 'monetizable' metric for its 126m users*, https://www.marketingdive.com/news/twitter-debuts-monetizable-metric-and-reveals-it-has-126m-users/547990/ (last visited March 24, 2021).

ads. Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily logged in or otherwise authenticated active total accounts. To calculate the year-over-year change in mDAU, we subtract the average mDAU for the three months ended in the previous year from the average mDAU for the same three months ended in the current year and divide the result by the average mDAU for the three months ended in the previous year. Additionally, our calculation of mDAU is not based on any standardized industry methodology and is not necessarily calculated in the same manner or comparable to similarly titled measures presented by other companies. Similarly, our measures of mDAU growth and engagement may differ from estimates published by third parties or from similarly titled metrics of our competitors due to differences in methodology. [16]

42.     Twitter moderates and otherwise controls third-party user content on its platforms.

43.     Twitter has a variety of mechanisms used to moderate content on the platform. Upon information and belief, Twitter uses software and algorithms to ensure tweets reach a smaller audience, block users from tweeting, hide tweets from users in a specific country, hide user profiles, convert users into read-only mode, temporarily lock users out of their account until account verification, and permanently suspend accounts. [17]

44.     Rather than act decisively by banning certain types of behavior and allowing others, Twitter's policy and engineering teams sometimes de-emphasize content and allow users to hide content that may be offensive but not explicitly against the platform's terms of service.

---

[16] Twitter, Inc., Q4 and Fiscal Year 2020 Letter to Shareholders (Feb. 9, 2021), https://s22.q4cdn.com/826641620/files/doc_financials/2020/q4/FINAL-Q4'20-TWTR-Shareholder-Letter.pdf (last visited March 24, 2021).

[17] Online Censorship.Org, https://onlinecensorship.org/resources/how-to-appeal (last visited December 15, 2020).

45.     Twitter's "hateful conduct policy" provides, in relevant part:

> You may not promote violence against or directly attack or threaten other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease. …

> We recognise that if people experience abuse on Twitter, it can jeopardize their ability to express themselves. Research has shown that some groups of people are disproportionately targeted with abuse online. This includes; women, people of color, lesbian, gay, bisexual, transgender, queer, intersex, asexual individuals, marginalized and historically underrepresented communities. For those who identity with multiple underrepresented groups, abuse may be more common, more severe in nature and have a higher impact on those targeted. …

> We are committed to combating abuse motivated by hatred, prejudice or intolerance, particularly abuse that seeks to silence the voices of those who have been historically marginalized. For this reason, we prohibit behavior that targets individuals with abuse based on protected category. [18]

46.     Twitter specifically notes a "zero tolerance policy against violent threats. Those deemed to be sharing violent threats will face immediate and permanent suspension of their account."[19]

47.     Twitter also bans wishing someone harm that does not rise to the level of a specific violent threat: "We prohibit content that wishes, hopes, promotes, or expresses a desire for death,

_____

[18] Twitter, Inc., *Twitter Hateful Conduct Policy of November 2019,*
https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy  (Attached as Exhibit C).
[19] *Id.*

- 14 -
FIRST AMENDED COMPLAINT

serious and lasting bodily harm, or serious disease against an entire protected category and/or individuals who may be members of that category."[20]

48.     And Twitter additionally bans slurs, epithets, and "sexist tropes, or other content that degrades someone."

49.     Yet despite Twitter's stated policy, numerous women – especially, women's rights advocates and sexual exploitation survivors – face harassment, doxxing, other abuse, and threats of violence, including murder and rape, on Twitter's platform.[21]

50.     Twitter does not deploy its extensive content moderation capacities to prevent or significantly reduce this abuse, even though it violates Twitter's own policies on hateful conduct. Rather, upon information and belief, Twitter selectively removes or prevents some content on its platform, and selectively chooses not to remove or prevent other content.

51.     On January 13, 2021, Jack Dorsey, the Chief Executive Officer of Twitter, Inc. tweeted the following:



jack ✔ @jack · Jan 13
I do not celebrate or feel pride in our having to ban @realDonaldTrump from Twitter, or how we got here. After a clear warning we'd take this action, we made a decision with the best information we had based on threats to physical safety both on and off Twitter. Was this correct?

💬 49.4K          ↻ 29.1K          ♡ 114.8K          ⬆

---

[20] Id.

[21] See, e.g., Amnesty International, *Toxic Twitter, A Toxic Place for Women*, https://www.amnesty.org/en/latest/research/2018/03/online-violence-against-women-chapter-1/ (last viewed on December 15, 2020).

FIRST AMENDED COMPLAINT



In the same thread, or series of tweets, Mr. Dorsey added:

**jack** ✓ @jack · Jan 13
Yes, we all need to look critically at inconsistencies of our policy and enforcement. Yes, we need to look at how our service might incentivize distraction and harm. Yes, we need more transparency in our moderation operations. All this can't erode a free and open global internet.

💬 1K        ↻ 1.5K        ♡ 13K

## TWITTER AND SEXUAL EXPLOITATION MATERIAL

52.     As described above, Twitter monetizes its platform through advertisements, sale of access to its API, and data collection.

53.     As long as content on Twitter's platform remains live, Twitter monetizes that content regardless of whether it is contrary to Twitter's own policies or promotes illegal conduct.

54.     Twitter thus profits from content on its platform that depicts rape, sex trafficking, child sexual abuse, and other illegal activity.

