**NATIONAL CENTER ON
SEXUAL EXPLOITATION**
Benjamin W. Bull*
Peter A. Gentala*
Danielle Bianculli Pinter*
Christen M. Price*
1201 F ST NW, Suite 200
Washington, D.C., 20004
Telephone: (202) 393-7245
lawcenter@ncose.com

**THE HABA LAW FIRM, P.A.**
Lisa D. Haba*
Adam A. Haba*
1220 Commerce Park Dr., Suite 207
Longwood, FL 32779
Telephone: (844) 422-2529
lisahaba@habalaw.com
adamhaba@habalaw.com

**THE MATIASIC FIRM, P.C.**
Paul A. Matiasic (SBN 226448)
Hannah E. Mohr (SBN 294193)
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
matiasic@mjlawoffice.com

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE #1 AND JOHN DOE #2,<br><br>   Plaintiffs,<br><br>vs.<br><br>TWITTER, INC.,<br><br>   Defendant. | Case No. 3:21-cv-00485-JCS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br><br>Hearing Scheduled: July 30, 2021 |

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

ARGUMENT .......................................................................................................... 1

I.     THE MOTION TO DISMISS STANDARD ..................................................... 1

II.    THE FIRST AMENDED COMPLAINT ("FAC") STATES A CLAIM FOR BOTH DIRECT AND BENEFICIARY SEX TRAFFICKING VIOLATIONS, CONSISTENT WITH SECTION 230'S EXCEPTION FOR SEX TRAFFICKING LAWSUITS UNDER FOSTA.................................................................................. 3

    A.    The FAC States a Claim for Sex Trafficking Pursuant to Direct Perpetrator Liability Under Section 1591(a)(1) and 1595. .......................................................... 3

        1.    The FAC Sufficiently Alleges that Twitter Knowingly Provided, Obtained, and Maintained Persons on its Platform by any Means..................................... 3

        2.    The FAC Sufficiently Alleges that Twitter Knew, or Recklessly Disregarded that, the Commercial Sex Acts at Issue Featured Minors. .................................... 5

    B.    The FAC States a Claim for Sex Trafficking Pursuant to Beneficiary Liability Under Sections 1591(a)(2) and 1595. ...................................................... 6

        1.    The FAC Sufficiently Alleges that Twitter Knowingly Benefited Financially and by Receiving Something of Value from the Commercial Sex Acts at Issue. .............. 6

        2.    The FAC Sufficiently Alleges that Twitter Participated in What it Knew or Should Have Known was a Sex Trafficking Venture. ....................................... 10

    C.    The Legislative History Demonstrates Congress's Intent to Protect Victims of Sex Trafficking Such as the John Doe Plaintiffs in this Case............................. 16

III.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT BAR CLAIMS FOR TWITTER'S KNOWING, UNLAWFUL CONDUCT. ......... 19

    A.    The Plain Text of CDA 230 Does Not Immunize Twitter's Knowing Violations of Child Pornography Laws. ............................................................... 19

    B.    The Stated Purpose of CDA 230 is Inconsistent and Incompatible with the Absolute-Immunity Interpretation Urged by Twitter. ......................................... 21

    C.    CDA 230 Does Not Immunize Twitter from Civil Liability for Possession and Distribution of Child Pornography because it is Illegal Contraband, Not Speech. .............. 22

    D.    Twitter Failed its Statutory Duty to Report the Child Sex Abuse Material Harming the Plaintiffs........................................................................................ 25

**IV.   THE FAC SUFFICIENTLY ALLEGES A PRODUCT LIABILTY CLAIM BASED ON TWITTER'S UNREASONABLY UNSAFE DESIGN AND PERFORMANCE.** ............................................................................ 26

**V.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE ALLOWED TO PROCEED BECAUSE THEY SUFFICIENTLY ALLEGE A VIOLATION OF TWITTER'S STATUTORY OBLIGATIONS AND DUTY OF CARE ONCE IT KNEW ABOUT THE CSAM DEPICTING THE PLAINTIFFS.** .................................... 27

**VI.   PLAINTIFFS' BUSINESS AND PROFESSIONAL CODE SECTION 17200 SUFFICIENTLY ALLEGES A CLAIM.** ................................................................ 29

**CONCLUSION** ........................................................................ 30

**CERTIFICATE OF SERVICE** ........................................................ 32

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

**Cases**

*A.B. v. Hilton Worldwide Holdings Inc.*, 484 F.Supp.3d 921 (D. Or. Sept. 8, 2020) ..................... 7

*A.B. v. Marriott Int'l Inc.*, 455 F. Supp. 3d 171 (E.D. Pa. 2020) .................................................... 7

*A.C. v. Red Roof Inns, Inc.*, 2020 WL 3256261 (S.D. Ohio Jun. 16, 2020) ................................ 7

*Ardolf v. Weber*, 332 F.R.D. 467 (S.D.N.Y. 2019) ......................................................................... 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................ 2

*B.M. v. Wyndham*, 2020 WL 4368214 (N.D. Cal. July 30, 2020) ........................................ passim

*Balderas v. Countrywide Bank, N.A.*, 664 F.3d 787 (9th Cir. 2011) ..................................... 29, 30

*Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009) ................................................................ 20

*Beaver v. Tarsadia Hotels*, 29 F. Supp. 3d 1294 (S.D. Cal. 2014), *aff'd*, 816 F.3d 1170 (9th Cir.

  2016) ........................................................................................................................................ 26

*Boyle v. United States*, 556 U.S. 938 (2009) ............................................................................... 11

*Cheneau v. Garland*, No. 15-70636, 2021 WL 1916947 (9th Cir. May 13, 2021) ..................... 19

*Chetal v. Am. Home Mortg.*, No. C 09-02727 CRB, 2009 WL 2612312 (N.D. Cal. Aug. 24, 2009)

  .................................................................................................................................................. 30

*Dillard v. Victoria M. Morton Enterprises, Inc.*, No. 08-1339 FCD/GGH, 2008 WL 11388472

  (E.D. Cal. Oct. 8, 2008) ...................................................................................................... 29, 30

*DiRosa v. Showa Denko K.K.*, 44 Cal. App. 4th 799 (1996) ....................................................... 26

Doe 1 v. Red Roof Inns, Inc., Case No. 1:19-cv-3840, 2020 WL 1872335 (N.D. Ga. Apr. 13,

  2020) ........................................................................................................................................ 14

*Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192 (S.D. Ohio Mar.

  16, 2020) ............................................................................................................................. 7, 14

*Doe v. Bates*, 2006 WL 3813758 (E.D. Tex., Dec. 27, 2006) ...................................................... 24

*Dyer v. United States,* 832 F.2d 1062 (9th Cir. 1987) ................................................................... 19

E.S. v. Best W. Int'l, Inc., No. 3:20-CV-00050-M, 2021 WL 37457 (N.D. Tex. Jan. 4, 2021)... 14

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ........................................................................................................................... 19, 21

*Finelite, Inc. v. Ledalite Architectural Prods.*, No. C-10-1276 MMC, 2010 WL 3385027, at *2 (N.D. Cal. Aug. 26, 2010) ........................................................................................................ 31

*Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 811 (N.D. Cal. 2011) ......................................... 31

*Geiss v. Weinstein Co. Holdings LLC*, 383 F.Supp. 3d 156 (S.D.N.Y. 2019) ............................... 8

*Gray v. Toyota Motor Sales, U.S.A., Inc.*, 554 F. App'x 608 (9th Cir. 2014) ............................... 2

*H.H. v. G6 Hosp., LLC*, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ......................................... 7

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) .......................................................................... 31

*In re Tracht Gut, LLC*, 836 F.3d 1146 (9th Cir. 2016) .................................................................. 2

*J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 6318707 (N.D. Cal. Oct. 28, 2020) ...................................................................................................................... 7, 14

*Jabagat v. Lombardi*, 2015 WL 11004900 (S.D. Miss. Jan. 30, 2015) ......................................... 8

*Jimenez v. Quarterman*, 555 U.S. 113 (2009) ............................................................................ 19

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) ..................................................................................................................... 8

*Lemmon v. Snap, Inc.*, No. 20-55295, 2021 WL 1743576 (9th Cir. May 4, 2021) ...................... 27

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019) .... 7, 14, 15

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) (Thomas, J. dissenting) ................................................................................................................................. 25

*Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003) ....................................... 24

Noble v. Weinstein, 335 F. Supp. 3d 504 (S.D.N.Y. 2018) ........................................... 14

*Paroline v. U.S.*, 572 U.S. 434 (2014) ............................................................. 23

*Perry v. Robertson*, 201 Cal.App.3d 333 (1988) ..................................................... 29

*Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090 (N.D. Cal. 2008) .............................. 30

*Reno v. ACLU*, 521 U.S. 844 (1997).................................................................. 21

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017).................................................... 15

*Rowe v. Educ. Credit Mgmt. Corp.,* 559 F.3d 1028 (9th Cir.2009).................................... 19

*S. Y. v. Naples Hotel Co.*, 476 F.Supp.3d 1251 (M.D. Fla. Aug. 5, 2020) ............................... 7

S.J. v. Choice Hotels Int'l, Inc., 473 F.Supp.3d 147 (E.D.N.Y. 2020) ................................... 14

S.Y. v. Wyndham Hotels & Resorts, Inc. & Laxmi of Naples, LLC, No. 2:20-CV-619-JES-MRM,

    2021 WL 1814651 (M.D. Fla. May 6, 2021) ..................................................... 14

*Smith v. United States*, 508 U.S. 223 (1993) ......................................................... 4

*Tinoco v. San Diego Gas & Elec. Co.*, No. 17-CV-2433-BAS-JLB, 2018 WL 4562479 (S.D. Cal.