55.     As of November 2019, Twitter's "sensitive media" policy provides, in relevant part:

> We prohibit violent sexual conduct to prevent the normalization of sexual assault and non-consensual violence associated with sexual acts… You can share graphic violence and consensually produced

- 16 -
FIRST AMENDED COMPLAINT

adult content within your Tweets, provided that you mark this media as sensitive.[22]

56.     As of March 2019, Twitter avers that it had a "zero-tolerance child sexual exploitation policy," and forbids the following:

> Any content that depicts or promotes child sexual exploitation including, but not limited to:
>
> - visual depictions of a child engaging in sexually explicit or sexually suggestive acts;
> - illustrated, computer-generated or other forms of realistic depictions of a human child in a sexually explicit context, or engaging in sexually explicit acts;
> - sexualized commentaries about or directed at a known or unknown minor; and
> - links to third-party sites that host child sexual exploitation material.
>
> The following behaviors are also not permitted:
>
> - sharing fantasies about or promoting engagement in child sexual exploitation;
> - expressing a desire to obtain materials that feature child sexual exploitation;
> - recruiting, advertising or expressing an interest in a commercial sex act involving a child, or in harboring and/or transporting a child for sexual purposes;
> - sending sexually explicit media to a child;
> - engaging or trying to engage a child in a sexually explicit conversation;
> - trying to obtain sexually explicit media from a child or trying to engage a child in sexual activity through blackmail or other incentives; and

---

[22] Twitter, Inc., *Twitter Child Sensitive Media Policy of November 2019*, https://help.twitter.com/en/rules-and-policies/media-policy (Attached as Exhibit D).

- identifying alleged victims of childhood sexual exploitation by name or image.[23]

57. Twitter's March 2019 policy also asserts that it will usually permanently suspend accounts with child sexual abuse material, and report any such material to the National Center for Missing & Exploited Children:

> In the majority of cases, the consequence for violating our child sexual exploitation policy is **immediate and permanent suspension**. In addition, violators will be prohibited from creating any new accounts in the future. Note: when we're made aware of content depicting or promoting child sexual exploitation, including links to third party sites where this content can be accessed, they will be removed without further notice and reported to the National Center for Missing & Exploited Children (NCMEC).[24]

58. Yet Twitter makes it hard for users to report CSAM. A recent report by the Canadian Centre for Child Protection® found that Twitter's platform made it "extremely difficult" to report CSAM, specifically:

- Twitter does not allow users to report a tweet for CSAM "through the easily-accessible report function"; one "must first locate the child sexual exploitation report form."

- Twitter does not allow people to "report an image or video sent within a DM on Twitter as CSAM. The child sexual exploitation report form will not accept the URL from an image within a DM."

---

[23] Twitter, Inc., Twitter Child Sexual Exploitation Policy of March 2019 (Attached as Exhibit A).

[24] *Id.* (emphasis added).

- 18 -
FIRST AMENDED COMPLAINT

- Twitter requires an email address for submitting CSAM reports.

- Even though tweets can be viewed without being logged in, Twitter requires a person to be logged in (and therefore have a Twitter account) in order to report CSAM.[25]

59.     Twitter received the lowest overall rating, compared to other platforms – including Bing, Facebook, Pornhub, and XVideos – by the Canadian Centre for Child Protection® for its CSAM reporting structure.

60.     Twitter is also a signatory to the Five Country Ministerial's Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse.  Two of these Principles are as follows:

> Principle 1: Companies seek to prevent known child sexual abuse material from being made available to users or accessible on their platforms and services, take appropriate action under their terms of service, and report to appropriate authorities.

> Principle 2: Companies seek to identify and combat the dissemination of new child sexual abuse material via their platforms and services, take appropriate action under their terms of service, and report to appropriate authorities.[26]

---

[25] Canadian Centre for Child Protection, "Reviewing Child Sexual Abuse Reporting Functions on Popular Platforms" at 15 (December 2020) https://protectchildren.ca/pdfs/C3P_ReviewingCSAMMaterialReporting_en.pdf.

[26] U.S. Dep't of Just., *Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse*, https://www.justice.gov/opa/press-release/file/1256061/download (last visited January 20, 2021).

- 19 -
FIRST AMENDED COMPLAINT

61.     Notwithstanding its stated policy, Twitter permits large amounts of human trafficking and commercial sexual exploitation material on its platform, despite having both the ability to monitor it, and actual and/or constructive knowledge of its posting on the platform.

62.     Twitter also contains significant pornographic content, including illegal child sexual abuse content. Upon information and belief, Twitter does not have adequate systems in place to detect, remove, and/or report this material.

63.     Upon information and belief, Twitter has not adequately used the technology that is within its power and control to effectively remove CSAM from its platform.

64.     The National Center on Missing and Exploited Children ("NCMEC") reported that in 2020 it received 65,062 reports from Twitter of apparent child sexual abuse material on its platform.[27]

65.     In 2019, the number of reports from Twitter to NCMEC of apparent child sexual abuse material on its platform were 45,726.[28]

---

[27] Nat'l Ctr. for Missing and Exploit. Child., *2019 Reports by Electronic Service Providers (ESP)*, https://www.missingkids.org/content/dam/missingkids/gethelp/2020-reports-by-esp.pdf (last visited March 23, 2021)

[28] Nat'l Ctr. for Missing and Exploit. Child., *2019 Reports by Electronic Service Providers (ESP)*, https://www.missingkids.org/content/dam/missingkids/gethelp/2019-reports-by-esp.pdf (last visited March 23, 2021).

[28] *See generally*, 18 U.S.C. § 2252A *and* Cal. Penal Code § 311.1 (West 2020).

[28] 47 U.S.C. § 230.

[28] *See Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119 (9th Cir. 2003). *See also Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003).

[28] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253

66.     These numbers are extremely low for the size of Twitter's platform. For example, its competitor Facebook, had over 20 million reports to NCMEC in 2020, and 15 million in 2019.[29]

67.     Upon information and belief, Twitter fails to report to NCMEC and/or law enforcement every instance of CSAM brought to their attention, even when they take action on the content by removing it or suspending the account.

68.     Upon information and belief, a child protection agency approached Twitter and offered its services to scan and remove known, or "hashed", CSAM from Twitter's site using its API.

69.     Upon information and belief, Twitter denied this offer and refused the child protection agency access to its API despite selling access to its API to advertisers for profit and not having an adequate in-house system in place to identify and remove CSAM.

### *Child Pornography or Child Sexual Abuse Material*

70.     Twitter permits numerous profiles, posts, comments, and other content either advertising, soliciting, or depicting CSAM.

71.     CSAM and sex trafficking are highly sought-after content on Twitter. This means that those wishing to view, buy, sell or trade images or videos of the sexual exploitation of others, to include children, have a platform that allows them to conduct this illegal activity.  Furthermore,

---

[29] Nat'l Ctr. for Missing and Exploit. Child., *2019 Reports by Electronic Service Providers (ESP)*, https://www.missingkids.org/content/dam/missingkids/gethelp/2019-reports-by-esp.pdf (last visited March 31, 2021).