    Sept. 21, 2018) ......................................................................... 29, 30

*United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016) ........................................ 11, 14

*United States v. Cook*, No. 10-00244-02-CR-W-DW, 2013 WL 3039296, at (W.D. Mo. June 17,

    2013), *aff'd*, 782 F.3d 983 (8th Cir. 2015).................................................... 4

*United States v. Flanders*, 752 F.3d 1317 (11th Cir. 2014).......................................... 4

*United States v. Jungers*, 702 F.3d 1066 (8th Cir. 2013)............................................ 4

*United States v. Love*, 743 F. App'x 138 (9th Cir. 2018) ........................................... 4

*United States v. Todd*, 627 F.3d 329 (9th Cir. 2010) ............................................... 13

*United States v. Tollefson*, 367 F. Supp. 3d 865 (E.D. Wis. 2019) ............................... 4, 5

*United States v. Turkette*, 452 U.S. 576 (1981) ................................................ 11

*Washington v. Deleon*, 2019 WL 11691424 (N.D. Cal. July 9, 2019) ........................ 11

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)........................................ 24

**Statutes**

18 U.S.C. § 1591 ........................................................................................ passim

18 U.S.C. § 1595 ........................................................................................ passim

18 U.S.C. § 2252 ........................................................................... 12, 23, 24, 25

18 U.S.C. § 2252A ..................................................................................... passim

18 U.S.C. § 2256 ............................................................................................. 26

18 U.S.C. § 2258A ........................................................................................... 26

18 U.S.C. § 2258B ........................................................................................... 26

47 U.S.C. § 230 ......................................................................................... passim

Cal. Evid. Code § 669 ...................................................................................... 29

**Other Authorities**

115 Cong. Rec. H1290, 1291 (statement of Rep. Jackson Lee) .................................. 18

164 Cong. Rec. S1849-08, S1853 (statement of Sen. Heitkamp)................................ 17

164 Cong. Rec. S1849-08, S1855 (statement of Sen. Portman).................................. 18

164 Cong. Rec. S1860-62) (statement of Senator Durbin)........................................ 17

4 Witkin Cal. Proc. (5th ed. 2008) § 402ff .......................................................... 29

47 U.S.C.A. § 230 ........................................................................................... 22

Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat
1253 (2018)............................................................................................... 17

Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, PL No. 115-299

   (2018) .................................................................................................................... 23

Protection of Children from Sex Predators Act of 1998, PL 105–314, 112 Stat 2974 (1998) ..... 25

**Rules**

Fed.R.Civ.P. 12(b)(6) .................................................................................................. 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

This is an actual knowledge case. Twitter knew that child pornography—also known as child sex abuse material ("CSAM")[1]—presenting two (2) thirteen-year-old boys engaged in sex acts was being widely distributed on its platform. Twitter also knew that this CSAM was created through an act of sex trafficking. With this knowledge, Twitter took the deliberate action of leaving the material on its platform, allowing it to gather hundreds of thousands of views, numerous shares (re-tweets), and countless downloads and screen captures. Each viewing and re-tweet further victimized Plaintiffs. Each viewing and re-tweet accelerated interactions on the Twitter platform, which in turn, immeasurably increased profit for Twitter, as evidenced through Twitter's own platform-monetization structure.

In its Motion to Dismiss the First Amended Complaint ("MTD"), Twitter claims that the entire action should be dismissed under 47 U.S.C. § 230 ("CDA 230") and that Plaintiffs have failed to state a claim upon which relief can be granted. This is incorrect for four (4) definitive reasons. First, Plaintiffs' claims under the Trafficking Victims Protection Act ("TVPA") are exempt from CDA 230. Second, CDA 230's plain language provides no protection for CSAM possession and distribution. In CDA 230, Congress provided platforms like Twitter a safe harbor for good-faith removal—not bad-faith redistribution—of harmful material like obscenity and CSAM. Third, Plaintiffs' product liability claim does not seek to treat Twitter as a "publisher" or "speaker" and so falls outside CDA 230's scope. Fourth, and finally, Plaintiffs' state-law claims sufficiently allege wrongdoing and a breach of its duty of care through Twitter's knowing distribution of CSAM depicting Plaintiffs.

**ARGUMENT**

**I.     THE MOTION TO DISMISS STANDARD**

To survive a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6),

---

[1] The codified legal term is "child pornography."  *See* 18 U.S.C. § 2256(8). This brief will use the term "child sexual abuse material" or "CSAM"—because it more accurately describes the harmful and abusive nature of the material.

a complaint must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

A court must construe the complaint's allegations "in the light most favorable to the nonmoving party." *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 554 F. App'x 608, 608–09 (9th Cir. 2014) (internal citations omitted). A court also "must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016) (internal citations omitted).

Yet in its MTD, Defendant improperly introduces factual claims to support its arguments, and essentially demands that the Court draw all reasonable inferences in its favor. This is contrary to well-established law and basic principles of common sense. Specifically, Twitter's MTD improperly contains an extended discussion of facts outside the FAC, including Twitter's alleged zero-tolerance for CSAM, its child protection measures, and how many accounts it has ostensibly suspended for CSAM violations. MTD at 1-6. Defendant also improperly discusses its policies and practices at length elsewhere in the MTD, including arguing why Facebook makes millions more NCMEC reports than Twitter does, and claiming that "Twitter takes active steps against sex trafficking[.]," MTD at 6, 19. Moreover, Twitter even inappropriately attaches declarations to its MTD, as an apparent attempt to offer its own evidence outside the four corners of the FAC. MTD; Exhibits 1 to 8. Additionally, Twitter also improperly denies the truth of Plaintiffs' allegations rather than contesting their legal sufficiency. MTD at 14. Finally, Twitter's language erroneously suggests that Plaintiffs must prove their case at this initial stage of litigation.[2]  However, as basic rules of pleading dictate,

---

[2] *See, e.g.*, Def. Mot. to Dismiss at 17 (claiming Plaintiffs' allegations do not "*establish[]* a causal relationship" between Plaintiffs' sex trafficking and Twitter's benefiting); *id.* ("Thus, Plaintiffs must *show* that Twitter knew specifically[.]" (emphasis added); *id.* (claiming that §1591's mens rea is "difficult to prove" to contest Plaintiffs' allegations about Twitter's

Plaintiffs are only required to allege sufficient facts to state a legal claim and are entitled to two presumptions (one of which Defendant does not even acknowledge): (1)that their facts are to be considered as true, and (2) that all reasonable inferences shall be drawn in their favor.

## II.   THE FIRST AMENDED COMPLAINT ("FAC") STATES A CLAIM FOR BOTH DIRECT AND BENEFICIARY SEX TRAFFICKING VIOLATIONS, CONSISTENT WITH SECTION 230'S EXCEPTION FOR SEX TRAFFICKING LAWSUITS UNDER FOSTA.

Plaintiffs' FAC properly alleges claims under Section 230's exception for sex trafficking lawsuits, and specifically, Plaintiffs have stated claims for (a) direct sex trafficking violations under 18 U.S.C. §§ 1591(a)(1), and (b) beneficiary sex trafficking violations under the standards for both §1591(a)(2) and § 1595(a).

### A.   The FAC States a Claim for Sex Trafficking Pursuant to Direct Perpetrator Liability Under Section 1591(a)(1) and 1595.

#### 1.   The FAC Sufficiently Alleges that Twitter Knowingly Provided, Obtained, and Maintained Persons on its Platform by any Means.

Section 1591(a)(1) provides for liability for a perpetrator who "knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person," while "knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]" 18 U.S.C. § 1591(a). Section 1591 does not require the offending party to be involved in a venture.

The phrase "by any means" is not defined and contains no exception for electronic or virtual actions.  18 U.S.C. § 1591 (a)(1). The terms "provided," "obtained," and "maintained" are not defined in context to § 1591. Courts must interpret terms not defined in a statute according to their ordinary meaning. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S.

_____

knowledge); *id.* at 29 ("To the extent Plaintiffs rely on allegations that Twitter was generally aware that sex trafficking occurred on its platform, they also *fail to establish* Twitter's constructive knowledge that the videos involved sex trafficking.") (emphasis added); *id.* at 29 ("Last, the mere passage of nine days between the offending Tweet and the content takedown is not enough to *show* that Twitter 'should have known.'") (emphasis added).