Twitter makes significant revenue from the presence, searches, connections, and interactions of such illegal and dangerous material.

72.     The Twitter platform has a feature known as "hashtags." Twitter has explained hashtags as follows:

> On Twitter, adding a "#" to the beginning of an unbroken word or phrase creates a hashtag. When you use a hashtag in a Tweet, it becomes linked to all of the other Tweets that include it. Including a hashtag gives a Tweet context and can give a conversation longevity.[30]

73.     Twitter has explained the utility and function of hashtags as follows:

> Are you Tweeting about a conversation that's happening more broadly (a relevant cultural movement or topical news story)? If so, adding that topic's hashtag will connect your Tweet to the broader conversation. By adding the hashtag, it increases the chance someone interested in the event will engage with your Tweet and discover your business.[31]

74.     Twitter generates, originates, or otherwise edits suggested search terms and hashtags associated with tweets posted onto its platform. Hashtags are used to assist in optimizing search features on the Twitter website, which ultimately helps to increase views, shares, and the success of targeted advertising.  Many hashtags and search suggestions that have been reviewed, categorized, created and/or edited by Twitter ultimately help users locate the type of content they are searching for, including CSAM.

_____

[30] Twitter, Inc., *How to create and use hashtags*, https://business.twitter.com/en/blog/how-to-create-and-use-hashtags.html (last visited March 22, 2021).

[31] *Id.*

- 22 -
FIRST AMENDED COMPLAINT

75.     To take one prominent example, searching the hashtag #megalinks on Twitter brings up users commenting on CSAM, openly soliciting for and offering to trade CSAM, and encouraging communication by direct message where CSAM can be illegally distributed and exchanged.[32]

76.     A search of the hashtag #megalinks on Twitter also brings up promoted tweets or advertisements, which are displayed intermixed between tweets that include the hashtag and overwhelmingly pertain to CSAM. Here is an example of advertising on Twitter featuring content relating to children that Twitter placed in Twitter's search results for the #megalinks hashtag and solicitation for CSAM using "c*p" to describe "child porn":

---

[32] *See generally*, NBC News, *Child sexual abuse images and online exploitation surge during pandemic*, https://www.nbcnews.com/tech/tech-news/child-sexual-abuse-images-online-exploitation-surge-during-pandemic-n1190506 (noting the use of the #megalinks hashtag on Twitter)(last viewed December 15, 2020).

FIRST AMENDED COMPLAINT



77.     The hashtag #megalinks is one example of many well-known hashtags associated with the dissemination of CSAM. Other hashtags that are commonly used to trade and distribute CSAM include #s2r, which stands for "send to receive" and hashtags including the term "dropbox." Here are examples of those hashtags used in  tweets soliciting "young" and specific age ranges of children in sexually graphic images:

- 24 -
FIRST AMENDED COMPLAINT





78.     Twitter has the ability to, and in fact does, block certain hashtags. For example,
the hashtag #savethechildren has been blocked by Twitter for being associated with the group
"QAnon." Meanwhile, the aforementioned hashtags known for primarily trading in CSAM and
sex trafficking material have not been banned by Twitter.

79.     Instead, Twitter's algorithm assists and enables pedophiles, collectors, and distributors of CSAM to find each other and increase their engagement with one another. In effect, Twitter has created the meeting place and the marketplace for a community that is generating content which Twitter is monetizing at the expense of exploited children.

### *Twitter's Search-Suggestion Feature*

80.     Twitter also includes a search-suggestion feature in its platform. This feature reads what the user enters into Twitter's search bar and makes suggestions for other searches that the user might consider.

81.     When a user searches for CSAM on the Twitter platform, the platform will make search suggestions designed to help the user find the illegal, CSAM.

82.     Twitter's software is designed so that a search for the #megalinks hashtag returns suggestions for other hashtags that are related to CSAM and users that use the #megalinks hashtag to discuss or distribute CSAM.



83.     Twitter has been made aware of these hashtags on many occasions but continues to index them and utilize them for advertising revenue.

- 26 -
FIRST AMENDED COMPLAINT

84.     Thus, while Twitter claims that it has a "zero-tolerance policy" for CSAM, its platform not only allows the distribution of CSAM, but its platform architecture also aids in the distribution of CSAM, and Twitter profits from it through advertisements.

**THE TRAFFICKING OF JOHN DOE #1 AND JOHN DOE #2**

85.     Plaintiff John Doe #1 was a minor at the inception of this lawsuit; however, he is presently 18 years old. He is currently a student in high school.

86.     Plaintiff John Doe #2 is presently 18 years old. He is currently a student in high school.

87.     In 2017, when John Doe #1 was 13-14 years old, he began interacting with someone he thought was an individual person on the communications application Snapchat.[33] That person or persons ("Traffickers") represented to John Doe #1 that "she" was a 16-year-old female and John Doe #1 believed that person went to his school.

88.     John Doe #1 was communicating with the Traffickers on Snapchat while he was in the presence of his friend, John Doe #2. When the Traffickers realized that both John Doe #1 and John Doe #2 were present together, they suggested that they exchange nude photos and/or videos.

---

[33] Snapchat is a messaging app that originated in 2011 and allows users to send photos, videos, and texts that will self-destruct shortly after all recipients have viewed message. Messages on Snapchat are known as "snaps."  *See* Christina Newberry, How to Use Snapchat: A Guide for Beginners. https://blog.hootsuite.com/how-to-use-snapchat-beginners-guide/ (last viewed April 1, 2021).

89.     John Doe #1 and John Doe #2 both exchanged nude photos and/or videos with the Traffickers on Snapchat. The Traffickers sent a photo of what appeared to be teen girls and John Doe #1 and John Doe #2 responded with photo(s) of themselves.

90.     After they did so, the correspondence changed to blackmail. Now the Traffickers wanted more sexually graphic pictures or videos of John Doe #1 and John Doe #2, and recruited, enticed, threatened and solicited them by threatening them that if they did not provide this material, then the images/videos that they had already sent would be sent to their parents, coach, pastor, and others in their community.