223, 228 (1993) (internal citation omitted). The Ninth Circuit has done this by citing standard dictionary definitions to interpret undefined terms in the TVPRA. *United States v. Love*, 743 F. App'x 138, 139 (9th Cir. 2018) (using Webster's dictionary to define "force" in § 1591(a)(1) charge against sex trafficker).[3] In the instant case, the terms "provided," "obtained," and "maintained" have the following common meanings:

> **Provide:** "to supply or make available (something wanted or needed)" or "to make something available to;"[4]
>
> **Obtain:** "to gain or attain usually by planned action or effort;"[5]
>
> **Maintain:** "to keep in an existing state (as of repair, efficiency, or validity), preserve from failure or decline or to continue or persevere in."[6]

Here, Plaintiffs have alleged that Twitter made them available, as depicted in a CSAM compilation video, to users on Twitter, having gained or attained Plaintiffs by the same electronic means, and having kept them in the same existing state, all despite Plaintiffs' own reports and objections.[7]

Pornography, including child pornography, can be the basis for a § 1591(a)(1) claim. *See, e.g.*, *United States v. Flanders*, 752 F.3d 1317, 1330 (11th Cir. 2014) (applying § 1591(a)(1) for fraudulently inducing adults to participate in pornography film); *United States v. Tollefson*, 367 F. Supp. 3d 865, 878-880 (E.D. Wis. 2019) (§ 1591(a) claim where defendant induced 13 year old to create pornography of herself over an app). Notably, in *Tollefson*, the defendant manipulated a child into creating pornography of herself to share with him over an

---

[3] *See also United States v. Jungers*, 702 F.3d 1066, 1070-71 (8th Cir. 2013) (using various dictionaries to define "obtain" to include sex buyer in § 1591(a)(1) charge); *United States v. Cook*, No. 10-00244-02-CR-W-DW, 2013 WL 3039296, at *11-12 (W.D. Mo. June 17, 2013), *aff'd*, 782 F.3d 983 (8th Cir. 2015) (using Webster's dictionary to define "obtain" in § 1591(a)(1) charge against sex buyer and pornography user); *Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019) (using Merriam-Webster's Dictionary to define "entice" and "recruit" to deny motion to dismiss § 1591(a)(1) charge based on sexual molestation of models during photo shoot).
[4] *Provide*, https://www.merriam-webster.com/dictionary/provide (last viewed June 4. 2021).
[5] *Obtain,* https://www.merriam-webster.com/dictionary/obtain (last viewed June 4. 2021).
[6] *Maintain*, https://www.merriam-webster.com/dictionary/maintain (last viewed June 4. 2021).
[7] *See* FAC at ¶¶ 101-131, 147-155.

app, in exchange for certain virtual rewards or currencies. 367 F. Supp. 3d at 868-870. The court found these allegations stated a claim for sex trafficking, as the virtual rewards meant that the video was a commercial sex act, and the victim was a minor. *Id.* at 879-880. The *Tollefson* decision demonstrates that child pornography allegations, where the defendant did not have physical contact or exchange money with the victim, can state a § 1591(a)(1) sex-trafficking claim. The FAC, by alleging that Twitter knowingly possessed, disseminated, and refused to remove sex trafficking content, sufficiently alleges that Twitter knowingly provided, obtained, and maintained sex trafficked persons by electronic means through Twitter's platform.[8]

### 2. The FAC Sufficiently Alleges that Twitter Knew, or Recklessly Disregarded that, the Commercial Sex Acts at Issue Featured Minors.

Section 1591(a)(1) applies to anyone who engages in the above actions while "knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]". 18 U.S.C. § 1591(a). A commercial sex act means "any sex act, on account of which anything of value is given to or received by any person[.]" § 1591(e)(3).

Plaintiffs have alleged actual knowledge. Plaintiffs alleged that they reported child sexual abuse material featuring them to Twitter, depicting them engaged in sexual acts due to extortion and blackmail (that is, in exchange for "something of value").[9] Plaintiffs also allege that John Doe 1 provided proof of his age to Twitter, that numerous users commented on their belief that videos featured minors and that one disseminating account had already been reported to Twitter for CSAM.[10]

Taken together, these allegations are more than sufficient to indicate that Twitter knew, or at least was in reckless disregard of, Plaintiffs' status as minors when engaging in the

---

[8] *See* FAC at ¶¶112-129.
[9] *Id.* at ¶¶ 112, 114, 123.
[10] *Id.* at ¶¶ 101-102, 114, 121-122.

commercial sex acts at issue. Thus, Plaintiffs sufficiently allege Twitter knowingly provided, obtained, and maintained them, by electronic means, knowing and in reckless disregard that they were minors who had been caused to engage in commercial sex acts, namely, creating CSAM of themselves through coercion and extortion.[11]

### B. The FAC States a Claim for Sex Trafficking Pursuant to Beneficiary Liability Under Sections 1591(a)(2) and 1595.

Section 1591(a)(2) provides for beneficiary liability for a perpetrator who "knowingly . . . benefits financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1) . . . knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]" 18 U.S.C. § 1591(a). "Participation in a venture" means "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." § 1591(e)(4). Section 1595(a) allows sex trafficking victims to sue both direct and beneficiary perpetrators, and those who benefit financially more generally: that is, by knowingly benefiting from what they know or should know is a sex trafficking venture. 18 U.S.C. §1595(a). The following will analyze the elements of both Sections, which have similar provisions for those who benefit financially, and distinct requirements for participation in a venture and the requisite level of knowledge.

### 1. The FAC Sufficiently Alleges that Twitter Knowingly Benefited Financially and by Receiving Something of Value from the Commercial Sex Acts at Issue.

"To state a claim under a section 1595(a) beneficiary theory," Plaintiffs first "must allege facts from which the Court can reasonably infer that" Twitter "knowingly benefit[ted] financially or by receiving anything of value[.]" *B.M. v. Wyndham*, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020). Both §§1591(a)(2) and §1595 contain the same language as to the

---

[11] FAC at ¶¶ 112-129.

financial benefit element of the standard.[12]

In *B.M.*, Defendant Wyndham Hotels argued that the financial benefit "must derive directly from, and be knowingly received in exchange for, participation in a sex trafficking venture." *B.M.,* 2020 WL 4368214, at *4 (internal citations omitted). This district disagreed, finding that § 1595 claims could not be subjected to the same knowledge standard as § 1591 without undermining the "should have known" language, and the Court concluded that it was sufficient to allege that the hotels knowingly received revenue from room rentals. *B.M. v. Wyndham*, 2020 WL 4368214, at *4 (internal citations omitted) (finding that hotel's revenues from room rental to sex trafficker meets financial benefit element).[13] Applying the *B.M.* standard for knowledge of the financial benefit to Plaintiffs' § 1595 claim, Defendant Twitter knowingly received a benefit and something of value from the CSAM by monetizing it, as Plaintiffs allege.[14] Furthermore, the value received does not have to be money. Plaintiffs allege that Twitter received something of value through the advertising on the page, through the data acquisition, since the CSAM video could only be seen by individuals with a Twitter account, and through the increase in activity on its platform via re-tweets and additional views of the CSAM. In the Twitter world, there is a currency to be had in viewers – the more viewers, the more popular the platform, which will lead to more advertisements, and new users from which data can be licensed.[15]

---

[12] *Compare* § 1591(a)("Whoever knowingly . . . benefits, financially or by receiving anything of value[.]") *with* § 1595(a)("[W]hoever knowingly benefits, financially or by receiving anything of value[.]").
[13] Numerous other courts have taken this approach.  *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 6318707, at *4 (N.D. Cal. Oct. 28, 2020); *A.B. v. Marriott Int'l Inc.*, 455 F. Supp. 3d 171, 191 (E.D. Pa. 2020); *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *5 (S.D. Ohio Mar. 16, 2020); *A.C. v. Red Roof Inns, Inc.*, 2020 WL 3256261, at *4 (S.D. Ohio Jun. 16, 2020); *S. Y. v. Naples Hotel Co.*, 476 F.Supp.3d 1251, 1255-56 (M.D. Fla. Aug. 5, 2020); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F.Supp.3d 921, 935-936 (D. Or. Sept. 8, 2020); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019).
[14] FAC at ¶¶ 52-54; 74-79; 196, 200.
[15] FAC at ¶¶ 25, 30-41, 52-54, 70-79,

**PLS.' OPPOSITION TO DEF.'S
MOTION TO DISMISS
CASE NO. 3:21-CV-00485-JCS**

Twitter cites two cases from other jurisdictions for the proposition that any benefit Twitter receives must have a causal relationship to the sex trafficking. MTD at 13, 15 (citing *Geiss v. Weinstein Co. Holdings LLC*, 383 F.Supp.3d 156, 169 (S.D.N.Y. 2019); *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013)). *Kolbek* is inapposite; it was a summary judgment decision analyzing whether commercial sex acts had occurred at all, testing the plaintiffs' evidence, not their complaint's sufficiency.[16] *Geiss* is also distinguishable, because, in the instant case, Plaintiffs allege that Twitter profited specifically from the CSAM dissemination,[17] while in *Geiss,* it was not clear whether the defendant's employees specifically benefited from his abuse, as opposed to merely being on his payroll.  *Geiss v. Weinstein Co. Holdings LLC*, 383 F.Supp.3d 156, 168-70 (S.D.N.Y. 2019).[18]

Even if "knowingly receiving a benefit" means knowing that the benefit has a causal relationship to sex trafficking, Plaintiffs' § 1591(a)(2) claim meets that standard, as Plaintiffs allege Defendant actually knew that it was directly benefitting from sex trafficking, because it continued to distribute the CSAM that it had monetized after it was notified of Plaintiffs' ages and extortion.[19]

In the MTD, Defendant flatly denies what Plaintiffs have plainly pled concerning the benefit Twitter received:

| Defendant's Claims | Plaintiffs' Allegations |
| --- | --- |
| "There is no factual allegation that   Twitter   monetized   or | "The distribution of the CSAM depicting John Doe was monetized by Twitter and it receive financial benefit from |

---

[16] *See Kolbek,* 2013 WL 6816174 at *16 ("In sum, Plaintiffs offer no evidence of a causal relationship between the sex acts and the payment of expenses. The fact that sexual abuse was committed by the ministry's leader and that members of the ministry had their expenses paid for through ministry funds is simply not sufficient to establish a violation of 18 U.S.C. § 1591.").