91.     Initially John Doe #1 and John Doe #2 complied with the Traffickers' demands. They were told to provide pictures and/or videos of themselves performing sexual acts and they did so.

92.     The pictures and videos constitute CSAM and sex trafficking because John Doe #1 and John Doe #2 were minors at the time the CSAM was produced, it was produced by the minors after the Traffickers threatened, defrauded, and solicited the images/videos from the minors, and the images/videos contained lewd and/or pornographic material.

93.     Messaging him on his phone, the Traffickers also attempted to meet with John Doe #1 in person. Fortunately, an in-person meeting never took place.

94.     Eventually John Doe #1 resolved to break free from the control of the Traffickers and attempted to block them on Snapchat.

95.     The Traffickers messaged John Doe #1 under another account, stating that he had made a big mistake in blocking them.

96.     Although afraid, John Doe #1 continued to attempt to avoid the Traffickers and eventually the communications ceased.

97.     Plaintiffs each received something of value in exchange for the images and videos of the sexual acts.  They were threatened with reputational harm and provided the images/videos in exchange for preventing the images and/or videos sent to others.

98.     Traffickers received something of value when they received the CSAM images from John Doe #1 and John Doe #2.[34]  Upon information and belief, the Traffickers' value in such images would have included using the images for personal sexual gratification, collection, distribution, or sale of the CSAM images.

99.     At some point in 2019, those saved images and videos appeared in a compilation video surfaced on Twitter, showing multiple CSAM images/videos depicting John Doe #1 and John Doe #2.  This compilation video was posted by the Twitter user handles @StraightBross and @fitmalesblog. It was also retweeted (i.e. reposted through the Twitter platform) by numerous Twitter users.

100.    The fact that the CSAM images and video appeared outside of the Snapchat platform shows that the Traffickers saved copies of the images and videos.  Snapchat is designed so that snaps will self-destruct after they have been viewed by all recipients.  It is possible to save videos and images before they disappear, but it would require an affirmative act on the part of the Traffickers to save each image and video.

---

[34] The CSAM images/videos were of John Doe #1 as an individual, and also with John Doe #1 and John Doe #2 depicted together.

- 29 -
FIRST AMENDED COMPLAINT

**CSAM DEPICTING JOHN DOE #1 AND
JOHN DOE #2 IS DISTRIBUTED ON TWITTER**

101.    On December 25, 2019, Twitter was alerted by a concerned citizen through its
content-reporting interface that the user account @StraightBross was posting CSAM. Here is an
excerpt of that report that was sent to Twitter:

| |
|---|
| 12/25/2019                    Report a child sexual exploitation issue. \| Help Center |
| Re: CSE Report to Twitter 12-25-19 and Cybertipline Report |
| The following accounts were reported individually to Twitter via https://help.twitter.com/forms/cse . They all Retweeted and/or Liked one or more of the following child porn pictures or videos. This is OBVIOUS CHILD PORN!!! It's the reason they were reported. Most of these pedophiles have shared much more than just the one link but this should be sufficient evidence to warrant further investigation and referral to ICAC for possible Child Porn Possession. |
| https://twitter.com/ StraightBross/status/1205557682654109696<br>https://twitter.com/ StraighterBross/status/1207298223926382596<br>https://twitter.com/ wanghuangdaily1/status/1179399976314650626<br>https://twitter.com/ crazyboombaya19/status/1189077730882543616<br>https://twitter.com/ Haektormai/status/1160787988260909057<br>https://twitter.com/ macsy21301613/status/1208584279799681024<br>https://twitter.com/ Jush69/status/1206597689007202306 |
| These links are all GRAPHIC CHILD PORN!!! |
| Twitter's Child Sexual Exploitation Policy states "We have a zero-tolerance child sexual exploitation policy on Twitter. Twitter has zero tolerance towards any material that features or promotes child sexual exploitation, one of the most serious violations of the Twitter Rules. This may include media, text, illustrated, or computer-generated images. Regardless of the intent, viewing, sharing, or linking to child sexual exploitation material contributes to the re-victimization of the depicted children. This also applies to content that may further contribute to victimization of children through the promotion or glorification of child sexual exploitation. For the purposes of this policy, a minor is any person under the age of 18." |
| These accounts are in CLEAR VIOLATION of this policy. There is ABSOLUTELY NO case to be argued to the contrary. Use the link addresses provided here to verify that they have retweeted and/or liked one or more of these links and thus, the media is displayed somewhere on their timeline or under the users Likes. |
| Twitter's TOS also states "In the majority of cases, the consequence for violating our child sexual exploitation policy is immediate and permanent suspension." These accounts qualify |

102.    Twitter assigned the report claim number 0136403334. It did not take action
against the @StraightBross account.

103.    John Doe #1 was 16 years old and attending high school in January of 2020.

- 30 -
FIRST AMENDED COMPLAINT

104.    John Doe #2 was 16 years old and attending high school in January of 2020.

105.    On or about January 19 or 20, 2020, John Doe #1 became aware of the posts when he learned from his classmates that CSAM videos of him and another minor were on Twitter and that many students in the school had viewed them.

106.    Due to the circulation of these videos, John Doe #1 suffered severe anguish and embarrassment; he faced teasing, harassment, vicious bullying, and became suicidal.

107.    In January of 2020, John Doe #2 became aware of the Twitter posts featuring CSAM depicting him and John Doe #1. He was attending the same high school as John Doe #1, where the Twitter posts were being circulated and discussed among the students.

108.    The circulation of these videos cause John Doe #2 severe anguish and embarrassment as well. John Doe #2 refused to go to school for multiple weeks.

109.    John Doe #1 spoke to his parents about what was happening and sought their help.

110.    John Doe #1's mother took immediate action to have the CSAM removed. She contacted school officials, local law enforcement, and reached out directly to Twitter through its content-reporting interface.

111.    John Doe #1 attempted to contact the Twitter users who had posted the CSAM video depicting him, informed them that the video was of him, that he was a minor in the video, and asked them to remove the posts. One of these Twitter users removed the post, however, the other ignored John Doe #1's request and kept the video live.