[17] FAC at ¶¶ 196, 200.

[18] *Jabagat* is also distinguishable; the plaintiffs in that case had no substantive factual allegations apart from reciting the TVPRA elements.  *See Jabagat v. Lombardi*, 2015 WL 11004900 (S.D. Miss. Jan. 30, 2015).

[19] *See, e.g.*, FAC at ¶¶ 30-41; 112-129; 200.

| Defendant's Claims | Plaintiffs' Allegations |
|---|---|
| benefited from the videos." MTD at 16. | its distribution on its platform." FAC at ¶ 196. |
| "In fact, the FAC makes no effort to connect any of the allegations regarding Twitter's revenue streams to the videos. Instead, the FAC assumes that Twitter must have monetized the videos and thereby received benefits from Plaintiffs' alleged sex trafficking venture because Twitter monetizes all the content on its platform." *Id.* at 16. | "As described above, Twitter monetizes its platform through advertisements, sale of access to its API, and data collection." *Id.* at ¶ 52.<br><br>"As long as content on Twitter's platform remains live, Twitter monetizes that content regardless of whether it is contrary to Twitter's own policies or promotes illegal conduct." *Id.* at ¶ 53.<br><br>"Twitter thus profits from content on its platform that depicts rape, sex trafficking, child sexual abuse, and other illegal activity." *Id.* at ¶ 54. |
| "The FAC also fails to plausibly plead that Twitter knowingly generated revenue "*because of*" its alleged failure to remove the videos." *Id.* at 16. | "The videos remained live approximately another seven days, resulting in substantially more views and retweets." *Id.* at ¶ 37.<br><br>"The distribution of the CSAM depicting John Doe was monetized by Twitter and it received financial benefit from its distribution on its platform." *Id.* at ¶ 196. |
| "The FAC here merely references Twitter's advertising and data licensing revenues; it does not allege a single fact to establish any causal link between either of those revenue streams and Twitter's handling of the videos, much less that Twitter was aware of that link." *Id.* at 17. | "CSAM and sex trafficking are highly sought-after content on Twitter. This means that those wishing to view, buy, sell or trade images or videos of the sexual exploitation of others, to include children, have a platform that allows them to conduct this illegal activity. Furthermore, Twitter makes significant revenue from the presence, searches, connections, and interactions of such illegal and dangerous material." *Id.* at ¶ 71.<br><br>"Thus, while Twitter claims that it has a "zero-tolerance policy" for CSAM, its platform not only allows the distribution of CSAM, but its platform architecture also aids in the distribution of CSAM, and Twitter profits from it through advertisements." *Id.* at ¶ 84. |
| "Likewise, there is no allegation establishing a causal link between the videos and any of Twitter's data licensing revenue." *Id.* at 17. | "Over 80% of Twitter's revenue comes from advertising. In the third quarter of advertising services and $127 million of which was from data licensing." *Id.* at ¶ 25.<br><br>"Twitter explains how it receives revenue from data licensing as follows: We generate data licensing and other revenue by (i) offering data products and data licenses that allow our data partners to access, search and |

| Defendant's Claims | Plaintiffs' Allegations |
|---|---|
|  | analyze historical and real-time data on our platform (which consists of public Tweets and their content), and (ii) providing mobile advertising exchange services through our MoPub exchange.  Our data partners generally purchase licenses to access all or a portion of our data for a fixed period.  We recognize data licensing revenue as our data partners consume and benefit from their use of the licensed data..." *Id.* at ¶ 33.<br><br>"Just two days after John Doe #1 first contacted Twitter, the videos had accrued over 167,000 views and 2,223 retweets. . . The videos remained live approximately another seven days, resulting in substantially more views and retweets." *Id.* at ¶ 37.<br><br>"As long as content on Twitter's platform remains live, Twitter monetizes that content regardless of whether it is contrary to Twitter's own policies or promotes illegal conduct." *Id.* at ¶ 53. |

As the above chart indicates, Defendant's arguments, in multiple instances, are simple contradictions. Defendant has repeatedly made claims that are misleading, disingenuous, and untrue about what Plaintiffs' allegations contain. Given that under the motion to dismiss standard, Plaintiffs claims must be taken as true and all reasonable inferences drawn in their favor, Plaintiffs have sufficiently pled that Twitter knowingly received a financial benefit and something of value from the exploitation of Plaintiffs as victims of sex trafficking, as required for both Section 1591(a)(2) and Section 1595(a).

> **2.  The FAC Sufficiently Alleges that Twitter Participated in What it Knew or Should Have Known was a Sex Trafficking Venture.**

Section 1591(a)(2) and Section 1595(a) have distinct requirements for stating a sex trafficking beneficiary claim; Plaintiffs address each in turn.

> **a.  The FAC Sufficiently Alleges that by Knowingly Possessing, Disseminating, and Refusing to Remove CSAM of Plaintiffs, Twitter Participated in What it *Knew* was a Sex Trafficking Venture.**

Under § 1591(e)(4), "[p]articipation in a venture" "means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." Plaintiffs have alleged § 1591(a)(1)

**PLS.' OPPOSITION TO DEF.'S
MOTION TO DISMISS
CASE NO. 3:21-CV-00485-JCS**

violations, as described above. As Plaintiffs have also alleged, this particular sex trafficking venture involved the mass distribution of CSAM depicting Plaintiffs, which Twitter assisted, supported, and facilitated by possessing and disseminating the CSAM through its platform – which is designed for quick, mass transmission – for nine (9) days.[20]

Twitter dismissively merges § 1591 and § 1595 to some extent, but in general offers three main arguments as to Plaintiffs' allegations that Twitter participated in a venture they knew was sex trafficking: (1) Twitter did not have a common purpose with the initial sex traffickers, (2) Twitter was at most a passive beneficiary of sex trafficking profits, and (3) Twitter does not know what sex trafficking is. Plaintiffs respond to each argument in turn.

First, in multiple instances, Twitter argues that the FAC must allege that Twitter worked toward a "common purpose" with the initial sex traffickers in order to participate in a sex trafficking venture. MTD at 12-13. [21] Twitter cites Racketeer Influenced and Corrupt Organizations Act ("RICO") cases to support this proposition.[22] But this is irrelevant—the RICO statute has a common purpose element, *Boyle v. United States*, 556 U.S. 938, 944 (2009), but § 1591 does not.

Second, Twitter cites *Afyare*'s analogy that a defendant who joins a soccer team whose members include sex traffickers who sponsor the team financially, does not violate § 1591(a)(2) unless that defendant commits "some overt act" that "furthers the sex trafficking aspect of the venture."[23] Rather, Twitter argues, liability arises only when a defendant makes 'some **overt**

---

[20] *See* FAC at ¶¶ 112-129.

[21] Defendants cite *United States v. Afyare*, 632 F. App'x 272, 283-86 (6th Cir. 2016) and *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *3 (N.D. Cal. July 30, 2020) to support this claim as well. But *Afyare* did not incorporate a common purpose requirement. The phrase "common purpose" cannot be found in that opinion, nor in *B.M.* And *B.M.* did not follow *Afyare* as to the elements of a §1595 violation. *B.M.,* 2020 WL 4368214, at *3.

[22] MTD at 13 n.11 (citing *United States v. Turkette*, 452 U.S. 576 (1981)(defining participation in a venture under RICO); *Washington v. Deleon*, 2019 WL 11691424 (N.D. Cal. July 9, 2019) (defining "association in fact" in the RICO context).

[23] MTD at 14 (citing *Afyare*, 632 F. App'x at 286) (internal quotation marks omitted). "Thus, the law does not punish a defendant for participation in a lawful venture with sex traffickers, or knowingly but passively receiving the financial benefits of sex trafficking.

*act that furthers the sex trafficking aspect of the venture.* " MTD at 14 (emphasis in original).

Aside from *Afyare* not being a controlling decision in this jurisdiction, its logic is inapposite. Playing soccer (i.e., the *Afyare*'s decision's analogy) is a lawful venture, however, CSAM possession and distribution are not. *See* 18 U.S.C. § 2252A. The decision's logic doesn't apply where the beneficiary defendant is engaging in illegal acts. By knowingly hosting, possessing, and distributing the CSAM of Plaintiffs, as Plaintiffs have alleged,[24] Twitter *has* engaged in overt acts that furthered the sex trafficking venture; to-wit: affirmatively denying all requests to remove the video and allowing many of thousands of people to access Plaintiffs' abuse.[25]

Third, Twitter claims that it "did not know of the alleged sex trafficking," MTD at 17, that "there is no allegation that any of these submissions informed Twitter that Plaintiffs were victims of sex trafficking," MTD at 18, that "none of the reports or emails sent to Twitter about the videos indicated that Plaintiffs had been sex trafficked or that they involved commercial sex acts," MTD at 21, and that Plaintiffs did not allege "that the videos would have, on their face, indicated to Twitter (or a reasonable viewer) that Plaintiffs had been trafficked and the videos involved commercial sex," MTD at 18 (internal citation omitted).[26]

This is misleading and meritless. Plaintiffs allege that they reported to Twitter that the

---

[24] FAC at ¶¶ 101-131.