112.    On January 21, 2020, John Doe #1 made a complaint to Twitter through its content-reporting interface about the CSAM depicting himself that was posted by the Twitter

user @fitmalesblog. He received a response from Twitter, which assigned his complaint the case number 0139512883.

113.    Twitter's response to John Doe #1's report on January 21, 2020, read:

Hello,

Thanks for reaching out. As the next step of our review, we need to confirm your identity that you're the person in the photo you've reported.

Please use this link to send us a copy of your valid government-issued photo ID, like a driver's license, passport, or school ID.

This helps to prevent false or unauthorized reports. Your information will remain private and be deleted once we've reviewed it.

We appreciate your help.

Thanks,

Twitter

114.    John Doe #1 submitted a picture of his drivers' license to Twitter proving that he is a minor. He emailed back the same day, alerting Twitter to both accounts, and saying:

• Yes these tweets are videos of me and a friend taken from 3 years ago. these videos were taken from harassment and being threatened. It is now spreading around school and we need them taken down as we are both minors and we have a police report for the situation. https://twitter.com/fitmalesblog/status/1213751523097886720

https://twitter.com/straightbross/status/1214673411689140224?s=21

• These are spreading around school and is causing many issues. the police and parents are both aware of it.
• These videos were taken 3 years ago but are now being resurfaced. It started about a week ago going around school.
• Me, [Name Redacted – John Doe #1] and also [Name Redacted – John Doe #2] are in these videos.

- 32 -
FIRST AMENDED COMPLAINT

115.     On January 22, 2020, the mother of John Doe #1 made two complaints to Twitter through its content-reporting interface about the CSAM depicting her son, one for each link of which she was aware. The first complaint was filed against the Twitter user account @StraightBross. The second complaint was filed against the Twitter user account @fitmalesblog.

116.     Twitter responded to both complaints with an automatic message. The first automated message, which was for CSAM posted by user @StraightBross, assigned the case number 0139729198 and read as follows:

> Hello,
>
> Thanks for bringing this to our attention. We don't tolerate child sexual exploitation on Twitter. Through our partnership with the National Center for Missing and Exploited Children (NCMEC), we ensure that appropriate law enforcement agencies are notified when such content is located. We'll review the content you've reported as soon as possible. Please be aware that removed content may remain visible to you until you've refreshed your browser or cleared your browser history or cache.
>
> If you have further information on the content you've reported, you can send it to NCMEC directly through this link: https://report.cybertip.org/. If you are seeing the content on other websites potentially hosted outside the United States, you can report it to the International Association of Internet Hotlines website here: http://www.inhope.org.
>
> For more information on Twitter's policy on child sexual exploitation, please visit: https://support.twitter.com/articles/37370.
>
> Thank you,
>
> Twitter

117.    The second automated message, which was for CSAM posted by user @fitmalesblog, was assigned the case number 0139730675 and included the same message as the auto message to the first complaint.

118.    John Doe #1 and his mother also reported the situation to a local law enforcement agency and provided Twitter with the report number for that agency.

119.    On January 26, 2020, John Doe #1's mother followed up with email to Twitter after a week of inactivity and lack of response by Twitter that read as follows:

> Hello there my name is [Name Redacted]
> i'm [John Doe #1's] mother. I sent two complains in
> case #0139730675
> case #0139729198
> without responses from you. He had been a victim in a sex abuse
> situation. No one gave permissions for these [videos] to be on your
> site. You are allowing child pornography to be in your web site for
> over a week now after my compliant on Jan 22nd 2020. The police
> case [redacted Police Report case number and jurisdiction]. We
> want them removed immediately.
> [Name Redacted]

120.    On January 28, 2020, Twitter sent John Doe #1 an email that read as follows:

> Hello,
>
> Thanks for reaching out. We've reviewed the content, and didn't
> find a violation of our policies, so no action will be taken at this
> time.
>
> If you believe there's a potential copyright infringement, please start
> a new report.
>
> If the content is hosted on a third-party website, you'll need to
> contact that website's support team to report it.
>
> Your safety is the most important thing, and if you believe you are
> in danger, we encourage you to contact your local authorities.
> Taking screenshots of the Tweets is often a good idea, and we have
> more information available for law enforcement about our policies.

- 34 -
FIRST AMENDED COMPLAINT

Thanks,

Twitter

121.    Here is a thread in which users commented on the CSAM depicting John Doe #1 and John Doe #2:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19
20
21
22
23
24
25
26
27
28

122.    If Twitter had reviewed the material as they claimed in their response to John Doe #1, they would have seen the comments above, which clearly acknowledge that the material was depicting minors.   At the very least, they would have seen that it was sexually explicit and matched John Doe #1's government issued driver's license identifying him as a minor and confirming that the material was CSAM, or child pornography.

123.    On January 28, 2020, John Doe #1 responded to Twitter's message as follows:

> What do you mean you don't see a problem? We both are minors
> right now and were minors at the time these videos were taken. We
> both were 13 years of age. We were baited, harassed, and threatened

- 36 -
FIRST AMENDED COMPLAINT

to take these videos that are now being posted without our permission. We did not authorize these videos AT ALL and they need to be taken down. We have a case number with the [Law Enforcement Agency] for these videos and this incident. Please remove this video ASAP and any videos linked to this one. There is a problem with these videos and they are going against my legal rights and they are again at (sic) the law to be on the internet. (capitalized emphasis in original)

124.    Twitter ignored John Doe #1's final plea and the illegal videos depicting CSAM remained live on Twitter. Just two days after John Doe #1 first contacted Twitter, the videos had accrued over 167,000 views and 2,223 retweets. Here is an image captured from one of those retweets.



125.    The videos remained live approximately another seven days, resulting in substantially more views and retweets. Each viewing is a harmful act to John Doe #1 and John Doe #2.

126.    Additionally, the word "twinks" was used to describe the children in the videos which is a term used to describe young boys or men as having certain boyish characteristics such as "little to no body or facial hair; a slim to average build; and a youthful appearance"[35]—another indication that they were minors, and that this fact was evident from their appearance.

---

[35] *Twink*, *Wikipedia.org*, https://en.wikipedia.org/wiki/Twink_(gay_slang) (last visited Apr. 1, 2021).