[25] Bizarrely, Defendant claims that Plaintiffs do not "allege that the Perpetrators used Twitter in any way to further their illicit behavior," MTD at 14, nor any "facts suggesting that Twitter actively participated in Plaintiffs' alleged exploitation or took any overt act to further it," MTD at 15. But the allegations described above, taken as true, describe Twitter possessing and distributing child pornography, which are federal crimes specifically under the child sexual exploitation section of the code, 18 U.S.C. § 2252, and – being felonies – also "illicit behavior."

[26] Twitter repeatedly refers its refusal to remove child sexual abuse material as a nine-day "delay," MTD at 3; 12; 21, as though they made a good-faith effort to remove the content but could not do so instantly. But Plaintiffs allege that Twitter demanded that John Doe 1 prove his age, and then when he did so, told him that the content did not violate Twitter's policy. FAC at ¶¶ 113-14, 119. That is a refusal, not a "delay." And Plaintiffs further allege an intervening circumstance through a family connection to a Homeland security agent, who contacted Twitter, at which point Twitter removed the CSAM. FAC at ¶¶ 128-129.

video contained 13-year-olds engaging in sexual acts, due to extortion and blackmail (that is, "in exchange for something of value" and thus commercial sex acts), that numerous users commented on their belief that the video featured minors, that one disseminating account had already been reported to Twitter for CSAM, and that Twitter monetized the distribution of this CSAM video featuring Plaintiffs. Plaintiffs additionally alleged that John Doe No. 1 reached out to Twitter and provided proof of age and identity, and specifically told Twitter that he and the other minor were "baited, harassed, and threatened to take these videos." [27] Twitter had ample information and knowledge about the nature of this video.

Under federal law, sex trafficking a minor is a sex act, involving someone under 18, on account of which something of value is given to or received by any person. 18 U.S.C. § 1591(a); § 1591(e)(3).[28] And unless the charge is advertising, § 1591(a), nowhere does the TVPRA require that the defendant actually knew that someone was a sex trafficking victim to be liable. Reckless disregard or constructive knowledge suffice for civil liability. §§ 1591(a), 1595(a).

Plaintiffs also allege that the CSAM posts received considerable engagement, which taken together with the allegation that CSAM is commonly traded on Twitter, supports the inference that those accounts also received something of value for sharing the videos.[29] Due to one Plaintiff's report and proof of age, Plaintiffs have alleged Twitter did know that commercial sex acts featuring them, as minors, were being disseminated through its platform. These allegations are, at the very least, sufficient to justify an inference that Twitter was in reckless disregard of Plaintiffs' sex trafficking. Therefore, Plaintiffs have sufficiently alleged that

---

[27] FAC at ¶¶ 52-53, 57, 101-102, 112, 114, 121-123, 196.
[28] Twitter claims that pleading 1591 violations requires allegations that the "victim 'will *in the future* [be] caused . . .to engage in prostitution." MTD at 12 n.10 (emphasis in original)(citing *United States v. Todd*, 627 F.3d 329 (9th Cir. 2010)). First, the TVPRA applies to any commercial sex act, not just prostitution. Second, *Todd* clarified that someone who knew that force, fraud, or coercion would likely induce a commercial sex act could be liable; it was not necessary to know the future for the provision to apply. 627 F.3d at 333-34. *Todd* did not state that no one can be held liable for a primary or beneficiary violation where the force, fraud, or coercion has already occurred. In any case, *Todd* does not apply here, because the Plaintiffs allege sex trafficking of minors.
[29] FAC at ¶ 71-77, 124.

Twitter knowingly supported, assisted, and facilitated – and thereby participated in – a sex trafficking venture.

### b. The FAC Sufficiently Alleges that Twitter Participated in What it *Knew or Should have Known* was a Sex Trafficking Venture.

For a Section 1595 claim, this district requires that Plaintiffs allege that Twitter (1) "knowingly benefit[ted] financially or by receiving anything of value"; (2) from participation in a venture; (3) that they "knew or should have known [had] engaged in" sex trafficking." *B.M. v. Wyndham Hotels*, 2020 WL 4368214, at *4. Defendant cites to *Afyare* to define participation in a sex trafficking venture. *See* MTD at 14-15. But contrary to Defendant's contention, *B.M.* is distinguished from *Afyare*, in that *Afyare* was a criminal prosecution under § 1591, not a civil lawsuit under § 1595; moreover, *Afyrare* was not at the motion to dismiss stage. *See Afyare*, 632 F. App'x at 273-74.

The *B.M.* court determined, as most courts have,[30] that the plaintiff "is not required to allege an overt act in furtherance of or actual knowledge of a sex trafficking venture in order to sufficiently plead her section 1595 civil liability claim," and that imposing the § 1591 standard for "participation in a venture" would gut the § 1595 "should have known" language. *B.M.*, 2020 WL 4368214, at *3 (internal citations and quotation marks omitted); *see also J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 6318707, at *7 (N.D. Cal. Oct. 28, 2020). Plaintiffs are not required to plead a § 1595 claim under a § 1591 standard – this jurisdiction has repeatedly rejected this approach.

Defendant also claims that the *M.A.* court "found a venture because the plaintiff alleged

---

[30] See, e.g., *S.Y. v. Wyndham Hotels & Resorts, Inc. & Laxmi of Naples, LLC*, No. 2:20-CV-619-JES-MRM, 2021 WL 1814651, at *4-5 (M.D. Fla. May 6, 2021); *E.S. v. Best W. Int'l, Inc.*, No. 3:20-CV-00050-M, 2021 WL 37457, at *3–4 (N.D. Tex. Jan. 4, 2021); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968–71 (S.D. Ohio 2019); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F.Supp.3d 147, 152-54 (E.D.N.Y. 2020); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, Case No. 2:19-cv-1194, 2020 WL 1244192, *6-7 (S.D. Ohio Mar. 16, 2020). But see *Doe 1 v. Red Roof Inns, Inc.*, Case No. 1:19-cv-3840, 2020 WL 1872335, at *3 (N.D. Ga. Apr. 13, 2020) (requiring "some participation in the sex trafficking act" for Section 1595 liability) (internal citation omitted); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018).

she saw the beneficiary defendant and her trafficker exchanging high-fives . . . while speaking about getting this thing going again." MTD at 13 (internal citations omitted). This is almost the precise opposite of what *M.A.* concluded. The trafficker "high-fiving" a defendant was a fact pattern from *another* case, which the court cited to show what was *not* required to plead § 1595 beneficiary claims; Plaintiffs need not allege "actual knowledge or conspiracy between [beneficiary defendants] and the trafficker." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 966 (S.D. Ohio 2019)(citing *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017)).

Similarly, Plaintiffs allege facts showing that Defendant "participated in a venture" by stating that Twitter possessed, disseminated, and refused to remove sex trafficking content.[31] Plaintiffs allege that they were repeatedly extorted into creating CSAM of themselves, which their exploiters then disseminated, which under § 1591(a), constituted commercial sex acts engaged in by persons under 18 years old.[32] Plaintiffs also allege the following facts as to what Twitter should have known: (1) general knowledge of widespread CSAM on Twitter – evidenced through account shutdowns, (2) CSAM hashtags and search terms of CSAM – demonstrating Twitter's ability to block hashtags, (3) difficult reporting structure and low reporting to NCMEC, (4) the existence of a specific report on one account for disseminating CSAM, which proved to be one of the same accounts circulating CSAM depicting Plaintiffs, (5) multiple reports from Plaintiff, himself, and his mother detailing the account, including Plaintiff proving his age, and (6) other Twitter users commenting that Plaintiffs appeared to be children.[33]

These are not mere indirect indicators, but direct evidence of liability. The court in this

---

[31] Defendants may have misunderstood the purpose of Plaintiffs' allegations about Twitter's selective content policing. *See* MTD at 9 n.8. Plaintiffs did not allege the facts about Twitter's content moderation practices to claim that Twitter was a content provider, but to claim that Twitter had the capacity to monitor and remove CSAM, and chose not to use it. *See, e.g.*, FAC at ¶ 50, 112-129.

[32] FAC at ¶ 152.

[33] *Id.* at ¶¶ 70-84, 52-67, 101-102, 112-129.

this district has held that hotels have constructive knowledge of sex trafficking within their properties based on indicators like large numbers of men arriving for short stays, cash payments for reservations, and condoms in the rooms, *B.M.*, 2020 WL 4368214, at *6, even though the main crime tends to occur behind the closed doors of the hotel rooms. Nevertheless, in the instant case, Plaintiffs have sufficiently alleged that Twitter had constructive *and* actual knowledge of Plaintiffs' sex trafficking, which it could see for itself; the main crime happened in plain sight.[34] Indeed, if Twitter were a hotel, Plaintiffs' notice to Twitter would have been akin to the victim walking up to the front desk, handing the clerk his ID, and stating that he was being sexually abused in one of the hotel rooms, but instead of calling the police, the hotel employee sent him back to be further exploited. Accordingly, Plaintiffs have sufficiently alleged that Twitter participated in what it knew or should have known was a sex trafficking venture.

### C. The Legislative History Demonstrates Congress's Intent to Protect Victims of Sex Trafficking Such as the John Doe Plaintiffs in this Case.