127.    Twitter still did not report the CSAM to NCMEC after being contacted by John Doe #1 and his mother.

128.    Eventually, through a mutual contact, John Doe #1's mother was able to connect with an agent of the U.S. Department of Homeland Security. The federal agent also initiated contact with Twitter and at the request of the U.S. federal government, the CSAM was finally removed from Twitter on or about January 30, 2020.

129.    Only after this take-down demand from a federal agent did Twitter suspend the user accounts that were distributing the CSAM and report the CSAM to NCMEC as required by law. This is directly in contrast to what their automated reply message and User Agreement state they will do to protect children.

130.    One of the Twitter user accounts that posted the CSAM depicting Plaintiffs—@StraightBross—had already been reported to Twitter for posting CSAM.

131.    On information and belief, Twitter did not block IP addresses, or take other measures, allowing the person or persons behind the @StraightBross account to continue distributing sexually exploitive material on the Twitter platform from other user accounts. As of the filing of the initial Complaint, @StraightBross had opened a new account @BrossStraight in which he identified himself as "Straight Bross."[36]

132.    Defendant's conduct has caused Plaintiffs serious and long-term, if not permanent harm, including, without limitation, psychological, financial, and reputational harm.

_____

[36] Complaint (ECF No. 1) at ¶100.

- 38 -

FIRST AMENDED COMPLAINT

**CLAIMS ALLEGED**

**COUNT I**

**VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(a)(1) AND 1595**

133.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

134.    Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

135.    Defendant's conduct was in or affected interstate and/or foreign commerce.

136.    Plaintiffs were minors during all relevant time periods pertinent to this lawsuit.

137.    Twitter knew, or was in reckless disregard of the fact, that John Doe #1 and John Doe #2 had not attained the age of 18.

138.    Extortive threats made against John Doe #1 and his family compelled him to create CSAM material featuring both himself, as well as John Doe #2, engaging in sex acts.

139.    Both Plaintiffs received from the Traffickers something of value for engaging in sex acts.

140.    The Traffickers received something of value for the images and/or video of the sex acts.

141.    Twitter knowingly provided, obtained, and maintained CSAM depicting John Doe #1 individually, as well as John Doe #1 and John Doe #2 together.

142.    Twitter knew, or was in reckless disregard of the fact, that through monetization and providing, obtaining, and maintaining CSAM on its platform, Twitter and Twitter users received something of value for the video depicting sex acts of John Doe #1 and John Doe #2 as minors.

143.    Twitter's conduct has caused John Doe #1 and John Doe #2 serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT II

### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(a)(2) AND 1595

144.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

145.    Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

146.    Defendant's conduct was in or affected interstate and/or foreign commerce.

147.    Plaintiffs were minors during all relevant time periods pertinent to this lawsuit.

148.    Twitter knew, or was in reckless disregard of the fact, that John Doe #1 and John Doe #2 had not attained the age of 18.

149.    The Traffickers made extortive threats against John Doe #1 that compelled him to create CSAM material featuring both himself and John Doe #2 engaging in sex acts.

150.    Both Plaintiffs received from the Traffickers something of value for engaging in sex acts.

151.    The Traffickers received something of value for the images and/or video of the sex acts.

152.    Twitter was notified that (a) the CSAM depicting John Doe #1 and John Doe #2 was the result of extortive threats; (b) that John Doe #1 and John Doe #2 were children; (c) that the video and/or images of John Doe #1 and John Doe #2 depicted a sex act; and (d) that the CSAM depicting John Doe #1 and John Doe #2 was continuing to be distributed on its platform.

153.    Defendant knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

154.    Defendant knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

155.    Twitter's conduct has caused John Doe #1 and John Doe #2 serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT III

### VIOLATION OF DUTY TO REPORT CHILD SEXUAL ABUSE MATERIAL,18 U.S.C. §§ 2258A AND 2258B

156.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

157.    As an "electronic communication service provider," Twitter is a "provider" under 18 U.S.C. §§ 2258E(6) and 2258A.

158.    Defendant obtained actual knowledge that there was online sexual exploitation material of children being published on its platform, which was an apparent violation of 18 U.S.C. § 2252A.

159.    Defendant's conduct for violating 18 U.S.C. § 2258A is eligible for civil claims for relief pursuant to paragraph (b) of 18 U.S.C. § 2258B.

160.    Twitter knowingly engaged in intentional misconduct by ignoring clear notice of the presence of actual online sexual exploitation material of children. 18 U.S.C. § 2258B(b)(1).

161.    Twitter's conduct constitutes a failure to act with reckless disregard to a substantial risk of causing physical injury without legal justification. 18 U.S.C. § 2258B(b)(2)(B).

162.    Twitter's conduct constitutes a failure to act for a purpose unrelated to the performance of any responsibility or function under 18 U.S.C. §§ 2258B(b)(2)(C).

163.    Twitter's conduct has caused John Doe #1 and John Doe #2 serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## <u>COUNT IV</u>

### CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO SEX TRAFFICKING AND RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY (18 U.S.C. §§ 1591, 2252A, AND 2255)

164.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

165.    Plaintiffs were minors during all relevant time periods pertinent to this lawsuit.

166.    Plaintiffs were victims of sex trafficking and distribution of child pornography as set forth in 18 U.S.C. §§ 1591 and 2252A.

167.    Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 2252A, occurring within the territorial jurisdiction of the United States.

168.    Defendant's conduct was in or affected interstate and/or foreign commerce.

169.     As previously alleged in Counts I and II, Defendants have violated 18 U.S.C. § 1591.

170.     Twitter knowingly and intentionally offers, operates, maintains, and advertises on its platform. Twitter also knowingly and intentionally encourages traffic on its platform and encourages advertisers to purchase advertisement space on its platform.

171.     Twitter has created a process for users of its platform to notify it of violations of Twitter's policies, to include the posting of illegal material and child exploitation material.

172.     Twitter was so notified of the CSAM material depicting John Doe #1 and John Doe #2 as minors on its platform and still knowingly received, maintained, and distributed this child pornography after such notice.