Section 230 has an exemption which eliminates immunity for civil claims "brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591[.]" 47 U.S. Code § 230 (e)(5)(A).[35] Defendant discusses the history of the bill which enacted that exemption (i.e., FOSTA), indicating that FOSTA's reach was largely confined to its most infamous target. *See* MTD at 2, 4-5, 17.

---

[34] Defendant claims Plaintiffs did not allege facts suggesting that Twitter had a "continuous relationship" or "tacit agreement" with Plaintiffs' original traffickers, MTD at 19, but Plaintiffs did allege that Twitter had a continuous relationship with the CSAM posters for at least the relevant time period for this lawsuit, which was nine days, FAC at ¶¶ 112-129, as they were enabling each other to receive something of value, and with one account for considerably longer, as it had been reported for CSAM roughly a month before Plaintiff John Doe 1 requested a takedown, FAC at ¶¶ 101-102.

[35] Twitter asserts that the exception only applies to civil cases against defendants who violate § 1591, but the exemption text states that the "conduct underlying the claim" not the "defendant's conduct" must violate 1591, 47 U.S.C. § 230 (e)(5)(A), which is almost certainly to limit the exception to sex trafficking claims, as labor trafficking claims are also covered by § 1595. That said, Plaintiffs do allege that Twitter has violated §1591, FAC at ¶¶ 133-55, and so falls within the FOSTA exemption.

Specifically, Twitter avers that FOSTA was "carefully targeted to remove civil immunity for the few criminal websites that, unlike Twitter here, were deliberately and knowingly assisting and profiting from reprehensible crimes[.]" MTD at 2. However, Plaintiffs *do* allege that Twitter was "deliberately and knowingly assisting and profiting from reprehensible crimes," and that Twitter's failure to remove the content at issue was not inadvertent, but deliberate.[36]

Twitter also states that Congress "intended to revoke immunity only in extreme cases (like Backpage)[.]" MTD at 5 (citing 164 Cong. Rec. S1860-62) (statement of Senator Durbin). But a single Senator's remarks do not define the exemption's scope, and the Congressional record overall does not indicate an intent for the exception to be limited to actors as deliberate and organized as Backpage. The Congressional record even references the need to hold websites accountable for inaction or being complicit.

For example, the bill itself, which Twitter cites to in its MTD, states that "websites that promote and facilitate prostitution have been reckless in allowing the sale of sex trafficking victims and *have done nothing to prevent the trafficking of children* and victims of force, fraud, and coercion," and that "clarification of such section is warranted to ensure that such section does not provide such protection to such websites."[37]

Individual congressional members also expressed this concern, including one that worried an amendment (removed before passage) would give websites *carte blanche* to passively profit from sex trafficking. *See* 164 Cong. Rec. S1849-08, S1853 (statement of Sen. Heitkamp)) ("I never believed that the Communications Decency Act protected them from prosecution or protected them from civil penalty *if they were complicit* and, in fact, abetted

---

[36] *See* FAC at ¶¶ 112-129
[37] Allow States and Victims to Fight Online Sex Trafficking Act of 2017, PL 115-164, 132 Stat 1253 (2018) (emphasis added).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

these crimes.") (emphasis added).[38] [39]

Even assuming, *arguendo*, that Defendant is correct about FOSTA's narrow scope, whether and how Twitter's actions compare to Backpage is a factual question that cannot be resolved at this stage of the litigation.[40] Pursuant to § 230, Plaintiffs have properly alleged that Defendant routinely receives, distributes, and profits from CSAM, and that Defendant knowingly did so with CSAM of Plaintiffs.[41] The scope of the child sex trafficking and profiteering that Twitter engaged in, and whether it was deliberate or negligent, will be appropriately determined during the course of discovery and at trial.

Defendant claims that "in enacting FOSTA, Congress acknowledged that the *mens rea* requirement of Section 1591 is 'difficult to prove' when it comes to online service providers." MTD at 17 (citing H.R. Rep. No. 115-572, pt. 1, at 3-6). Two distinctions, however, are in order.

First, the House Report passage above is describing how hard it is to prove actual knowledge under § 1591(a)(1) claims for advertising, H.R. Rep. No. 115-572, at 5, which are the only § 1591(a)(1) claims that require actual knowledge to establish *mens rea* – the remaining claims rely on a mere showing of reckless disregard, 18 U.S.C. § 1591(a)(1). However, in the instant case, Plaintiffs have not alleged any § 1591(a)(1) claims for advertising in the FAC, so

---

[38] *And see* 164 Cong. Rec. S1849-08, S1855 (statement of Sen. Portman) ("For instance, if backpage or another website filters for illegal content and, as a result, learns that their site is being used for trafficking but ignores that activity, I think this amendment would say that evidence could not be considered in a case against backpage. To me, that is wrong[.]")
[39] 115 Cong. Rec. H1290, 1291 (statement of Jackson Lee) ( (Believing FOSTA would hold accountable "those websites that have acted recklessly in allowing the sale of victims of sex trafficking online, *or stood idly by* while young boys and girls—many as young as thirteen years old or even younger—were coerced, threatened, tortured, bought, and sold on the whims of their exploiters.") (emphasis added).

[40] Interestingly, one of the examples of Backpage's depravity cited in the congressional record bears some similarity to the allegations in this case. Sen. Portman described Backpage's response to a mother who reported an ad for her missing child: "I found my daughter on your website. She is 14 years old. Thank you for taking down that ad and helping me to connect with my daughter. The answer from backpage.com was this: You didn't pay for the ad. We will not take it down. Again, talk about evil." 164 Cong. Rec. S1849-08, S18555.

[41] FAC at ¶¶ 61-84,112-129.

Defendant's argument on this point is irrelevant and misleading.

Secondly, the House Report passage above refers to criminal prosecutions, where the evidentiary standard is "beyond a reasonable doubt." Yet, this is a civil case, where the standard is a preponderance of evidence. Moreover, in relation to a motion to dismiss, the standard of proof is irrelevant, because Plaintiffs do not have to prove anything at this stage of litigation; they simply must allege enough to state a legal claim.

## III.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT BAR CLAIMS FOR TWITTER'S KNOWING, UNLAWFUL CONDUCT.

Twitter argues that it is completely immune from liability for its knowing, continued distribution of CSAM under CDA 230. MTD at 8. However, this position directly contradicts the statute's plain language, its context, and the legislative intent. The statute was never intended to immunize conduct that entails both criminal and civil liability. *See, e.g., Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (conduct that is "unlawful when posed face-to-face or by telephone, [does not] magically become lawful when asked electronically online. The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet.")

### A.  The Plain Text of CDA 230 Does Not Immunize Twitter's Knowing Violations of Child Pornography Laws.

All questions of statutory construction "begin with the plain language of the statute."[42] "The plain meaning governs unless a clearly expressed legislative intent is to the contrary, or unless such plain meaning would lead to absurd results." *Dyer v. United States,* 832 F.2d 1062, 1066 (9th Cir. 1987). When determining if the plain language is sufficient, courts are to consider: (1) the language itself; (2) the specific context in which that language is used; and (3) the broader context of the statute as a whole. *Rowe v. Educ. Credit Mgmt. Corp.,* 559 F.3d 1028, 1032 (9th Cir.2009).

---

[42] *Cheneau v. Garland*, No. 15-70636, 2021 WL 1916947, at *4 (9th Cir. May 13, 2021) citing *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (internal citations omitted); *Rowe v. Educ. Credit Mgmt. Corp.,* 559 F.3d 1028 (9th Cir.2009).

A review of the plain language of the statute makes it clear that CDA 230 immunity is only triggered by good faith removal of content. Specifically, the statute reads:

> (c) Protection for "Good Samaritan" blocking and screening of offensive material
>
> (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of—
>
> > (A) any action voluntarily taken in good faith <u>to restrict access</u> to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> >
> > (B) any action taken to enable or make available to information content providers or others the technical means <u>to restrict access</u> to material described in paragraph (1).

47 U.S.C. 230(c)(2) (emphasis added)

The liability shield provided by this subparagraph requires a triggering event. In other words, in order to trigger immunity, an interactive computer service must **take action** in good faith to restrict access to material, which is the opposite of what Twitter did in the instant case. At no point does the statute's plain language immunize a failure to act, or, as in this case, a refusal to act. Remarkably, Twitter urges that this plain meaning be flipped. Twitter is not being sued for any action "restricting access…or availability" to the CSAM. It is being held accountable for its knowing and continued distribution and monetization of the CSAM, which is beyond the scope of CDA 230's immunity.[43]

Some Ninth Circuit decisions have interpreted the liability shield in CDA 230 to cover not just the removal of objectionable content, but the decision whether to remove the content. *See, e.g., Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28,

---

[43] *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019)("Good Samaritan" provision of the CDA immunizes computer-software providers from liability for *actions affirmatively taken* to restrict or block obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable content); *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009)("Good Samaritan" provision of the CDA immunizes acts taken in furtherance of blocking materials that the provider determine to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable).

2009) *citing Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1170–71 (9th Cir. 2008). This interpretation is not consistent with the plain language of § 230(c)(2), which only limits liability for "any action . . . to restrict access" to harmful content. In any event, these decisions do not apply to the instant case, because they do not hold that CDA 230 immunizes a knowing decision to possess and distribute CSAM and Twitter has pointed to no controlling authority for such a proposition.

### B. The Stated Purpose of CDA 230 is Inconsistent and Incompatible with the Absolute-Immunity Interpretation Urged by Twitter.