173.     As a proximate result of Twitter's violation of 18 U.S.C. § 2252A, John Doe #1 and John Doe #2 suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

174.     18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. §§ 1591 and 2252A, and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

175.     Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

176.     Both John Doe #1 and John Doe #2 have suffered personal injury as a result of Twitter's violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

- 43 -
FIRST AMENDED COMPLAINT

**COUNT V**

**CALIFORNIA PRODUCTS LIABILITY**

177.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

178.     Twitter created its platform, API, and related products, and distributes them and has placed these products into commerce.

179.     Twitter is designed to enable its users to disseminate information very quickly to large numbers of people.

180.     Twitter is designed so that search terms and hashtags utilized for trading CSAM return suggestions for other search terms and hashtags related to CSAM.

181.     Twitter's algorithm(s), API, and other proprietary technology are used by child predators and sex traffickers to distribute CSAM on a massive scale. Additionally, this technology is used by pedophiles to find each other via hashtags and search terms and used by sex traffickers to find their customers and advertise via Twitter's platform.

182.     Twitter is not designed to enable its users to easily report CSAM, nor is it designed so that CSAM is immediately blocked pending review when reported.

183.     On information and belief, Twitter does not consistently deploy IP blocking, or other measures, to prevent users suspended by Twitter for disseminating CSAM from opening new accounts under different names.

184.     While third parties posted CSAM of John Doe #1 and John Doe #2 on Twitter's platform, due to the structure of the platform, including Twitter's capacity to monitor, block, or delete content on the platform, the product in question never left Twitter's possession.

185.     After the third parties posted CSAM of John Doe #1 and John Doe #2 on Twitter's platform, Twitter refused to remove the CSAM when John Doe notified them, allowing and monetizing at least 167,000 views and 2,220 retweets of the CSAM depicting the Plaintiffs.

186.     John Doe #1 and John Doe #2 were additionally harmed by having at least 167,000 people view their abuse and 2,220 retweet it, compounding the views, consistent with how Twitter designed its platform to facilitate swift and broad distribution of CSAM, but without sufficient safeguards so that CSAM is removed and reported quickly.

187.     Twitter's products are defective because they do not perform as safely as an ordinary consumer would expect them to perform when used in an intended or reasonably foreseeable way.

188.     Twitter is a product about which consumers should be able to have reasonable minimum safety expectations; namely, that a mainstream, general social media platform will not serve as a mass distribution channel for CSAM.

189.     Having insufficient features to prevent the Twitter platform from being used as a mass distribution channel for CSAM is a defect in the design of the Twitter platform.

190.     Plaintiffs were harmed by these defects in Twitter's products and the products' failure to perform safely is a substantial factor in causing the harm to Plaintiffs.

## COUNT VI

### NEGLIGENCE

191.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

192.     The possession and distribution of child pornography (i.e. CSAM) is illegal under both federal law and the laws of California.[37] Additionally, CSAM is illegal in every other state in the United States as well as across the world where Twitter does business.

193.     The CSAM depicting Plaintiffs John Doe #1 and John Doe #2 was a violation of Twitter's own policies and terms of service.

194.     Twitter had a duty to protect John Doe #1 and John Doe #2. Twitter had actual knowledge that Plaintiffs John Doe #1 and John Doe #2 were minors, and that CSAM depicting them was being distributed on its platform, in violation of both the law and Twitter's own policies.

195.     Twitter breached that duty and continued to disseminate the unlawful CSAM causing it to be viewed at least 167,000 times and retweeted 2,220 times for additional views.

196.     The distribution of the CSAM depicting John Doe was monetized by Twitter and it receive financial benefit from its distribution on its platform.

197.     Twitter's broad distribution of the CSAM depicting John Doe #1 and John Doe #2 has caused them severe harm, including physical, emotional, reputational, and financial harm.

## COUNT VII

## GROSS NEGLIGENCE

198.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

_____

[37] *See generally*, 18 U.S.C. § 2252A *and* Cal. Penal Code § 311.1 (West 2020).

199.     Twitter had a duty to protect John Doe #1 and John Doe #2. Twitter had actual knowledge that Plaintiffs John Doe #1 and John Doe #2 were minors, and that CSAM depicting them was being distributed on its platform, in violation of both the law and Twitter's own policies.

200.     Twitter breached that duty and continued to disseminate and profit from the unlawful CSAM, causing it to be viewed at least 167,000 times and retweeted 2,223 times for additional views.

201.     By permitting the CSAM depicting Plaintiffs to remain on its platform after it was notified of the material's presence by members of the public, by John Doe #1, and by John Doe's mother, Twitter exhibited a lack of any care.

202.     Twitter's conduct is an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to others.

203.     As a direct result of Twitter's conduct, John Doe #1 and John Doe #2 have suffered severe harm, including physical, emotional, reputational, and financial harm.

## COUNT IIX

## NEGLIGENCE PER SE

204.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

205.     Twitter's conduct with respect to Plaintiffs violated numerous laws including but not limited to 18 U.S.C. §§ 1591 and 1595 (benefiting from a sex trafficking venture), 18 U.S.C. § 2258A (failing to report known child sexual abuse material), 18 U.S.C. § 2552A (knowingly

distributing child pornography), Cal. Civ. Code § 1708.85 (intentionally distributing non-consensually shared pornography), and Cal. Penal Code § 311.1 (possessing child pornography).

206.    Twitter's violation of numerous laws was a substantial factor in bringing about harm to Plaintiffs and as a consequence Twitter is negligent.

## COUNT IX

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

207.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

208.    Twitter's conduct in refusing or failing to remove the CSAM depicting Plaintiffs John Doe #1 and John Doe #2 was outrageous, due to the extreme illegality and abusive nature of the content and Twitter's large distribution potential.

209.    Severe emotional distress is typical for sexual abuse and human trafficking victims, and it is magnified when depictions of the abuse are made public, especially to large numbers of people.

210.    Twitter acted with reckless disregard of the probability that John Doe #1 and John Doe #2 would suffer emotional distress from Twitter's continued distribution of sexual abuse material depicting them.

211.    Plaintiffs suffered severe emotional distress and mental anguish due the public depiction of their abuse, which proliferated as Twitter refused to remove it.