Twitter's argument for immunity for all third-party content, even contraband – specifically, child pornography, also cuts against the purpose of CDA 230 as expressed succinctly in its title: "Protection for private blocking and screening of offensive material." Similarly, the second paragraph of CDA 230 sets forth "the policy of the United States," including: "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," and "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C.A. § 230(b)(4)-(5). These subparagraphs demonstrate that Congress's priority amid the internet's continued development was ensuring that there would also be ongoing development of the ability to restrict childrens' access to harmful, or even objectionable material.[44] The Supreme Court stated "the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech. . . ." *Reno v. ACLU*, 521 U.S. 844, 868 (1997). In *Reno*, the Court struck down part of the protections for children as inconsistent with the First Amendment. Yet, the overall purpose of the CDA – protection of children online – remains clear.

---

[45] *See generally*, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003) ("Congress enacted this provision as part of the Communications Decency Act of 1996 for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.")

45

### C. CDA 230 Does Not Immunize Twitter from Civil Liability for Possession and Distribution of Child Pornography because it is Illegal Contraband, Not Speech.

Twitter argues it is immune from Plaintiffs' claims that it knowingly possessed and distributed child pornography in violation of 18 U.S.C. §§ 2252A and 2255. MTD at 21. This is an unsupportable reading of CDA 230 for two reasons. First, CSAM material is not lawful "information provided by another information content provider," but rather is illegal contraband, stemming from the sexual abuse of a child, and wholly outside any protection or immunity under the law, to include CDA 230. Second, CDA 230 was enacted to incentivize internet service providers ("ISP's") to protect children, not immunize them for intentionally or recklessly harming them.

CDA 230's prohibition of ISPs from being treated as "speaker[s]" of "information" is not implicated here because child pornography is not protected speech and conveys no information; rather, it is filmed child abuse and illegal contraband. Instead, Twitter attempts to minimize its violations under 18 U.S.C. § 2252A. See, e.g., MTD at 21 (noting the "mere passage of nine days between offending tweet and content takedown"). This blithely ignores the devastating harms of CSAM distribution. As the Supreme Court has explained, "demand for child pornography harms children in part because it drives production" and "the harm to the child is exacerbated by its circulation." *Paroline v. U.S.*, 572 U.S. 434, 439-40 (2014). Congress has been very clear on this point:

> The harms caused by child pornography begin, but do not end, with child sex assault because child pornography is a permanent record of that abuse and trafficking those images compounds the harm to the child . . . Victims suffer continuing and grievous harm as a result of knowing that a large, indeterminate number of individuals have viewed and will in the future view images of their childhood sexual abuse. Harms of this sort

---

[45] *See generally, Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003) ("Congress enacted this provision as part of the Communications Decency Act of 1996 for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.")

are a major reason that child pornography is outlawed.[46]

Indeed, the scale of Twitter's alleged possession and redistribution of CSAM victimizing Plaintiffs is staggering. Twitter's own tracking system shows that as of the second day of the video being posted by one user, the CSAM was viewed at least 167,000 times and retweeted over 2,200 times. Moreover, these numbers continued to increase exponentially for the remaining seven days.[47]

Twitter cites an unreported decision from the Eastern District of Texas for the proposition that technology companies are immune from civil claims for violations of 18 U.S.C. §§ 2252A and 2255. MTD at 21 (citing *Doe v. Bates*, 2006 WL 3813758 (E.D. Tex., Dec. 27, 2006)). *Bates* is a non-binding, first of its kind, federal decision extending CDA immunity to a civil suit alleging receipt and possession of child pornography. *Bates* relies on the Fourth Circuit's decision in *Zeran*[48] and a district court decision, *Noah v. AOL Time Warner*.[49] Neither dealt with child pornography. The *Zeran* decision is a detailed examination of a defamation claim and was one of the first decisions after the inception of CDA 230, meaning the *Zeran* court did not have the benefit of other caselaw to build upon when rendering its decision. The Court's analysis of the terms "publisher" and "speaker" from CDA 230, as well as the defamed Plaintiff's arguments that the Defendant was a "distributer" all take place in the context of defamation law. *See*, *Zeran*, 129 F.3d at 331-34. A distributer of child pornography, however, is not analogous to a distributer of defamatory statements. Child pornography is at once contraband, beyond the covering of First Amendment speech protection, evidence of criminal child abuse, and an ongoing sexual crime against a child. The *Bates* decision is wrong when it says it is following *Zeran*'s approach for a "publisher's traditional editorial functions." *Bates*, 2006 WL 3813758 at *20. No one exercises "traditional editorial functions" over CSAM.

---

[46] Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, PL No. 115-299 (2018).
[47] FAC ¶¶ 124-5.
[48] *Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997).
[49] *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 537 (E.D. Va. 2003), *aff'd,* No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004).

Everyone has the same responsibility: the strictest obligation to not create, possess, or distribute it – enforced by both criminal and civil liability. The *Noah* decision is inapposite as it focused on a public accommodation claim under Title II of the Civil Rights Act premised on AOL's moderation of a chat room on its platform. Neither *Zeran* nor *Noah* provide any grounds to immunize child pornography possession and distribution; nor are they binding on this court.

Lastly, Congress made clear that child protection was a paramount purpose of CDA 230. It references protecting children from harmful material, 47 U.S.C. § 230(b)(4). It mandates an obligation by ISPs to notify its customers of parental controls and filter technology available to protect children, § 230(d). Finally, it specifically targeted two areas of criminal law as unaffected by CDA 230 – one of which is "chapter . . . 110 of title 18 (relating to sexual exploitation of children)," which includes §§ 2252A and 2255. See, § 230(e)(1). It is untenable then, to assert that CDA 230 immunizes platforms from knowingly possessing and distributing child sexual exploitation material.

Congress intended to create civil liability for possession and distribution of child pornography even against platforms like Twitter. The civil remedy for § 2252A was added to § 2255, and the § 2258A reporting requirement for electronic service providers was made law, in a bill titled Protection of Children from Sex Predators Act of 1998, PL 105–314, 112 Stat 2974 (1998). This bill was passed two years *after* the Communications Decency Act of 1996, demonstrating congressional understanding that CDA 230 immunity was not implicated with respect to possession and distribution of child pornography. Additionally, § 2252A specifically and repeatedly recognizes that the elements of the offense can be met through actions "by any means, including by computer." And § 2252A liability for knowing distribution applies to "any child pornography" – regardless of the publication status of the material, and regardless of whether it was originally created by a third party. 18 U.S.C. § 2252(A)(a)(2). The very laws Congress enacted show that limiting liability for child pornography was not what it intended when it enacted CDA 230. As Justice Thomas recently recognized, "[e]xtending § 230 immunity beyond the natural reading of the text can have serious consequences. Before giving companies immunity from civil claims for knowingly hosting illegal child pornography. . . we

should be certain that is what the law demands." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020) (Thomas, J. dissenting) (internal citations omitted).

Twitter does not claim that the FAC fails to establish the elements of 18 U.S.C. § 2252A. This is a necessary concession. The facts – which at this stage must be accepted as true – demonstrate that Twitter was notified of the presence of child pornography as defined by 18 U.S.C. § 2256(8). FAC ¶¶ 112-119. As noted above, to apply CDA 230 immunity under these facts would defeat the statute's purpose, not to mention make the immunity specifically for restricting harmful material superfluous. Section 230 offers immunity for publishing and distributing third parties' information, not for possessing and distributing contraband. *See* 47 U.S.C. § 230(c)(1).

### D. Twitter Failed its Statutory Duty to Report the Child Sex Abuse Material Harming the Plaintiffs.

"In order to reduce the proliferation of online child sexual exploitation and to prevent the online sexual exploitation of children," Twitter is required to report "as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances" indicating any "apparent" or "imminent" violation of 18 U.S.C. 2252A "that involves child pornography." 18 U.S.C. § 2258A(a)(1) and (a)(2). Twitter contends that this provision does not create a civil cause of action. MTD at 22. But Congress intended to make deliberate and reckless violations of 2258A privately enforceable. *See* 18 U.S.C. § 2258B(b) (permitting civil claims against providers, based on intentionality or recklessness, including failure to act). The FAC alleges that Twitter both engaged in intentional misconduct and failed to act within the meaning of 2258B(b)(1) and (2).

Additionally, the standards of misconduct in paragraph (b) of 2258(B) establish the duty of care that Twitter owes Plaintiffs. Twitter's reporting requirements under § 2258A with regard

to CSAM provide the standard of care for negligence actions.[50] Accordingly, the allegations that Twitter has violated 18 U.S.C. § 2258A serve the dual purpose of establishing liability under both federal and state law.

## IV. THE FAC SUFFICIENTLY ALLEGES A PRODUCT LIABILTY CLAIM BASED ON TWITTER'S UNREASONABLY UNSAFE DESIGN AND PERFORMANCE.

Twitter argues that CDA 230 also immunizes it from Plaintiffs' product liability claim. This is wrong because Plaintiffs' negligent design claim does not attempt to treat Twitter as the "publisher or speaker" of information. Rather it seeks to hold Twitter accountable for failing in its "duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public." *Lemmon v. Snap, Inc.*, No. 20-55295, 2021 WL 1743576, at *4 (9th Cir. May 4, 2021). In its recent decision in *Lemmon v. Snap, Inc.*, the Ninth Circuit explained the distinction.