212.    Twitter's conduct was both the cause and a substantial factor in causing Plaintiffs' severe emotional distress and mental anguish.

- 48 -
FIRST AMENDED COMPLAINT

## COUNT X

**DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS,
CAL. CIV. CODE § 1708.85**

213.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

214.    By refusing to remove or block the photographic images and video depicting him after Plaintiff John Doe #1 notified Twitter that both he and John Doe #2 were minors, Twitter intentionally distributed on its online platform photographic images and video of the Plaintiffs.

215.    Plaintiffs John Doe #1 and John Doe #2 did not consent to the online distribution of the photographic images and video depicting them.

216.    Twitter knew that Plaintiffs had a reasonable expectation that the photographic images and video depicting them would remain private.

217.    The photographic images and video exposed intimate body parts of John Doe #1 and John Doe #2.

218.    Plaintiffs were harmed by Twitter's knowing and intentional distribution of the photographic images and video and Twitter's conduct was a substantial factor in cause the harm to Plaintiffs.

## COUNT XI

**INTRUSION INTO PRIVATE AFFAIRS**

219.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

- 49 -
FIRST AMENDED COMPLAINT

220.    Twitter knew that Plaintiffs had a reasonable expectation that the photographic images and video depicting him would remain private.

221.    Twitter intentionally intruded into Plaintiffs' reasonable expectation of privacy by continuing to distribute the photographic images and video depicting them after John Doe #1 notified Twitter that Plaintiffs were minors and the material had been posted on its platform without their consent.

222.    Twitter's intentional intrusion into Plaintiffs' reasonable expectation of privacy would be highly offensive to a reasonable person.

223.    Plaintiffs were harmed by Twitter's knowing and intentional distribution of the photographic images and video and Twitter's conduct was a substantial factor in cause the harm to Plaintiffs.

## COUNT XII

### INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, SECTION I

224.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

225.    Plaintiffs had a legally protected right to privacy under California law.  Article I, Section I of the California Constitution states: "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

226.    Twitter knew that Plaintiffs had a reasonable expectation that the photographic images and video depicting them would remain private.

- 50 -
FIRST AMENDED COMPLAINT

227.    Twitter intentionally intruded into Plaintiffs' reasonable expectation of privacy by continuing to distribute the photographic images and video depicting him after John Doe #1 notified Twitter that he was a minor and the material had been posted on its platform without his consent.

228.    Twitter's intentional intrusion into Plaintiffs' reasonable expectation of privacy would be highly offensive to a reasonable person and was a violation of Plaintiffs' right to privacy as set forth in Article I, Section I of the California Constitution. Plaintiffs were harmed by Twitter's knowing and intentional distribution of the photographic images and video and Twitter's conduct was a substantial factor in cause the harm to John Doe #1 and John Doe #2.

## COUNT XIII

## VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200

229.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

230.    At all times mentioned herein, Twitter utilized and exploited Plaintiffs for its own benefit and profit.  Plaintiffs, to their detriment, reasonably relied upon Twitter's willful and deceitful conduct and assurances that it effectively moderates and otherwise controls third-party user content on its platforms.  Specifically, Plaintiffs relied on Twitter's "zero tolerance policy against violent threats," "zero-tolerance child sexual exploitation policy," and its banning of slurs, epithets, and "sexist tropes, or other content that degrades someone."  These policies were not properly implemented or enforced.

231.    The aforementioned acts and omissions of Defendant, as herein alleged, constitute unfair business practices in that they were unlawful in violation of various statutes and were unfair and/or fraudulent within the meaning of California Business and Professions Code Sections 17200, *et seq*.

232.    As a result of Twitter's actions, inactions, and policies, Plaintiffs suffered harm.

233.    As a direct and proximate result of the willful, deceitful, unlawful, and unfair business practices of Defendant, Plaintiffs John Doe #1 and John Doe #2 have incurred injuries and damages, including but not limited to, physical, psychological, financial, and reputational harm, in an amount to be proven at trial.

234.    Accordingly, Plaintiffs John Doe #1 and John Doe #2 seek restitution, pursuant to Business and Professions Code Section 17203, of all amounts to which Twitter has been unjustly enriched as a result of its unlawful, unfair, and/or fraudulent acts.

235.    WHEREFORE, Plaintiffs pray for judgment for damages as hereinafter set forth.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor, and against the Defendant, and grant the following relief:

A.  That the Court grant preliminary and permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts and practices described herein;

B.  That the Court award Plaintiffs compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

- 52 -
FIRST AMENDED COMPLAINT

C. Requiring restitution and disgorgement of all profits and unjust enrichment obtained as a result of Defendant's unlawful conduct;

D. That the Court award punitive or exemplary damages in an amount to be determined at trial;

E. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F. That the Court award statutory damages and penalties;

G. That the Court award pre- and post-judgment interest at the maximum legal rate;

H. Other equitable relief as the Court may deem just and proper; and

I. That the Court retain jurisdiction of this matter to ensure all forms of relief it deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: April 7, 2021          By:      /s/ *Paul A. Matiasic*          
Paul A. Matiasic
Hannah E. Mohr
**THE MATIASIC FIRM, P.C.**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
*matiasic@mjlawoffice.com*

Lisa D. Haba*
Adam A. Haba*
**THE HABA LAW FIRM, P.A.**
1220 Commerce Park Dr., Suite 207
Longwood, FL 32779

- 53 -
FIRST AMENDED COMPLAINT

Telephone: (844) 422-2529
*lisahaba@habalaw.com*
*adamhaba@habalaw.com*


Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
**NATIONAL CENTER ON SEXUAL
EXPLOITATION**
1201 F Street, NW, Suite 200
Washington, D.C. 20004
Telephone: (202) 393-7245
*lawcenter@ncose.com*

***Attorneys for Plaintiffs***

*\*Admitted Pro Hac Vice*

- 54 -
FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email address denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of April, 2021.

    /s/ *Hannah E. Mohr*
Paul A. Matiasic
Hannah E. Mohr
**THE MATIASIC FIRM, P.C.**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
*matiasic@mjlawoffice.com*

FIRST AMENDED COMPLAINT