> The duty underlying [product liability claims] differs markedly from the duties of publishers as defined in the CDA. Manufacturers have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm to consumers. Meanwhile, entities acting solely as publishers—*i.e.*, those that review material submitted for publication, perhaps edit it for style or technical fluency, and then decide whether to publish it—generally have no similar duty.

*Lemmon*, 2021 WL 1743576 at *5.

Here, Plaintiffs seek to hold Twitter accountable for designing its product with an unreasonable risk of harm to users. FAC ¶¶ 187-190. Notably in the *Lemmon* decision, the Ninth Circuit rejected a social media platform's attempt to argue that CDA 230 applied because the platform allowed "its users to transmit user-generated content to one another. . . ." *Id*. at *5. Similar to Snap Chat, another popular social media platform, Twitter's "duty to design a

---

[50] *DiRosa v. Showa Denko K.K.*, 44 Cal. App. 4th 799, 808 (1996) ("There is no doubt in this state that a federal statute or regulation may be adopted as a standard of care."); *Beaver v. Tarsadia Hotels*, 29 F. Supp. 3d 1294, 1321 (S.D. Cal. 2014), *aff'd*, 816 F.3d 1170 (9th Cir. 2016) ("A federal statute or regulation may be adopted as a standard of care in a negligence action.").

reasonably safe product is fully independent of [its] role in monitoring or publishing third-party content. *Id*.

Finally, Twitter argues for dismissal of the products liability claim saying that Plaintiffs' allegations do not clearly identify which aspect of the Twitter platform is the product. Twitter also suggests that its platform might be something other than a "product." MTD at 22-23. These semantics are unavailing. First, Twitter's multitudinous features do not change the fact that Twitter is a defectively designed product that has harmed John Doe #1 and John Doe #2. Whether it is Twitter's architecture for its online interface, mobile interface, API, search-function capability, ineffective reporting processes, or hashtags – or all of these things – Plaintiffs' allegations demonstrate an unreasonable risk of harm within Twitter's actual platform design. If, for example, Twitter's search function did not assist child predators in finding CSAM, then the CSAM depicting John Doe #1 and John Doe #2 would not have had as prolific a distribution. By design, Twitter enabled the broad distribution of illegal harmful material.

Second, Twitter incorrectly suggests that its platform is not subject to product defect liability because it is not "geared to the tangible world." The federal courts apply product-liability principles to internet-based platforms. *See, Lemmon*, 2021 WL 1743576.  What matters is whether Twitter has fallen short of its duty to protect the public from unreasonable risky and/or dangerous products entering into commerce. Simply put, there is no wholesale exemption for technology-based products from design-defect liability. CDA 230 does not grant Twitter immunity from harm caused by dangerously designed products. As alleged at this pleading stage, Plaintiffs' product liability allegations are sufficient to proceed.

**V.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE ALLOWED TO PROCEED BECAUSE THEY SUFFICIENTLY ALLEGE A VIOLATION OF TWITTER'S STATUTORY OBLIGATIONS AND DUTY OF CARE ONCE IT KNEW ABOUT THE CSAM DEPICTING THE PLAINTIFFS.**

Twitter contends that Plaintiffs' Negligence Per Se and Negligent Infliction of Emotional Distress causes of action are infirm and untenable because they are not separate causes of actions, which appears to be a variant of arguing they involve the "same primary

right." Such a contention is misplaced. These causes of action, on their very face, reveal that they are not duplicative. Although these causes of action include a number of similar allegations and claims, each is premised on a separate and distinct theory. For example, in the cause of action or Negligence Per Se, Plaintiffs allege a different theory of negligence based upon a number of specific violations of various statutes. Moreover, it is black-letter law that a plaintiff may plead multiple theories of recovery based on the same set of facts.  (4 Witkin Cal. Proc. (5th ed. 2008) § 402ff; *see e.g. Perry v. Robertson*, 201 Cal.App.3d 333, 339-340 (1988)). This notion is buttressed by the fact that separate California Civil Jury Instructions ("CACI") exist for each of these causes of action. (See e.g.  CACI No. 418 at 262 (Negligence Per Se); CACI 1620 at 961 et seq. (Negligent Infliction of Emotional Distress).[51]

It is true that negligence per se functions as a presumption to establish a defendant's duty of care. Cal. Evid. Code § 669. But that simply means that Plaintiffs' allegations of Twitter's multiple violations of its statutory duties should be read in tandem with its negligence claims.  *Tinoco v. San Diego Gas & Elec. Co*., No. 17-CV-2433-BAS-JLB, 2018 WL 4562479, at *2 (S.D. Cal. Sept. 21, 2018) (denying motion to dismiss negligence per se claim where it was clear that plaintiffs relied in part on violations of statutory duty to establish negligence). Here, Plaintiffs allege the elements to meet the presumption of negligence per se and have presented multiple other negligence claims. Under these circumstances, the Court should treat the negligence per se claim as a support to, and part of, the other negligence claims. See *Dillard v. Victoria M. Morton Enterprises, Inc*., No. 08-1339 FCD/GGH, 2008 WL 11388472, at *5 (E.D. Cal. Oct. 8, 2008) (dismissing negligence per se as an independent claim, but treating the substantive allegations supporting the negligence per se claim as into other negligence claims). Moreover, Twitter's request for outright dismissal of the negligence per se claim is premature and should be rejected because in California negligence per se

---

[51] Judicial California Jury Instructions, https://www.courts.ca.gov/partners/documents/Judicial_Council_of_California_Civil_Jury_Instructions.pdf (last viewed June 7, 2021).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

functions as an evidentiary presumption and "evidentiary presumptions are inappropriate for evaluation at the pleadings stage." *Balderas v. Countrywide Bank, N.A.*, 664 F.3d 787, 790 (9th Cir. 2011) (internal citations omitted).

## VI.   PLAINTIFFS' BUSINESS AND PROFESSIONAL CODE SECTION 17200 SUFFICIENTLY ALLEGES A CLAIM.

Twitter's argument regarding Plaintiffs' Business and Professions Code Section 17200 rests upon a misreading of the statute.  Specifically, Twitter appears to conflate the factual predicate to maintain a § 17200 violation. "Unfair competition" is defined in the UCL as any one of the following wrongs: (1) an "unlawful" business act or practice; (2) an "unfair" business act or practice; (3) a "fraudulent" business act or practice; (4) "unfair, deceptive, untrue or misleading advertising"; and (5) any act prohibited by §§ 17500 through 17577.5.   Salient here is the fact that these definitions are disjunctive, and each of the wrongs operates independently from the others. As such, a practice is prohibited as 'unfair' or 'fraudulent' even if not 'unlawful' and vice versa.   Here, Twitter's criminal, aiding and abetting conduct is actionable under § 17200. *Chetal v. Am. Home Mortg.*, No. C 09-02727 CRB, 2009 WL 2612312, at *4 (N.D. Cal. Aug. 24, 2009) (noting that an aiding and abetting theory is available under the UCL); *Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008) (allowing claims to proceed on aiding and abetting theory).

Moreover, in support of its request that the 17200 claim be dismissed in its entirety, Twitter resorts to arguing that Plaintiffs will ultimately not be able to avail themselves of the full spectrum of damages available under a 17200 claim. Such an argument puts the cart before the horse. Indeed. the availability of a certain remedy is not relevant to a determination of standing to assert the claim. *See Finelite, Inc. v. Ledalite Architectural Prods.*, No. C-10-1276 MMC, 2010 WL 3385027, at *2 (N.D. Cal. Aug. 26, 2010) (the right to seek injunctive relief under the UCL is not dependent on the right to seek restitution; the two are wholly independent remedies). Indeed, a Section 17200 Plaintiff seeking only injunctive relief can have standing. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009). In addition, there is nothing about the injury sustained by the Plaintiffs here to support a finding that there was not an economic injury

associated therewith.  Twitter can hardly argue that the monetization and dissemination of Plaintiffs' images and likenesses do not constitute a cognizable property right capable of protection under Section 17200.  ( *See e.g. Fraley v. Facebook, Inc*., 830 F. Supp. 2d 785, 811 (N.D. Cal. 2011) (noting that plaintiffs sufficiently alleged a loss of money or property based on potential unpaid compensation where Facebook used plaintiffs' Facebook profiles to endorse third- party products and services).

<u>**CONCLUSION**</u>

For all these reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss and allow Plaintiffs the opportunity to prove their claims.

Respectfully submitted this 7th day of June, 2021.

By:      /s/ *Paul A. Matiasic*
Paul A. Matiasic
Hannah E. Mohr
**THE MATIASIC FIRM, P.C.**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
*matiasic@mjlawoffice.com*

Lisa D. Haba*
Adam A. Haba*
**THE HABA LAW FIRM, P.A.**
1220 Commerce Park Dr., Suite 207
Longwood, FL 32779
Telephone: (844) 422-2529
*lisahaba@habalaw.com*
*adamhaba@habalaw.com*

Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
**NATIONAL CENTER ON SEXUAL EXPLOITATION**

1201 F Street, NW, Suite 200
Washington, D.C. 20004
Telephone: (202) 393-7245
*lawcenter@ncose.com*

***Attorneys for Plaintiffs***

*Admitted Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email address denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of June, 2021.

 /s/ *Hannah E. Mohr*
Paul A. Matiasic
Hannah E. Mohr
**THE MATIASIC FIRM, P.C.**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 675-1089
*matiasic@mjlawoffice.com*