1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   JOHN DOE, et al.,

                        Plaintiffs,                 Case No.  21-cv-00485-JCS

8

9        v.                                         **ORDER GRANTING IN PART AND
                                                    DENYING IN PART MOTION TO**
10  TWITTER, INC.,                                  **DISMISS FIRST AMENDED
                                                    COMPLAINT**
                        Defendant.
11                                                  Re: Dkt. No. 48

12

13

14  **I.      INTRODUCTION**

15          Plaintiffs John Doe #1 and John Doe #2 allege that when they were thirteen years old they

16  were solicited and recruited for sex trafficking and manipulated into providing to a third-party sex

17  trafficker pornographic videos ("the Videos") of themselves through the social media platform

18  Snapchat.  A few years later, when Plaintiffs were still in high school, links to the Videos were

19  posted on Twitter.  Plaintiffs allege that when they learned of the posts, they informed law

20  enforcement and urgently requested that Twitter remove them but Twitter initially refused to do

21  so, allowing the posts to remain on Twitter, where they accrued more than 167,000 views and

22  2,223 retweets.  According to Plaintiffs, it wasn't until the mother of one of the boys contacted an

23  agent of the Department of Homeland Security, who initiated contact with Twitter and requested

24  the removal of the material, that Twitter finally took down the posts, nine days later.

25          Plaintiffs assert state and federal claims against Twitter based on its alleged involvement in

26  and/or enabling of sex trafficking and the distribution of the child pornography containing their

27  images.  Twitter, however, contends that even after Congress's enactment of the Fight Online Sex

28  Trafficking Act and Stop Enabling Sex Traffickers Act in 2018, the conduct alleged by Plaintiffs

United States District Court
Northern District of California

is shielded from liability under Section 230 of the Communications Decency Act ("CDA").   Thus, Twitter brings a Motion to Dismiss First Amended Complaint ("Motion") seeking dismissal of all of Plaintiffs' claims on the basis that it is immune from liability under the CDA.  In the Motion, Twitter also contends Plaintiffs fail to state viable claims as to many of their claims.  A hearing on the Motion was held on August 6, 2021.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.      BACKGROUND

### A.      First Amended Complaint

Plaintiffs' First Amended Complaint ("FAC"), which is the operative complaint, contains detailed allegations describing: 1) Twitter's platform, business model and content moderation policies and practices (FAC ¶¶ 23-51); 2) the ways Twitter allegedly permits and even aids in the distribution of child pornography on its platform and profits from doing so (FAC ¶¶ 52-84); 3) how pornographic content featuring John Doe #1 and John Doe #2 was created and eventually ended up on Twitter's platform (FAC ¶¶ 85-100); and 4) Twitter's response to requests that the pornographic photos and videos containing Plaintiffs' images be removed from Twitter (FAC ¶¶ 101-132).

Based on these allegations, Plaintiffs assert the following claims:

1) violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591(a)(1) and 1595(a) based on the allegation that "Twitter knew, or was in reckless disregard of the fact, that through monetization and providing, obtaining, and maintaining [child sexual abuse material ("CSAM")] on its platform, Twitter and Twitter users received something of value for the video depicting sex acts of John Doe #1 and John Doe #2 as minors."  FAC ¶¶ 133-143 (Claim One);

2) violation of the TVPRA, 18 U.S.C. §§ 1591(a)(2) and 1595(a), based on the allegation that Twitter "knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1)." FAC ¶¶ 144-155 (Claim Two);

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

3)  violation of the duty to report child sexual abuse material under 18 U.S.C. §§ 2258A and 2258B.  FAC ¶¶ 156-163 (Claim Three);

4) civil remedies for personal injuries related to sex trafficking and receipt and distribution of child pornography under 18 U.S.C. §§ 1591, 2252A, and 2255, based on the allegations that Twitter was "notified of the CSAM material depicting John Doe #1 and John Doe #2 as minors on its platform and still knowingly received, maintained, and distributed this child pornography after such notice[,]" causing Plaintiffs to suffer "serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm."  FAC ¶¶ 164-176 (Claim Four);

5) California products liability based on the allegedly defective design of the Twitter platform, which is "designed so that search terms and hashtags utilized for trading CSAM return suggestions for other search terms and hashtags related to CSAM" and through use of "algorithm(s), API, and other proprietary technology" allows "child predators and sex traffickers to distribute CSAM on a massive scale" while also making it difficult for users to report CSAM and not allowing for immediate blocking of CSAM material once reported pending review.   FAC ¶¶ 177-190 (Claim Five);

6) negligence based on allegations that Twitter had a duty to protect Plaintiffs, had actual knowledge that CSAM containing their images was being disseminated on its platform and failed to promptly remove it once notified.  FAC ¶¶ 191-197 (Claim Six);

7) gross negligence based on the same theory as Plaintiffs' negligence claim. FAC ¶¶ 198-203 (Claim Seven);

8) negligence per se based on the allegation that Twitter's conduct violated numerous laws, including 18 U.S.C. §§ 1591 and 1595 (benefiting from a sex trafficking venture), 18 U.S.C. § 2258A (failing to report known child sexual abuse material), 18 U.S.C. § 2552A (knowingly distributing child pornography), Cal. Civ. Code § 1708.85 (intentionally distributing non-consensually shared pornography), and Cal. Penal Code § 311.1 (possessing child pornography). FAC ¶¶ 204-26 (Claim Eight);

9) negligent infliction of emotional distress.   FAC ¶¶ 207-212 (Claim Nine);

10) distribution of private sexually explicit materials, in violation of Cal. Civ. Code § 1708.85, based on the allegation that "[b]y refusing to remove or block the photographic images and video depicting him after Plaintiff John Doe #1 notified Twitter that both he and John Doe #2 were minors, Twitter intentionally distributed on its online platform photographic images and video of the Plaintiffs." FAC ¶¶ 213-218 (Claim Ten);

11) intrusion into private affairs, based on the allegation that "Twitter intentionally intruded into Plaintiffs' reasonable expectation of privacy by continuing to distribute the photographic images and video depicting them after John Doe #1 notified Twitter that Plaintiffs were minors and the material had been posted on its platform without their consent." FAC ¶¶ 219-223 (Claim Eleven);

12) invasion of privacy under the California Constitution, Article 1, Section 1.  FAC ¶¶ 224-228 (Claim Twelve); and

13) violation of California Business and Professions Code § 17200 ("UCL") based on allegations that "Twitter utilized and exploited Plaintiffs for its own benefit and profit" and "Plaintiffs, to their detriment, reasonably relied upon Twitter's willful and deceitful conduct and assurances that it effectively moderates and otherwise controls third-party user content on its platforms."   FAC ¶¶ 229-234 (Claim Thirteen).

Plaintiffs seek compensatory and punitive damages, injunctive relief, restitution, disgorgement of profits and unjust enrichment and attorneys' fees and costs.

**B.     Statutory Background**

**1.   The CDA**

The CDA was enacted as part of the Telecommunications Act of 1996.  It contains a "Good Samaritan" provision that immunizes interactive computer service ("ICS") providers from liability for restricting access to certain types of materials or giving users the technical means to restrict access to such materials, providing as follows:

(c) **Protection for "Good Samaritan" blocking and screening of offensive material**

(1) Treatment of publisher or speaker

United States District Court
Northern District of California

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2)   Civil liability

> No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. § 230(c).

"This grant of immunity dates back to the early days of the internet when concerns first arose about children being able to access online pornography." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1046 (9th Cir. 2019), cert. denied, 141 S. Ct. 13 (2020).  At that time, "[p]arents could not program their computers to block online pornography, and this was at least partially due to a combination of trial court decisions in New York that had deterred the creation of online-filtration efforts."  *Id.*  Under the New York cases, "if a provider remained passive and uninvolved in filtering third-party material from its network, the provider could not be held liable for any offensive content it carried from third parties."  *Id.*  (citing *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139–43 (S.D.N.Y. 1991)).  On the other hand, "once a service provider undertook to filter offensive content from its network, it assumed responsibility for any offensive content it failed to filter, even if it lacked knowledge of the content."  *Id.* (citing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, *5 (N.Y. Sup. Ct. May 24, 1995)).   "The *Stratton Oakmont* decision, along with the increasing public concern about pornography on the internet, served as catalysts" for the enactment of the CDA.  *Id.*

The Ninth Circuit has interpreted CDA § 230 broadly:  so long as an interactive computer service provider is not also an "information content provider," that is, someone who is "responsible, in whole or in part, for the creation or development of" the offending content, it is immune from liability arising from content created by third parties.  *Fair Hous. Council of San*

5

United States District Court
Northern District of California

1    *Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (citing 47 U.S.C.

2    §§ 230(c), (f)).  Thus, a defendant is entitled to immunity under the CDA if: 1) it is a "provider or

3    user of an interactive computer service," 2) the information for which the plaintiff seeks to hold

4    the defendant liable was "information provided by another information content provider," and 3)

5    the complaint seeks to hold the defendant liable as the "publisher or speaker" of that information.

6    *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (citing 47 U.S.C. § 230(c)(1)); *see*

7    *also Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 890 (N.D. Cal. 2017) (finding that under Section

8    230 Twitter was immune from claims based on theory that third-party content Twitter allowed to

9    be posted on its platform led to plaintiff's injury because the claim sought to hold Twitter liable as

10    a publisher).[2]

11       As expressly stated in Section 230, the policies underlying the enactment of that section

12    are:

13       (1) to promote the continued development of the Internet and other
         interactive computer services and other interactive media;

14       (2) to preserve the vibrant and competitive free market that presently
15           exists for the Internet and other interactive computer services,
         unfettered by Federal or State regulation;

16       (3) to encourage the development of technologies which maximize
17           user control over what information is received by individuals,
         families, and schools who use the Internet and other interactive
18           computer services;

19       (4) to remove disincentives for the development and utilization of
         blocking and filtering technologies that empower parents to
20           restrict their children's access to objectionable or inappropriate
         online material; and

21       (5) to ensure vigorous enforcement of Federal criminal laws to deter
22           and punish trafficking in obscenity, stalking, and harassment by
         means of computer.

23    47 U.S.C. § 230(b).

24       Section 230 expressly states that it has "[n]o effect on criminal law[,]" providing that

25    "[n]othing in this section shall be construed to impair the enforcement of section 223 or 231 of this

26    title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title

27

28    [2] Here, it is undisputed that Twitter is an interactive computer service provider and that the Videos
     were provided by another information content provider.

18, or any other Federal criminal statute." 47 U.S.C. § 230(e)(1). It expressly preempts all state laws that are inconsistent with Section 230's grant of immunity. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

### 2. The TVPRA

In 2000, Congress enacted the TVPRA, which criminalized sex trafficking. When it enacted the TVPRA, "Congress declared that the purposes of the [TVPRA] are to 'combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims.' " *Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub.L. No. 106–386, § 102, 114 Stat. 1488 (2000) (codified as amended at 18 U.S.C. § 1589 *et seq.*)). In 2003, the law was expanded to provide a private right of civil action for victims of sex trafficking, codified at 18 U.S.C. § 1595. *Id.* "The version of § 1595 enacted in 2003 limited the civil remedy to victims of three specific trafficking acts (including sex trafficking of minors), and did not expressly permit recovery against individuals who benefit from participation in a trafficking venture." *Id.* n. 1 (citing Pub.L. 108–193, § 4(a)(4)(A), 117 Stat. 2878 (2003)). "In the [TVPRA's] 2008 reauthorization, Congress deleted those limitations." *Id.* (citing Pub.L. 110–457, Title II, § 221(2), 122 Stat. 5067 (2008)).

In its current form, the TVPRA makes it a crime to engage in direct sex trafficking or to benefit financially from sex trafficking, providing as follows:

> (a) Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to

United States District Court
Northern District of California

1

> cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

2

3   18 U.S.C. § 1591(a). Section 1591(e) further provides that "[in] this section . . . [t]he term

4   'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of

5   subsection (a)(1)." 18 U.S.C. § 1591(e)(4).

6         The civil liability provision in its current form provides that "[a]n individual who is a

7   victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever

8   knowingly benefits, financially or by receiving anything of value from participation in a venture

9   which that person knew or should have known has engaged in an act in violation of this chapter)

10   in an appropriate district court of the United States and may recover damages and reasonable

11   attorneys fees." 18 U.S.C. § 1595(a).

12        **3.   FOSTA**

13         In 2018, the CDA was amended by the Allow States and Victims to Fight Online Sex

14   Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA"), which inserted a

15   new provision in CDA § 230 specifically addressing the application of that section in the context

16   of sex trafficking law.  *See* 47 U.S.C. § 230(f)(5).  " 'Congress passed [FOSTA] to narrow Section

17   230's scope and provide prosecutors with new tools to combat the sex trafficking of both minors

18   and adults.' " *J. B. v. G6 Hosp., LLC*, No. 19-CV-07848-HSG, 2020 WL 4901196, at *4 (N.D.

19   Cal. Aug. 20, 2020) (quoting *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 368 (D.C.

20   Cir. 2020));  *see also* 164 Cong. Rec. S1849-08, 164 Cong. Rec. S1849-08, S1849 (reflecting that

21   FOSTA was enacted in response to an increase in sex trafficking resulting from "the presence of

22   [sex trafficking] organizations online that are using the ruthless efficiency of the internet to sell

23   women and children").  The legislative history reflects that one of the websites of particular

24   concern to Congress was a sex trafficking website called "Backpage," which knowingly trafficked

25   in young women and children.  *See* 164 Cong. Rec. S1849-08, 164 Cong. Rec. S1849-08, S1854

26   ("Why is this law so important? If I am looking at this through a prosecutor's lens, now all of the

27   prosecutors in the country can go after anyone who knowingly facilitates sex trafficking online. I

28   am not saying when it is by accident, and I am not saying when it has slipped through and they

United States District Court
Northern District of California

don't know it; I am talking about to knowingly facilitate, which is what [B]ackpage was doing.")

(Senator McCaskill).

FOSTA's amendment of the CDA consisted of adding Section 230(e)(5):

> (5) No effect on sex trafficking law
>
> Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—
>
> (A) any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;
>
> (B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or
>
> (C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

47 U.S.C. § 230(e)(5). " 'FOSTA narrowed the scope of immunity for interactive computer service providers, by providing that Section 230 has "[n]o effect on sex trafficking law," and shall not "be construed to impair or limit" civil claims brought under TVPRA Section 1595 or criminal charges brought under state law if the underlying conduct would constitute a violation of TVPRA Sections 1591 or 2421A.' " *J. B. v. G6 Hosp., LLC*, 2020 WL 4901196, at *4 (quoting *Woodhull Freedom Found. v. United States*, 948 F.3d at 368) (quoting 132 Stat. at 1254).

## C.     Contentions of the Parties

### 1.   Motion

Twitter argues in the Motion that it is immune under CDA § 230 as to all of Plaintiffs' claims. Motion at 2. According to Twitter, the amendment of Section 230 under FOSTA, permitting sex trafficking victims to pursue civil claims under 18 U.S.C. § 1595 against an interactive computer service provider where the provider violates 18 U.S.C. § 1591, created only a narrow exception to the immunity afforded under Section 230 that was "carefully targeted to remove civil immunity for the few criminal websites that, unlike Twitter here, were deliberately and knowingly assisting and profiting from reprehensible crimes." *Id.* Twitter contends,

United States District Court
Northern District of California

1    "FOSTA's language, its legislative history, and the pre-existing case law on Section 1591 all point

2    to the same conclusion: civil claims can only proceed against sex traffickers and those who

3    knowingly benefit from their affirmative participation in a sex trafficking venture."  *Id.*

4          Twitter argues that here, Plaintiffs have failed to allege facts showing that the exception to

5    immunity created under FOSTA applies because the FAC: 1) "lacks any facts showing that

6    Twitter affirmatively participated in any kind of venture with the Perpetrators, let alone a sex

7    trafficking venture"; 2) "does not allege, as required to establish a violation of Section 1591, any

8    facts establishing that Twitter knew that Plaintiffs were victims of sex trafficking or that the

9    Videos were evidence of this crime"; and 3) does not "allege any connection between the

10   Perpetrators and Twitter or that Twitter received any benefits because of the Videos."  *Id.* Twitter

11   further asserts that CDA § 230 protects it from liability because "Twitter did remove the Videos

12   and suspend the accounts that had posted them" and it cannot be held liable under "any applicable

13   law" simply because it did not take the videos down immediately.  *Id.*

14         Twitter represents that it "vigorously combats [child sexual exploitation material ("CSE")]

15   through a combination of methods, including review of user reports and the use of proprietary

16   technology to proactively identify and remove such material" but that "given the sheer volume of

17   Tweets posted every day on Twitter's platform (hundreds of millions of Tweets posted by over

18   190 million daily users), it is simply not possible for Twitter – or the individuals who enforce its

19   Rules and policies – to find and remove all offending content immediately or accurately in all

20   cases."  *Id.*  at 1.  Twitter points to its zero-tolerance policy for child sexual exploitation materials,

21   which is set forth in its Rules – to which users must agree when they create a Twitter account.  *Id.*

22   at 6.  According to Twitter, it also "utilizes multiple tools, including reports by the public . . . ,

23   moderators who review reports of abuse and CSE content, innovative technology and algorithms

24   that proactively identify abusive content, and online education and information sharing to combat

25   online abuse."  *Id.* (citing FAC ¶¶ 42-43, 55-57; Wong Decl., Exs. 1 (news article entitled "Twitter

26   says it's getting better at detecting abusive tweets without your help"), 2 (a blog post by Twitter

27   entitled "A healthier Twitter: Progress and more to do")).  According to Twitter, in enacting

28   FOSTA, Congress did not intend "for online platforms like Twitter that proactively act against

such activity to be sued for their inadvertent failure to remove content." *Id.* at 2.

The purpose of CDA § 230, according to Twitter, was "to ensure that interactive computer service ('ICS') providers would never have to choose 'between taking responsibility for all messages and deleting no messages at all,' which presents such providers a 'grim' and illusory choice." *Id.* at 3 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162-63 (9th Cir. 2008)). To achieve that purpose, it asserts, "§ 230 creates broad immunity for claims against ICS providers based on content created by users: 'No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' " *Id.* (quoting 47 U.S.C. § 230(c)(1)). Twitter contends this provision "bars all causes of action that seek to hold ICS providers like Twitter liable for not removing content created by a third-party." *Id.* (citing *Igbonwa v. Facebook, Inc.*, 2018 WL 4907632, at *5-7 (N.D. Cal. Oct. 9, 2018), aff'd, 786 F. App'x 104 (9th Cir. 2019)).

Twitter asserts that FOSTA created only a narrow exception to the immunity afforded under CDA § 230, permitting a victim of sex trafficking to bring a civil action under § 1595, but only " 'if the conduct underlying the claim constitutes a violation of [S]ection 1591,' the criminal statute prohibiting sex trafficking." *Id.* at 4 (citing 47 U.S.C. § 230(e)(5)(A); *Doe v. Kik Interactive*, 482 F.Supp.3d 1242, 1251 (S.D. Fla. 2020) ("FOSTA permits civil liability for websites only if the conduct underlying the claim constitutes a violation of section 1591.")). This limitation is important, it contends, because "Section 1591 has more stringent *mens rea* and required elements to meet than Section 1595." *Id.* Thus, Twitter argues, the FOSTA exception only applies to "openly malicious actors" and does not otherwise change the scope of immunity under CDA § 230. *Id.* at 5 (citing *Kik*, 482 F.Supp.3d at 1249-51); *see also id.* at 3. According to Twitter, this is apparent from the legislative history. *Id.* (citing 164 Cong. Rec., at S1860-62 (statement of Senator Durbin ("[FOSTA] is a narrowly crafted bill that would ensure that Section 230 . . . does not provide legal immunity to websites like Backpage that knowingly facilitate sex trafficking")); *id.* (statement of Senator Schumer ("Key to my support is my understanding that this legislation would not allow nuisance lawsuits against technology companies."))).

Here, Twitter asserts, it meets all the requirements for establishing immunity under CDA §

11

230, namely, that (1) it is an ICS provider; (2) Plaintiffs' claims treat Twitter as the publisher or speaker of the content in question; and (3) someone other than Twitter provided or created the content at issue. *Id.* at 8-11. Twitter argues further that the FAC does not allege facts that would establish that any exemption to CDA § 230 applies, including the FOSTA exception that allows for the imposition of liability where the ICS itself violates Section 1591, either as a "primary violator" or a "secondary participant" that 'knowingly . . . benefits, financially or by receiving anything of value, from participation in a venture' with a primary violator." *Id.* (quoting 18 U.S.C. § 1591(a)). *Id.* at 11-12.

With respect to Plaintiffs' claim that Twitter was a primary participant in sex trafficking under Section 1591(a)(1), Twitter contends Plaintiffs' allegations fall short because "[t]o plead a primary violation, a plaintiff must allege that the defendant 'provide[d], obtain[ed], [and] maintain[ed] . . . a **person**" knowing that he or she "will be . . . cause[d]" to engage in a commercial sex act." *Id.* at 12 (quoting 18 U.S.C. § 1591(a)(1)) (emphasis added by Twitter). Twitter contends "Plaintiffs allege only that 'Twitter knowingly provided, obtained, and maintained the **Videos**,' not Plaintiffs" and therefore they fail to allege a primary violation. *Id.* (quoting FAC ¶ 141) (emphasis added by Twitter). Twitter also argues that as to Plaintiffs' claims under both Section 1591(a)(1) and Section 1591(a)(2), those claims fall short for the additional reason that Section 1591 "requires a defendant to know that the victim 'will in the future [be] cause[d] . . . to engage in prostitution.' " *Id.* at 12 n. 10 (citing *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)). According to Twitter, "Plaintiffs cannot plead that Twitter had such knowledge as the FAC alleges that Plaintiffs had cut off contact with the Perpetrators before the Videos were posted on Twitter's platform." *Id.* (citing FAC ¶¶ 94-96).

Twitter contends Plaintiffs also fail to allege that it was a secondary participant under Section 1591(a)(2). *Id.* at 12-19. According to Twitter, to establish that it is a secondary participant, Plaintiffs must "plead that Twitter 'knowingly . . . benefit[ed] . . . from participation in a venture which has engaged in [sex trafficking] in violation of [Section 1591(a)(1)].' " *Id.* (quoting 18 U.S.C. § 1591(a)(2)). It further asserts that Section 1591 was amended by FOSTA to define "[p]articipation in a venture" as "**knowingly** assisting, supporting, or facilitating" a primary

United States District Court
Northern District of California

violation.  *Id*. at 12 (quoting 18 U.S.C. § 1591(e)(4)) (emphasis added by Twitter)).  Twitter argues that neither of the grounds upon which Plaintiffs rely to establish that Twitter was a secondary participant – "(i) Twitter's initial failure to find a violation of its policies after reviewing the Video, or (ii) Twitter's nine-day delay in removing the Videos" – establishes it was a secondary participant for three reasons.  *Id.*

"First, Plaintiffs do not allege the existence of any type of venture between Twitter and any party that has a common purpose, much less facts suggesting 'that [Twitter] actually participated in a *sex-trafficking venture'* that had the common purpose of trafficking Plaintiffs."  *Id.* at 12 (quoting *United States v. Afyare*, 632 F. App'x 272, 283-86 (6th Cir. 2016) (emphasis in original); and citing *B.M. v. Wyndham Hotels & Resorts, Inc*., 2020 WL 4368214, at *3 (N.D. Cal. July 30, 2020) (purportedly analyzing the elements of a Section 1591 violation and following *Afyare*));  *see also id.* at 13-15 (arguing that Plaintiffs have not alleged any "venture" or any "active participation" in a venture).

"Second, there are no facts indicating Twitter received a benefit 'because of' the alleged sex trafficking venture, let alone that Twitter knowingly received it."  *Id.* at 12 (citing *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019));  *see also id.* at 15-17 (arguing that Plaintiffs have not alleged "a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit, with actual . . . knowledge of that causal relationship") (citing *Geiss*, 383 F.Supp.3d at 169; *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc*., 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013)).  In particular, Twitter asserts that the FAC contains no factual allegations that it monetized or benefited from the Videos, instead containing only conclusory allegations that it did so, which are insufficient.  *Id.* at 16 (citing *Jabagat v. Lombardi*, 2015 WL 11004900, at *4 (S.D. Miss. Jan. 30, 2015)).  Twitter further contends the FAC does not plausibly allege that it knowingly generated revenue "because of" its alleged failure to remove the Videos.  *Id.* at 16 (citing *Geiss*, 383 F.Supp.3d at 169-170).

"Third, the FAC does not contain any allegation that Twitter had actual knowledge that Plaintiffs were victims of sex trafficking or that it knew the Videos contained evidence of this." *Id.* at 12 (citing FAC ¶¶ 152-54; *Noble v. Weinstein*, 335 F.Supp.3d 504, 523-24 (S.D.N.Y. 2018));

*see also id.* at 17-19.  According to Twitter, Plaintiffs "must show that Twitter knew specifically that Plaintiffs had been sex trafficked, and deliberately assisted the sex trafficking."  *Id.* at 17 (citing *Kik*, 482 F.Supp.3d at 1251).  They do not satisfy this requirement, Twitter asserts, because "[t]he FAC . . .  contains no facts plausibly alleging that Twitter had actual knowledge of Plaintiffs' prior interactions with the Perpetrators" or that it *knew* the perpetrators were sex traffickers or that the videos related to commercial sex.  *Id.*  at 18-19 (citing *Noble*, 335 F.Supp.3d at 524; *Lawson v. Rubin*, 2018 WL 2012869, at *12-14 (E.D.N.Y. Apr. 29, 2018); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F.Supp.3d 921, 940 (D. Or. Sept. 8, 2020); *Woodhull Freedom Found. v. United States*, 334 F.Supp.3d 185, 203 (D.D.C. 2018), rev'd on other grounds, 948 F.3d 363 (D.C. Cir. 2020)).

Twitter argues that even if it is not immune under CDA § 230, Plaintiffs fail to state a claim under Section 1595.  *Id.* at 19-21.  First, it argues that Plaintiffs fail to allege that Twitter is a perpetrator and therefore cannot establish liability on the basis of primary liability.  *Id.*  at 19.  To the extent that Plaintiffs assert their claim under Section 1595 on a "beneficiary" theory the claim also fails, Twitter asserts, because Plaintiffs have not alleged that Twitter participated in a venture with the perpetrators or that Twitter should have known of Plaintiffs' alleged sex trafficking.  *Id.*  at 19-21.

Twitter further asserts that even if Plaintiffs' Section 1595 claim is not subject to immunity under CDA § 230, their remaining claims are nonetheless barred because FOSTA removes immunity *only* for claims asserted under Section 1595.  *Id.* at 21-22 (citing *Kik*, 482 F.Supp.3d at 1249; *M. L. v. Craigslist Inc.*, 2020 WL 6434845, at *9-10 (W.D. Wash. Apr. 17, 2020); *Doe v. Bates*, 2006 WL 3813758, at *18-20 (E.D. Tex. Dec. 27, 2006); *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1054-55 (E.D. Mo. 2011); Cal. Civ. Code § 1708.85(h); *J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196, at *7 (N.D. Cal. Aug. 20, 2020); *Riggs v. MySpace, Inc.*, 2009 WL 10671689, at *3 (C.D. Cal. Sept. 17, 2009), reversed in part on other grounds, 444 Fed. Appx. 986 (9th Cir. 2011); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003); *Caraccioli v. Facebook, Inc.*, 700 Fed. Appx. 588, 590 (9th Cir. 2017); *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 575 (2009); *Ripple Labs Inc. v. YouTube*

*LLC*, 2020 WL 6822891, at *6 (N.D. Cal. Nov. 20, 2020)).

Twitter argues further that Plaintiffs fail to state viable claims under 18 U.S.C. §§ 2258A & 2258B, California products liability law, as to any of their negligence claims, under Cal. Civ. Code § 1708.85, or under Cal. Bus. & Prof. Code § 17200. *Id.* at 22-25. Twitter contends there is no private right of action as to 18 U.S.C. §§ 2258A & 2258B. *Id.* at 22 (citing *Abcarian v. Levine*, 972 F.3d 1019, 1025-26 (9th Cir. 2020)). It challenges the California product liability claim on the grounds that Plaintiffs "do not allege physical injury or property damage resulting from their use of a defective product" or even identify any product that is defective. *Id.* at 22 (citing *Hernandez v. Avis Budget Grp., Inc.*, 2017 WL 6406838, at *5 (E.D. Cal. Dec. 15, 2017); *Griff v. Woejeckloski*, 2017 WL 8185857, at *3 (C.D. Cal. March 20, 2017)). Twitter further asserts that to the extent Plaintiffs base that claim on defective platform design, it fails because product liability law is "geared to the tangible world." *Id.* at 23 (citing *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-35 (9th Cir. 1991); *Intellect Art Multimedia Inc. v. Milewski*, 899 N.Y.S.2d 60, at *7 (2009); *Brooks v. Eugene Burger Management Corp.*, 215 Cal. App. 3d 1611, 1624-25 (1989); *Wilson v. Midway Games, Inc.*, 198 F.Supp.2d 167, 172-73 (D. Conn. 2002)).

With respect to Plaintiffs' negligence claims (Claims Six through Nine), Twitter challenges the negligence per se and negligent infliction of emotional distress claims (Claims Eight and Nine) on the basis that they are not independent causes of action. *Id.* at 23 (citing *J.B. v. G6 Hospitality LLC*, 2020 WL 4901196, at *11; *Sinclair for Tucker v. Twitter, Inc.*, 2019 WL 10252752, at *7 (N.D. Cal. Mar. 20, 2019)). As to the two remaining negligence claims (Claims Six and Seven), Twitter argues that they fail because Plaintiffs have not alleged that Twitter owed them any duty. *Id.* (citing *Worldwide Media, Inc. v. Twitter, Inc.*, 2018 WL 5304852, at *8-9 (N.D. Cal. Oct. 24, 2018)). According to Twitter, Plaintiffs' allegations that "Twitter had a duty to protect" them because it knew of the Videos and failed to take them down (FAC ¶¶ 112, 128, 194-95) are insufficient because a defendant can only be liable for negligence based on failure to act where there is a special relationship between the parties and Plaintiffs have not alleged such a relationship. *Id.* at 24.

Twitter contends Plaintiffs' claim under California Civil Code section 1708.85, which

creates a private right of action against a person "who intentionally distributes" private sexually explicit materials "without consent" fails to state a claim because "the FAC alleges no facts from which the Court could infer that Twitter 'intentionally distribute[d]' the Videos; rather, it makes a conclusory allegation that '[b]y refusing to remove or block [the Videos], Twitter intentionally distributed' them" *Id.* (citing FAC ¶ 214). It argues further that "liability is precluded if the 'material was previously distributed by another person,' Cal. Civ. Code § 1708.85(c)(6), and here, the Videos were distributed first on a different platform—Snapchat—by two individuals (whom Plaintiffs do not allege were the individual(s) who trafficked them) months before Twitter ever became aware of the Videos—@StraightBross and @fitmalesblog." *Id.* (citing FAC ¶¶ 87-89, 99, 100.)

Finally, Twitter argues that Plaintiffs' UCL claim is insufficiently pled because Plaintiffs have not alleged any economic injury and therefore, they do not have standing to assert the claim. *Id.* at 24 (citing *Huynh v. Quora, Inc.*, 2019 WL 11502875, at *7 (N.D. Cal. Dec. 19, 2019)). Twitter further contends Plaintiffs have not alleged an unfair business practice because: 1) they have not pled any statutory violation and therefore have not alleged an unlawful act by Twitter; and 2) "To the extent Plaintiffs' claim is premised on an alleged misrepresentation (¶ 230), it fails to meet Rule 9(b) because Plaintiffs do not allege with particularity a misrepresentation by Twitter." *Id.* (citing *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1244 (N.D. Cal. 2017)). Twitter also argues that the claim fails because Plaintiffs have not alleged actual reliance, having failed to allege that they "ever used Twitter, saw or read its policies, or that seeing those policies resulted in an economic injury." *Id.*

### 2.  Opposition

In their Opposition, Plaintiffs reject Twitter's challenges under CDA § 230, arguing that the claims in this case are based on just the sort of knowing conduct that Congress intended to exempt from Section 230 when it enacted FOSTA. Opposition at 1. In particular, they assert that Twitter knew that the Videos were being widely distributed on its platform and that they contained child pornography created as a result of sex trafficking and deliberately allowed the posts to remain on Twitter. *Id.*

First, Plaintiffs argue that they have sufficiently alleged their claims under the TVPRA, which FOSTA exempts from CDA § 230, both on the basis of direct sex trafficking under Section 1591(a)(1) and as a beneficiary of sex trafficking under Section 1591(a)(2).   *Id.* at 3.  With respect to direct sex trafficking, Plaintiffs point to the language of Section 1591(a)(1), providing for liability for a perpetrator who "knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits *by any means* a person," while "knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]" *Id.* (quoting 8 U.S.C. § 1591(a)) (emphasis added).  According to Plaintiffs, "the phrase 'by any means' is not defined and contains no exception for electronic or virtual actions."  *Id.*  Further, they assert, while the statute does not define the words  "provide[]," "obtain[ ],"  or "maintain[ ]," their ordinary meaning as evidenced by dictionary definitions – upon which the Ninth Circuit has relied to define other undefined terms of the TVPRA –support the conclusion that Plaintiffs' allegations are sufficient as to the first part of Section 1591(a)(1) (establishing liability as to a defendant that "knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person").  *Id.* at 3-4.  In particular, Plaintiffs contend they have satisfied this requirement by alleging that "Twitter made them available, as depicted in a CSAM compilation video, to users on Twitter, having gained or attained Plaintiffs by the same electronic means, and having kept them in the same existing state, all despite Plaintiffs' own reports and objections."  *Id.*  at 4 (citing *United States v. Love,* 743 F. App'x 138, 139 (9th Cir. 2018) (using Webster's dictionary to define "force" in § 1591(a)(1) charge against sex trafficker)).

Plaintiffs further assert that child pornography can be the basis for a TVPRA claim under Section 1591(a)(1), including in cases where the perpetrator procures pornographic material without having direct contact with the child or paying money for the material.  *Id.* at 4-5 (citing *United States v. Flanders*, 752 F.3d 1317, 1330 (11th Cir. 2014); *United States v. Tollefson*, 367 F. Supp. 3d 865, 878-880 (E.D. Wis. 2019)).

Plaintiffs argues further that their allegations are sufficient as to the second phrase of Section 1591(a)(1), requiring that the conduct that is the basis for the claim must have been

"knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]" *Id.* at 5-6.  According to Plaintiffs, a "commercial sex act" is defined under the TVPRA as " 'any sex act, on account of which anything of value is given to or received by any person[.]' " *Id.* at 6 (quoting 18 U.S.C. § 1591(e)(3)).  Here, they contend, they have alleged "actual knowledge" in that they "alleged that they reported child sexual abuse material featuring them to Twitter, depicting them engaged in sexual acts due to extortion and blackmail (that is, in exchange for 'something of value')." *Id.* (citing FAC ¶¶ 112, 114, 123).  They also point to their allegation that "John Doe 1 provided proof of his age to Twitter, that numerous users commented on their belief that videos featured minors and that one disseminating account had already been reported to Twitter for CSAM." *Id.* (citing FAC ¶¶ 101-102, 114, 121-122).  Plaintiffs argue that "[t]aken together, these allegations are more than sufficient to indicate that Twitter knew, or at least was in reckless disregard of, Plaintiffs' status as minors when engaging in the commercial sex acts at issue." *Id.* at 5-6.

Plaintiffs also argue that they state a claim on the basis of beneficiary liability under Section 1595(a) and Section 1591(a)(2), addressing the requirements of both provisions; according to Plaintiffs, Sections 1591(a)(2) and 1595(a) "have similar provisions for those who benefit financially, and distinct requirements for participation in a venture and the requisite level of knowledge." *Id.* at 6.

With respect to whether Plaintiffs have alleged that Twitter knowingly "benefited financially or by receiving anything of value," Plaintiffs contend they have satisfied this requirement by alleging that Twitter both monetizes the CSAM on its platform and gains more viewers from CSAM, which makes the platform more popular and attracts advertisers. *Id.* at 6-7. In support of this argument, it points to *B.M. v. Wyndham*, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020).  *Id.*   According to Plaintiffs, in that case the Court rejected the defendant's argument that a plaintiff asserting a claim under Sections 1591(a)(2) and 1595(a) was required to show that the financial benefit "must [have] derive[d] directly from, and [been] knowingly received in exchange for, participation in a sex trafficking venture." *Id.* at 7 (quoting *B.M.*, 2020 WL 4368214, at *4 (internal citations omitted) (alterations added)).  Instead, Plaintiffs assert, the

United States District Court
Northern District of California

court in *B.M.* found "that § 1595 claims could not be subjected to the same knowledge standard as § 1591 without undermining the 'should have known' language, and the Court concluded that it was sufficient to allege that the hotels knowingly received revenue from room rentals." *Id.* (citing *B.M.*, 2020 WL 4368214, at *4) (internal citations omitted).

Plaintiffs reject Twitter's argument that "any benefit [it] receives must have a causal relationship to the sex trafficking[,]" arguing that the cases upon which it relies – *Geiss v. Weinstein Co. Holdings LLC*, 383 F.Supp. 3d 156, 169 (S.D.N.Y. 2019) and *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc*., 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013) – are not on point. *Id.* at 8 (citing Motion at 13, 15). Even if Twitter is correct, Plaintiffs contend, they have demonstrated such a connection through the allegations in the FAC. *Id.* at 8-10. Plaintiffs argue that many of Twitter's assertions as to their allegations are contradicted by the FAC and provide a list of examples comparing specific claims about the allegations made by Twitter with the actual allegations in the FAC. *Id.*

Next, Plaintiffs address whether they have adequately alleged that Twitter participated in what it knew or should have known was a sex trafficking venture. *Id.* at 10-16. According to Plaintiffs, Sections 1591(a)(2) and 1595 contain distinct requirements. *Id.* at 10. "Participation in a venture" for the purposes of Section 1591(a)(2) means "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." *Id.* (quoting 18 U.S.C. § 1591(e)(4)). Plaintiffs contend they have alleged a violation of subsection (a)(1) for the reasons discussed above and therefore have satisfied that aspect of the definition of "participation in a venture" under Section 1591(a)(2). *Id.* at 11. Further, they reject Twitter's arguments that it did not participate in a venture that it knew was sex trafficking, which they characterize are as follows: "(1) Twitter did not have a common purpose with the initial sex traffickers, (2) Twitter was at most a passive beneficiary of sex trafficking profits, and (3) Twitter does not know what sex trafficking is." *Id.*

As to the "common purpose" argument, Plaintiffs contend Twitter relies on cases interpreting the Racketeer Influenced and Corrupt Organizations Act ("RICO") in support of such a requirement, but that these cases have no bearing on Plaintiffs' TVPRA claims. *Id.* (citing Motion at 13 (citing *United States v. Turkette*, 452 U.S. 576 (1981); *Washington v. Deleon*, 2019

WL 11691424 (N.D. Cal. July 9, 2019)).

Plaintiffs argue that Twitter's passive beneficiary argument also fails because it's reliance on *Afyare*, 632 F. App'x at 286, is misplaced.  *Id.* at 11-12.  According to Plaintiffs, in *Afyare* the court offered an analogy "that a defendant who joins a soccer team whose members include sex traffickers who sponsor the team financially, does not violate § 1591(a)(2) unless that defendant commits 'some overt act' that 'furthers the sex trafficking aspect of the venture.' "  *Id.*  at 11 (quoting Motion at 14).  Plaintiffs argue that Twitter's reliance on that analogy to argue that there must be "some overt act that furthers the sex trafficking aspect of the venture" should be rejected because "[t]he decision's logic doesn't apply where the beneficiary defendant is engaging in illegal acts."  *Id.*  at 12.  In particular, they assert, while playing soccer is a lawful venture, "CSAM possession and distribution are not."  *Id.* (citing 18 U.S.C. § 2252A).  Thus, Plaintiffs assert, they *have* alleged that Twitter engaged in overt acts that further the sex trafficking venture "[b]y knowingly hosting, possessing, and distributing the CSAM of Plaintiffs, as Plaintiffs have alleged."  *Id.*

Next, Plaintiffs reject Twitter's claims that it "did not know of the alleged sex trafficking" (Motion at 17),  that "there is no allegation that any of these submissions informed Twitter that Plaintiffs were victims of sex trafficking" (Motion at 18), that "none of the reports or emails sent to Twitter about the videos indicated that Plaintiffs had been sex trafficked or that they involved commercial sex acts" (Motion at 21), and that Plaintiffs did not allege "that the videos would have, on their face, indicated to Twitter (or a reasonable viewer) that Plaintiffs had been trafficked and the videos involved commercial sex" (Motion at 18).  *Id.* at 12.  Plaintiffs argue that these claims are "misleading and meritless" in light of the allegations in the FAC.  *Id.* at 12-13 (citing FAC ¶¶ 52-53, 57, 101-102, 112, 114, 121-123, 196).  Likewise, they argue that Twitter's suggestion that their claims are merely about "delay," implying that it acted in good faither in eventually taking action to remove the Videos rather than doing so in response to an intervening event (a request from the federal government that it take action) after refusing to take action, is misleading.  *Id.* at 12 n. 26. According to Plaintiffs, "unless the charge is advertising, § 1591(a), nowhere does the TVPRA require that the defendant actually knew that someone was a sex

1   trafficking victim to be liable. Reckless disregard or constructive knowledge suffice for civil

2   liability." *Id.* (citing 18 U.S.C. §§ 1591(a), 1595(a)). Thus, they contend, their allegations are

3   sufficient to establish knowledge of their sex trafficking. *Id.*

4          Plaintiffs also point to Section 1595, which they contend under *B.M.* requires that they

5   "allege that Twitter (1) 'knowingly benefit[ted] financially or by receiving anything of value'; (2)

6   from participation in a venture; (3) that they 'knew or should have known [had] engaged in' sex

7   trafficking.' " *Id.* at 14 (quoting *B.M.*, 2020 WL 4368214, at *4). They contend, "[t]he *B.M.* court

8   determined, as most courts have, that the plaintiff 'is not required to allege an overt act in

9   furtherance of or actual knowledge of a sex trafficking venture in order to sufficiently plead her

10  section 1595 civil liability claim[.]' " *Id.*  (quoting *B.M.*, 2020 WL 4368214, at *4 and citing *S.Y.*

11  *v. Wyndham Hotels & Resorts, Inc. & Laxmi of Naples, LLC*, No. 2:20-CV-619-JES-MRM, 2021

12  WL 1814651, at *4-5 (M.D. Fla. May 6, 2021); *E.S. v. Best W. Int'l, Inc*., No. 3:20-CV-00050-M,

13  2021 WL 37457, at *3–4 (N.D. Tex. Jan. 4, 2021); *M.A. v. Wyndham Hotels & Resorts, Inc*., 425

14  F. Supp. 3d at 968–71 (S.D. Ohio 2019); *S.J. v. Choice Hotels Int'l, Inc*., 473 F.Supp.3d 147, 152-

15  54 (E.D.N.Y. 2020); *Doe S.W. v. Lorain-Elyria Motel, Inc*., Case No. 2:19-cv-1194, 2020 WL

16  1244192, *6-7 (S.D. Ohio Mar. 16, 2020)).  Plaintiffs note that *Afyare*, upon which Twitter relies

17  to assert that an overt act is required, was a criminal action, in contrast to *B.M.,* and argue that

18  under *B.M.* Plaintiffs are not required to plead a § 1595 claim under a § 1591 standard.  *Id.* (citing

19  *B.M.*, 2020 WL 4368214, at *3;  *J.C. v. Choice Hotels Int'l, Inc*., No. 20-CV-00155-WHO, 2020

20  WL 6318707, at *7 (N.D. Cal. Oct. 28, 2020)). Plaintiffs also argue that Twitter's reliance on *M.A.*

21  *v. Wyndham Hotels & Resorts, Inc*., 425 F. Supp. 3d 959, 966 (S.D. Ohio 2019) is misplaced

22  because is mischaracterizes the facts and holding of that case.  *Id.* at 14-15. According to

23  Plaintiffs, they have "sufficiently alleged that Twitter had constructive and actual knowledge of

24  Plaintiffs' sex trafficking, which it could see for itself; the main crime happened in plain sight."

25  *Id.* at 16.

26          Plaintiffs strenuously disagree with Twitter's characterization of the legislative history of

27  FOSTA and its argument that Congress intended to create only a narrow exception for bad actors

28  like Backpage. *Id.*  at 16-19.  Plaintiffs argue that in any event, they have alleged conduct that is

21

sufficient to fall within the exception, and the question of "how Twitter's actions compare to Backpage is a factual question that cannot be resolved at this stage of the litigation." *Id.*

Plaintiffs also argue that even apart from FOSTA, CDA § 230 was "never intended to immunize conduct that entails both criminal and civil liability." *Id.* (citing *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) ("The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet.")). In particular, they argue that the plain language of Section 230(c) requires that an interactive service provider "**take action** in good faith to restrict access to material, which is the opposite of what Twitter did in the instant case." *Id.* at 20 (emphasis in original). Plaintiffs concede that "[s]ome Ninth Circuit decisions have interpreted the liability shield in CDA 230 to cover not just the removal of objectionable content, but the decision whether to remove the content." *Id.* (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), as amended (Sept. 28, 2009) (citing *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008)). According to Plaintiffs, "[t]his interpretation is not consistent with the plain language of § 230(c)(2), which only limits liability for 'any action . . . to restrict access' to harmful content[,]" but these cases do not apply here because "they do not hold that CDA 230 immunizes a knowing decision to possess and distribute CSAM and Twitter has pointed to no controlling authority for such a proposition." *Id.* at 21.

Further, Plaintiffs assert, the stated purpose for CDA § 230 is inconsistent with Twitter's argument that it creates "immunity for all third-party content, even contraband – specifically, child pornography[.]" *Id.* The title of Section 230 – "Protection for private blocking and screening of offensive material" – supports this conclusion, Plaintiffs assert. *Id.* Likewise, the policies stated in Section 230 indicate that it was enacted "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," and "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." *Id.* (quoting 47 U.S.C.A. § 230(b)(4)-(5)). Twitter's position would undermine these policies rather than advance them, Plaintiffs assert. *Id.*

22

Plaintiffs also argue that CDA § 230 does not apply to their claim under 18 U.S.C. § 2252A and 2255 that Twitter knowingly possessed and distributed child pornography (Claim Four) because "CSAM material is not lawful 'information provided by another information content provider'" but rather is illegal contraband, stemming from the sexual abuse of a child, and wholly outside any protection or immunity under the law, to include CDA 230.' " *Id.* at 22. Plaintiffs' further assert that "CDA 230 was enacted to incentivize internet service providers ("ISP's") to protect children, not immunize them for intentionally or recklessly harming them." *Id.*

Plaintiffs argue that the Court should decline to follow the case cited by Twitter, *Doe v. Bates*, 2006 WL 3813758 (E.D. Tex., Dec. 27, 2006), which is a "non-binding, first of its kind, federal decision extending CDA immunity to a civil suit alleging receipt and possession of child pornography." *Id.* at 23.  According to Plaintiffs, neither of the cases upon which the Texas district court relied, *Zeran v. Am. Online, Inc*., 129 F.3d 327 (4th Cir. 1997) and *Noah v. AOL Time Warner, Inc*., 261 F. Supp. 2d 532, 537 (E.D. Va. 2003), aff'd, No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004), involved child pornography. *Id.*  They also contend the reasoning of the Texas case is wrong to the extent it treats child pornography in the same way courts have treated defamatory statements instead of treating it as contraband. *Id.* at 23-24.

According to Plaintiffs, given that Congress made clear that the protection of children was paramount when Section 230 was enacted, as is evidenced by the policies stated in subsection (b) and the exemption for " 'chapter . . . 110 of title 18 (relating to sexual exploitation of children),' which includes §§ 2252A and 2255[,]" "[i]t is untenable . . . to assert that CDA 230 immunizes platforms from knowingly possessing and distributing child sexual exploitation material." *Id.* at 24.  Moreover, Plaintiffs assert, Twitter does not dispute that they have adequately alleged the elements of claim under 18 U.S.C. § 2252A. *Id.*  at 25.

Plaintiffs also challenge Twitter's argument that their claims under 18 U.S.C. § 2258A(a)(1) and (a)(2) fail because those provisions do not create a civil cause of action. *Id.* (citing Motion at 22).  According to Plaintiffs, "Congress intended to make deliberate and reckless violations of 2258A privately enforceable" and that is what they allege here. *Id.* (citing 18 U.S.C.

§ 2258B(b)).  Plaintiffs argue further that "the standards of misconduct in paragraph (b) of 2258(B) establish the duty of care that Twitter owes Plaintiffs" for the purposes of their negligence claims and thus establish liability under both federal and state law.  *Id.*  at 25-26.

Next, Plaintiffs argue that CDA § 230 does not give rise to immunity as to their state law products liability claim based on negligent design.  *Id.*  According to Plaintiffs, this is because their claim "does not attempt to treat Twitter as the 'publisher or speaker' of information."  *Id.*  at 26.  Instead, "it seeks to hold Twitter accountable for failing in its 'duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public.' "  *Id.*  (quoting *Lemmon v. Snap, Inc.*, No. 20-55295, 2021 WL 1743576, at *4 (9th Cir. May 4, 2021)).  Plaintiffs contend that the distinction drawn by the Ninth Circuit in *Lemmon*, in which the court "rejected a social media platform's attempt to argue that CDA 230 applied because the platform allowed its users to transmit user-generated content to one another. . . .[,]' " also applies here, supporting the conclusion that Section 230 does not apply to this claim.  *Id.*  at 26-27. To the extent Twitter argues that Plaintiffs have not clearly identified what aspect of its platform is the "product," Plaintiffs contend this is just semantics.  *Id.*  at 27.  They also reject Twitter's argument that product liability law applies only to the "tangible" world, arguing that the Ninth Circuit's holding in *Lemmon* shows that Twitter is incorrect.  *Id.*

Finally, Plaintiffs argue that their state law claims are adequately alleged and should be allowed to proceed.  As to the negligence claims, they assert that it is apparent from the FAC that these claims are based on different theories and California's Civil Jury Instructions treat them as separate causes of action.  *Id.* at 28.  To the extent negligence per se operates as a presumption to establish a duty of care rather than a separate claim, Plaintiffs argue, "that simply means that Plaintiffs' allegations of Twitter's multiple violations of its statutory duties should be read in tandem with its negligence claims."  *Id.*  (citing *Tinoco v. San Diego Gas & Elec. Co.*, No. 17-CV-2433-BAS-JLB, 2018 WL 4562479, at *2 (S.D. Cal. Sept. 21, 2018)).  Plaintiffs also argue that they state a claim for violation of California's UCL based on "unlawful" conduct because "Twitter's criminal, aiding and abetting conduct is actionable under § 17200."  *Id.* at 29 (citing *Chetal v. Am. Home Mortg.*, No. C 09-02727 CRB, 2009 WL 2612312, at *4 (N.D. Cal. Aug. 24,

24

2009); *Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008)).  Twitter's argument that Plaintiffs do not have standing on this claim because they cannot seek "the full spectrum of damages" also falls short, Plaintiffs contend, as "the availability of a certain remedy is not relevant to a determination of standing to assert the claim."  *Id.* (citing *Finelite, Inc. v. Ledalite Architectural Prods.*, No. C-10-1276 MMC, 2010 WL 3385027, at *2 (N.D. Cal. Aug. 26, 2010)).

### 3.  Reply

In its Reply, Twitter reiterates its arguments that it cannot be held liable as either a perpetrator of sex trafficking under Section 1591(a)(1) or a criminal beneficiary of sex trafficking under Section 1591(a)(2).  Reply at 1-10.  As to Plaintiffs' direct sex trafficking claim under Section 1591(a)(1), Twitter rejects Plaintiffs' interpretation of the provision, again pointing to the words "a person" in the provision to argue that the prohibited conduct applies to an *individual*.  *Id.* at 2.  Twitter argues that Plaintiffs' "novel" interpretation of the provision as also encompassing a video depicting a person is not supported by any authority.  *Id.*  Twitter points to other uses of the word "person" in Section 1591 to support its argument that this word cannot be read to mean a depiction of a person under Section 1591(a)(1).  *Id.* at 3 (citing 18 U.S.C. § 1591(a)(2) ("person has not attained the age of 18");  18 U.S.C. § 1591(e)(2) ("coercion" is "threats of serious harm to or physical restraint against any person")).

Twitter argues further that the cases cited by Plaintiffs in support of their reading of Section 1591(a)(1), *United States v. Flanders*, 752 F.3d 1317, 1330 (11th Cir. 2014) and *United States v. Tollefson*, 367 F. Supp. 3d 865, 878-80 (E.D. Wis. 2019), are not on point because in those cases,  the court "determined that each defendant violated Section 1591(a)(1) because they procured a person for commercial sex using electronic means, i.e., they used the internet to communicate with the victims and to pay them to engage in recorded sex acts, similar to what the Perpetrators did here."  *Id.* at 3 (citing *Flanders*, 752 F.3d at 1330; *Tollefson*, 367 F. Supp. 3d at 878-80).  According to Twitter, *Flanders* and *Tollefson* "revolved around whether Section 1591 covered situations in which the defendant was not physically present during the alleged sex trafficking, not whether the challenged conduct could apply to an object (such as a video) instead of a person."  *Id.*

Twitter also repeats its argument that Plaintiffs, by their own admission, cannot satisfy the requirement under Section 1591(a) that a defendant must have known that a victim "will in the future [be] cause[d]" to engage in a commercial sex act given that Plaintiffs' allegations establish that "the venture was over at the time Twitter allegedly refused to remove the Videos from its platform, . . . making it impossible for Twitter to know that its alleged failure to act would likely cause Plaintiffs to engage in commercial sex acts in the future." *Id.*

Twitter also rejects Plaintiffs' arguments as to their claim that Twitter is liable as a beneficiary of sex trafficking under Section 1591(a)(2). *Id.* at 3-10. It again argues that it did not participate in any "venture" for the purposes of this subsection because it was not "associated in fact" with the perpetrators. *Id.* at 4. Twitter acknowledges that this term is not defined under Section 1591 but argues it is reasonable to look to the RICO cases cited in the Motion to understand its meaning. *Id.* Twitter reiterates its argument that these cases support the conclusion that to be engaged in a "venture" under Section 1591 the participants must have a common purpose, which Plaintiffs fail to allege. *Id.* Twitter notes that "[t]his construction of 'venture' is implicit to the *Afyare* court's holding that Section 1591(a)(2) requires proof of a sex trafficking venture and that '[t]wo or more people who engage in sex trafficking together are a sex-trafficking venture.' " *Id.* n. 4 (quoting *United States v. Afyare*, 632 F. App'x 272, 279-86 (6th Cir. 2016)).

Moreover, Twitter contends, under Section 1591the common purpose that is alleged must involve the *particular* sex trafficking venture involving the plaintiff. *Id.* at 4-5 (citing *S.J. v. Choice Hotels Int'l*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020); *Doe v. Kik*, 482 F. Supp. 3d 1242, 1251 (S.D. Fla. 2020); *J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020)). Plaintiffs fail to meet this requirement as well, Twitter argues. *Id.* at 5. Twitter argues further that "[f]inding a venture between Twitter and the Perpetrators based on a standard platform-user relationship also makes no sense considering Twitter's userbase, which numbers in the hundreds of millions." *Id.* at 6 (citing FAC ¶ 23; *J.B.*, 2020 WL 4901196, at *10 ("Craigslist cannot be deemed to have participated in all ventures arising out of each post on its site.")).

Twitter also asserts that Plaintiffs' claim under Section 1592(a)(2) fails because the FAC does not allege any "active participation" by Twitter, arguing again that Plaintiffs must allege

overt acts by Twitter in furtherance of the venture. *Id.* According to Twitter, Plaintiffs do not dispute that this is a requirement but instead argue, without authority, that its denial of the requests to remove the Videos was an affirmative act that satisfies this requirement. *Id.* (citing Opposition at 12). Twitter contends this argument "conflicts with the FAC itself, which is clear that Plaintiffs were allegedly harmed by the failure to immediately remove the Videos." *Id.* (citing FAC ¶¶ 124-25). In any event, they assert, Plaintiffs' argument fails because "Twitter's failing to act is not 'affirmative conduct' " and "the nine-day removal time frame is not tantamount to an affirmative act on Twitter's part." *Id.* (citing Motion at 14-15 (quoting *Geiss v. Weinstein Co. Holdings, LLC*, 383 F. Supp. 3d 383, 169 (S.D.N.Y. 2019)); *Bradley Bergeron v. Monex Deposit Co*., 2020 WL 6468457, at *6–7 (C.D. Cal. Aug. 18, 2020); *Gressett v. Contra Costa Cty*., 2013 WL 2156278, at *17 (N.D. Cal. May 17, 2013)). Even if Twitter's inaction were deemed an overt act, it argues, it would still be insufficient because it did not further the sex trafficking venture. *Id.* at 6 n. 6 (citing *Kik*, 482 F. Supp. 3d at 1251).

Twitter reiterates its argument that Plaintiffs' claim under Section 1591(a)(2) also fails because the FAC does not plead that Twitter knowingly benefited from its participation in Plaintiffs' alleged sex trafficking. *Id.* at 7-8. Twitter rejects Plaintiffs' attempt to distinguish *Geiss* and *Kolbek*, cited in the Motion, arguing that "the specific procedural posture and facts of those cases are irrelevant to the legal holding about what the statute requires." *Id.* at 7.

More importantly, Twitter argues, "the Opposition never explains how Twitter could have received a benefit from Plaintiffs' alleged sex trafficking when none of the broad allegations regarding how Twitter makes money are connected to what happened to them." *Id.* Twitter contends the "FAC does not allege that there were any advertisements, or promoted Tweets associated with the Videos, nor does it allege that Twitter obtained (let alone licensed) any data related to the Videos." *Id.* Moreover, it argues, the allegations that Twitter " 'continued to distribute the CSAM that it had monetized after' John Doe #1 and his mother reported it" are not supported by any specific facts and therefore do not raise a plausible inference that Twitter received a benefit from the Videos. *Id.* at 7-8 (citing Opposition at 8-10 (citing FAC ¶¶ 52-54)).

Twitter argues further that the Opposition also "does not provide any other facts that would

establish the 'causal relationship' between receipt of a benefit and Twitter's 'actual knowledge of that causal relationship.' " *Id.* at 8.  Twitter rejects Plaintiffs' argument that it has satisfied this requirement by alleging that Twitter's conduct was motivated by the fact that "CSE content is 'highly sought-after' on Twitter and Twitter 'makes significant revenue from the presence, searches, connections, and interactions of such illegal and dangerous material.' " *Id.*  at 8 (quoting Opposition at 9 (citing ¶¶ 37, 71, 84))).   According to Twitter, "these allegations are not only incorrect, they are conclusory and unsupported." *Id.*  And to the extent that Plaintiffs point to allegations citing statements about how it monetizes its platform, these allegations are insufficient, Twitter asserts, because they do not establish that Twitter monetizes *all* public posts and interactions. *Id.* n. 8 (citing Opposition at 8-9; FAC ¶ 33).

Next, Twitter rejects Plaintiffs' argument that they have satisfied the "actual knowledge" requirement of Section 1591(a)(2) by alleging facts showing "reckless disregard or constructive knowledge." *Id.* at 9.  Twitter argues that this standard is incorrect and that "[c]ourts have repeatedly held that Section 1591(a)(2) requires a defendant to have actual knowledge of the sex trafficking venture involving the plaintiff to constitute a criminal violation suffices for a Section 1591(a)(2) violation." *Id.* at 9 (citing *Kik*, 482 F. Supp. 3d at 1251).   Twitter contends Plaintiffs also fail to establish in the Opposition that it had actual knowledge as the allegations they point to do not "demonstrate that Twitter understood that Plaintiffs were the victims of sex trafficking and the acts depicted in the Videos were commercial sex acts." *Id.* (citing Opposition at 5, 12-14).

Twitter concedes that Plaintiffs allege "that John Doe #1 emailed saying Plaintiffs 'were baited, harassed, and threatened to take these videos,' " but contends "that is simply insufficient to establish Twitter's actual knowledge of the alleged sex trafficking" because "[f]rom John Doe #1's email Twitter cannot tell whether Plaintiffs were harassed and baited by friends or an adult, for example, and Twitter cannot tell whether the harassment caused them to engage in the sex acts, film them, or share the Videos with others." *Id.* at 9-10 (citing Opposition at 13 (citing FAC ¶ 123)).

Twitter reiterates its arguments that Congress intended only to create a narrow exception to Section 230 when it enacted FOSTA. *Id.*  at 10-12.  That exception, it contends, was to allow for

United States District Court
Northern District of California

the imposition of liability on "websites that *'have done nothing to prevent the trafficking of children.'* " *Id.* at 12 (quoting Opposition at 17-18 (emphasis in Opposition)).   Twitter argues that "even according to Plaintiffs' own allegations, Twitter plainly is not one of those websites." *Id.* (citing FAC ¶¶ 42-43, 55-58, 60, 64-65, 128-29).

Twitter also rejects Plaintiffs' argument that CDA § 230 only provides immunity where an ICS *removes* offensive content, arguing that it is well settled in the Ninth Circuit that Section 230 applies whenever a claim is based on an ICS's decision to publish or remove third-party content. *Id.* at 12-13 (citing *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 406-07 (6th Cir. 2014)).   This immunity applies even when an ICS has received notice of the offensive content, Twitter contends.  *Id.* at 14 (citing *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997); *Doe v. Bates*, 2006 WL 3813758, at *18 (E.D. Tex. Dec. 27, 2006); *Igbonwa v. Facebook, Inc.*, 2018 WL 4907632, at *1, *5-7 (N.D. Cal. Oct. 9, 2018), aff'd, 786 F. App'x 104 (9th Cir. 2019)).

Twitter argues that even if Plaintiffs' claim under Section 1595 is not barred under CDA § 230, it fails to state a claim because Plaintiffs have not alleged all the required elements, namely, "that Twitter participated in a venture with the Perpetrator or should have known about Plaintiffs' alleged sex trafficking."  *Id.* at 14-16. According to Twitter, Plaintiffs' argument that the FAC is not required to allege a "conspiracy" between Twitter and the sex traffickers is a "red herring."  *Id.* at 15 (citing Opposition at 14-15).  Rather, Twitter contends, its argument is that "pleading a 'venture' under Section 1595 required Plaintiffs to allege facts demonstrating 'a continuous [] relationship between the trafficker and the [defendant] such that it would appear that the trafficker and the [defendant] have established a pattern of conduct or could be said to have a tacit agreement.' "  *Id.*  (quoting *J. B.*, 2020 WL 4901196, at *9 (citing *M.A.*, 425 F. Supp. 3d at 970)).  Here, Twitter asserts, the FAC does not allege facts establishing such a continuous relationship. *Id.*

Twitter argues further that "the FAC alleges no facts showing that Twitter 'should have known' that the Videos involved sex trafficking conduct – *i.e.*, the exploitation of children for

commercial sex purposes," despite the arguments in the Opposition to the contrary.  *Id.* at 15-16 (citing Motion at 20-21; Reply at 9-10;  Opposition at 15).  According to Twitter, "[t]he Opposition's reliance on Twitter's alleged 'general knowledge' of CSE content on its platform also fails because such knowledge does not demonstrate Twitter should have known of what specifically happened to Plaintiffs." *Id.*  at 16 (citing *A.B. v. Hilton Worldwide Holdings Inc*., 484 F. Supp. 3d 921, 937-38 (D. Oregon 2020)).

Twitter reiterates it position that all of Plaintiffs' remaining claims are barred under CDA § 230.  *Id.* at 16-18.  Twitter contends Plaintiffs "do not disagree save for their products liability claim."  *Id.*

As to Twitter's arguments that Plaintiffs have failed to state viable state law claims, Twitter notes that Plaintiffs did not address its arguments related to California Civil Code section 1708.85 and contends this claim should therefore be dismissed.  *Id.* at 19.

Twitter argues as to the products liability claim that Plaintiffs' reliance on *Lemmon v. Snap* to argue that CDA § 230 does not immunize Twitter from their products liability claim is misplaced because in that case, the plaintiffs' claims were based on the use of a "speed filter" and did not, as here, treat the defendant as a publisher of information.  *Id.* at 19-20 (citing 995 F.3d at 1087-88).

Twitter argues that Plaintiffs' Opposition fails to establish that they have viable negligence claims because if does not address Twitter's argument that it owed Plaintiffs no duty.  *Id.* at 20 (citing Motion at 23-24; *GN Resound A/S v. Callpod, Inc*., 2013 WL 1190651, at *5 (N.D. Cal. Mar. 21, 2013)).  Nor have Plaintiffs "established that Twitter violated any law or statute that would give rise to a presumption of negligence," Twitter contends, "and Plaintiffs' own authority agrees that negligence per se is not an independent claim."  *Id.*

Finally, Twitter argues that the Opposition fails to establish that Plaintiffs have standing on their UCL claim.  *Id.* at 20-21.  First, to the extent that the Opposition "seemingly argues that Plaintiffs have standing to bring a UCL claim because they suffered economic injury as a result of the 'monetization and dissemination of Plaintiffs' images and likenesses' by Twitter[,]" Twitter rejects that argument.  *Id.* (citing Opposition at 29-30 (citing *Fraley v. Facebook, Inc*., 830 F.

Supp. 2d 785, 811 (N.D. Cal. 2011))). According to Twitter, *Fraley* does not support Plaintiffs' position because in that case, the "plaintiffs alleged that Facebook 'fail[ed] to compensate them for their valuable endorsement of third-party products and services' when it took their image and name to create 'Sponsored Stories.' " *Id.* (quoting 830 F. Supp. 2d at 790). Twitter contrasts the allegations in the FAC, which "alleges that advertisements or promoted Tweets are 'displayed intermixed between tweets' " but does not allege "that Plaintiffs' image or name was used to endorse any product or used in any advertisement." *Id.* at 20-21.

Twitter also rejects Plaintiffs' reliance on its alleged "criminal, aiding and abetting conduct" in support of UCL standing, arguing that this theory (which was raised for the first time in the Opposition) fails because "[a]iding and abetting requires not only knowledge [of the complained of act], but 'substantial assistance o[r] encouragement' of another's tort." *Id.* at 21 (citing Opposition at 29; quoting *Chetal v. Am. Home Mortg.*, 2009 WL 2612312, at *4 (N.D. Cal. Aug. 24, 2009)). Plaintiffs have not alleged such facts, Twitter asserts. *Id.*

For these reasons, Twitter asks the Court to dismiss all of Plaintiffs' claims with prejudice. *Id.*).

### 4. Amicus Brief

In addition to the briefing supplied by the parties, a group of anti-trafficking organizations have submitted an amicus brief addressing Congress's intent in enacting FOSTA. These organizations contend Congress intended to afford greater protection to victims of online sex trafficking by abrogating the broad immunity afforded under CDA § 230 and urge the Court to reject Twitter's assertion that it is immune from Plaintiffs' claims in this case.

## III.   ANALYSIS

### A.  Legal Standards Under Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' "  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' "  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' "  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original).  Rather, the claim must be " 'plausible on its face,' " meaning that the plaintiff must plead sufficient factual allegations to "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B.     The TVPRA Claims (Claims One and Two)

Plaintiffs assert two claims against Twitter under the TVPRA – a claim for direct sex trafficking and a claim for beneficiary liability.  For the reasons set forth below, the Court finds that Plaintiffs fail to state a claim for direct sex trafficking and therefore does not reach the question of whether that claim is barred under CDA § 230.  On the other hand, the Court finds that Plaintiffs state a claim for beneficiary liability under the TVPRA and that Section 230 does not apply to that claim.

### 1. Direct Sex Trafficking

Both sides rely on the plain language of Section 1591(a)(1) in support of their arguments relating to the sufficiency of Plaintiffs' allegations that Twitter engaged in direct sex trafficking in violation of the TVPRA. Twitter argues that the series of verbs in the provision relate to a "person" and that here, Twitter's alleged conduct relates not to a person but to the Videos. Plaintiffs, on the other hand, points to the words "by any means" in Section 1591(a)(1) in support of their reading of the provision. The Court finds Twitter's argument more persuasive.

Section 1591(a)(1) contains a series of verbs, all of which relate to a "person." One of the verbs – the word "advertises" – might plausibly be read to fit the allegations in the FAC as a video posted on Twitter could, at least as a matter of grammar, advertise a "person" but Plaintiffs don't claim that Twitter "advertised" them. The verbs on which Plaintiffs rely ("provides", "obtains" and "maintains"), on the other hand, do not lend themselves to the reading Plaintiffs suggest and Plaintiffs have pointed to no authority that supports their interpretation of Section 1591(a)(1).

Plaintiffs' reliance on *United States v. Tollefson*, 367 F. Supp. 3d 865, 878-80 (E.D. Wis. 2019) to support their reading of Section 1591(a)(1) is misplaced. In that case, the defendant was criminally charged under Section 1591(a)(1) on the basis that he had "*solicited*" a child using an online chat, which he used to communicate with the victim and to persuade her to create and send him pornographic content using her phone. 367 F. Supp. 3d at 867-68. Section 1591(a)(1) expressly allows for criminal liability where a defendant "solicits by any means a person" and the conduct at issue in that case falls comfortably within that language. Plaintiffs here do not, however, allege any solicitation by Twitter. Therefore, the Court finds that Plaintiffs do not state a claim for direct sex trafficking under Section 1591(a)(1) and does not reach the question of Section 230 immunity as to that claim.

### 2. Beneficiary Liability

The more difficult issue is whether Plaintiffs have stated a claim under Section 1591(a)(2) and, if they have, whether Twitter is immune from liability under Section 230 on that claim. To decide these questions, the Court must grapple with three primary issues. First, how stringent is the *mens rea* requirement as to Twitter's knowledge of whether Plaintiffs were victims of sex

United States District Court
Northern District of California

1   trafficking.  Second, what must be alleged to show that Twitter participated in a "venture."

2   Finally, what must be alleged to show that Twitter received a benefit from the sex trafficking

3   venture and that the benefit motivated its conduct.  As to all three questions, Twitter urges the

4   Court to adopt the stringent requirements for establishing a criminal violation under Section

5   1591(a).  The Court concludes, however, that Twitter's arguments are at odds with the plain

6   language of FOSTA and the case law addressing the requirements for establishing civil liability

7   under Section 1595.

8          Although the post-FOSTA case law addressing the requirements of Section 1595 and

9   1591(a)(2) as they relate to third-party content and ICS providers is scant, a series of cases in

10  which victims of sex trafficking have sought to impose civil liability against hotel chains shed

11  light on the pleading requirements for such claims in other contexts.  In those cases, courts have

12  addressed the significance of the fact that the "language of § 1591 differs from the language of §

13  1595" in that "the former does not have a constructive knowledge element manifested by 'should

14  have known' language."  *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969

15  (S.D. Ohio 2019).  In *M.A.*, and in a number of cases that have adopted the reasoning of that case,

16  the court "rejected the application of the criminal definition to civil claims under the TVPRA."

17  *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 937 (D. Or. 2020) (citing *M.A.* 425

18  F. Supp. 3d at 969 (S.D. Ohio 2019); *A.B. v. Marriott Int'l, Inc.*, 455 F.Supp.3d 171, 186–88 (E.D.

19  Pa. 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214 at *3 (N.D. Cal. July 30,

20  2020)).

21         In *M.A.,* the plaintiff was a victim of sex trafficking that occurred at hotels owned by the

22  defendant and she sued under Sections 1595 and 1591(a)(2).  Her claims were based on the theory

23  that the hotel chain benefited from the rental of the rooms where she was trafficked and knew or

24  should have known that trafficking was occurring there based on various signs of sex trafficking

25  that should have been obvious to hotel staff.   425 F. Supp. 3d at 962.  The court found that the

26  plaintiff adequately alleged that the hotel chain benefited from the sex trafficking based on the

27  rental of its rooms.  *Id.* at 965. It further found that she alleged sufficient facts to show that it

28  "knew or should have known" that the venture was engaged in sex trafficking, applying the looser

34

1    knowledge requirement of Section 1595 rather than the knowledge requirement that applies to

2    criminal claims under Section 1591(a)(2).  *Id.*  at 968.  It cited both to allegations that there were

3    obvious signs of sex trafficking that hotel staff should have recognized and that the hotel chain

4    was "on notice about the prevalence of sex trafficking generally at their hotels and failed to take

5    adequate steps to train staff in order to prevent its occurrence." *Id.*  at 969.

6         Next, the *M.A.* court addressed what the plaintiff was required to allege to meet the

7    "participation in a venture" requirement of Section 1595.   Like Twitter here, the defendant in

8    *M.A.* "rel[ied] extensively on *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016), which

9    addresses the meaning of 'participation in a venture' under § 1591." *Id.* at 968.  As the *M.A.* court

10   explained, "[i]n *Afyare*, a panel of the Sixth Circuit affirmed the district court's finding that §

11   1591(a)(2) 'require[s] that a defendant actually participate and commit some 'overt act' that

12   furthers the sex trafficking aspect of the venture.' " *Id.* (quoting *Afyare*, 632 F. App'x at 286).

13   Thus, under Section 1591, "the venture had to be a sex-trafficking venture and the 'participation'

14   had to be an 'overt act' that furthers the sex trafficking aspect of the venture.' " *Id.* (quoting

15   *Afyare*, 632 F. App'x at 286). Further, *Afyare* held that under Section 1591 a defendant had to be

16   " 'associated for the purpose of furthering the sex trafficking.' " *Id.*  The court in *M.A.* found,

17   however, that this criminal standard did not apply to the plaintiff's civil claim under Section 1595,

18   concluding that a defendant "need not have actual knowledge of the sex trafficking in order to

19   have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the

20   'should have known' language in § 1595(a) would be meaningless." *Id.* at 971.  It further found

21   that the alleged acts and omissions of the hotel chain in that case were sufficient to allege

22   "participation in a venture" under Section 1595.  *Id.*

23        The *M.A.* court's interpretation of Section 1595 and the meaning of "participation in a

24   venture" under that section was based on the following statutory analysis:

25            Some Defendants have relied on the definition of "participation in a
              venture" supplied in § 1591(e)(4). Generally, "there is a natural
26            presumption that identical words used in different parts of the same
              act are intended to have the same meaning." *Atlantic Cleaners &
27            Dyers v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed.
              1204 (1932). But this presumption does not apply where "there is such
28            variation in the connection in which the words are used as reasonably

United States District Court
Northern District of California

to warrant the conclusion that they were employed in different parts of the act with different intent." *Id.* Here, § 1591(e) purports to only apply to "this section," i.e., § 1591. *See, e.g., Gilbert v. United States Olympic Committee*, No. 18-cv-00981-CMA-MEH, 2019 WL 1058194, at *9, *10 (D. Colo. Mar. 6, 2019) (noting that "there are persuasive reasons to conclude ... that the term 'venture' is defined differently in § 1591(a)(2) than it is in § 1589(b)" and "neither §§ 1589 nor 1595 define 'venture' ").

In addition to the language in § 1591(e) limiting the definitions to that section, applying the definition of "participation in a venture" provided for in § 1591(e) to the requirements under § 1595 would void the "known or should have known" language of § 1595. Such a construction would violat[e] the " 'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)). Section 1591(e)(4) provides the following definition of "participation in a venture": "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." The term "participation in a venture" in § 1591 thus imports a state of mind requirement—the participation must be "knowing." Although § 1591(a)(2) also criminalizes some action taken with less than actual knowledge, that is, "reckless disregard," such "reckless disregard" provision applies only to the requirement "that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." § 1591 (a). It does not lessen the scienter requirement of actual knowledge as to participation or the venture's true ends.

425 F. Supp. 3d 959, 969–70. The court therefore concluded that " 'participation' under § 1595 does not require actual knowledge of participation in the sex trafficking itself." *Id.* at 970.

The court in *M.A.* went on to find that "[i]n the absence of a direct association, "the plaintiff could adequately allege participation under Section 1595 only by alleging facts showing "a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *Id.* The court found that the plaintiff met this requirement by alleging that the defendant rented rooms to people it knew or should have known were engaged in sex trafficking. *Id.*

District courts, including in this district, have found the statutory analysis in *M.A.* supporting its interpretation of Section 1595 to be persuasive. In *B.M. v. Wyndham Hotels &*

*Resorts, Inc.*, Judge Freeman stated, "The Court agrees with the statutory construction analysis in

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019), adopted by

Judge Orrick in *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 3035794, at

\*1, n. 1 (N.D. Cal. June 5, 2020) that applying the 'participation in a venture' definition from the

criminal liability section of the TVPRA to the civil liability section of the TVPRA, 'would void

the "should have known" language in the civil remedy' and '[t]his violates the "cardinal principle

of statutory construction that a statute ought, upon the whole, to be construed so that, if it can be

prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." ' " No. 20-

CV-00656-BLF, 2020 WL 4368214, at \*3 (N.D. Cal. July 30, 2020) (quoting *J.C. v. Choice

Hotels Int'l, Inc.*, 2020 WL 3035794, at \*1, n. 1 (quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*,

425 F. Supp. 3d at 969)).[3]  Thus, in *B.M.*, the court concluded that the plaintiff was "not required

to allege an overt act in furtherance of or actual knowledge of a sex trafficking venture in order to

sufficiently plead her section 1595 civil liability claim" based on beneficiary liability under

Section 1591(a)(2) against parent companies that owned hotels where the plaintiff was the victim

of sex trafficking. *Id.*

The undersigned also finds the reasoning and analysis of *M.A.* to be persuasive and

therefore concludes that as a general matter, where a plaintiff seeks to impose civil liability under

Section 1595 based on a violation of Section 1591(a)(2), not only does the "known or should have

known" language of Section 1595 apply (rather than the actual knowledge standard of Section

1591(a)) but such a claim also does not require that a plaintiff demonstrate an overt act that

furthered the sex trafficking aspect of the venture in order to satisfy the "participation in a

venture" requirement.

---

[3]Twitter misrepresents the holding of *B.M.* when it states in its briefs that the court in that case
followed *Afyare*. *See* Motion at 13 (citing *B.M.* with parenthetical stating that the case "analyz[ed]
the elements of a Section 1591 violation and follow[ed] *Afyare*"); *see also* Reply at 6 n. 5  (stating
that "*Afyare* is the seminal decision interpreting the term 'participation in a venture' under Section
1591(a)(2) and its reasoning has been cited approvingly by numerous courts, including this Court"
and citing *B.M.*).  In *B.M.*, Judge Freeman expressly held that while the prosecution in a *criminal*
case brought under Section 1591(a)(2) must under *Afyare* "prove that the defendant actually
participated in a sex-trafficking venture[,]" the  standard from criminal cases does not apply to
civil claims under Section 1595.

United States District Court
Northern District of California

1    The hotel line of cases, however, does not answer the question of whether the same

2    standards apply where a civil claim is asserted under Section 1591(a)(2) against an ICS provider

3    and thus (arguably) falls within the ambit of Section 230 immunity.  This issue was recently

4    addressed in *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1244 (S.D. Fla. 2020), on which

5    Twitter relies.  In that case, the defendant was a web-based interactive service called Kik that

6    offered a messaging service that was marketed to teens and young adults.  The plaintiff alleged

7    that numerous adult male users of Kik "solicited her and convinced her to take and send them

8    sexually graphic pictures of herself using Kik"; that these adult males sent her sexually explicit

9    photographs via Kik"; that "her father found the photographs on her cellphone and computer tablet

10   and reported the incidents to the police"; that there had been "multiple instances where adult users

11   of Kik ha[d] used the service to contact and solicit sexual activity with minors, with some of those

12   contacts resulting in death of the minors"; and that the defendants knew "that sexual predators

13   use[d] its service to prey on minors but have failed to provide any warnings or enact policies to

14   protect minors from such abuses."  *Kik*, 482 F. Supp. 3d at 1244. The plaintiff sued Kik's owner,

15   seeking to impose beneficiary liability under Section 1595 based on alleged violations of Section

16   1591(a)(2) and the defendant brought a motion to dismiss asserting that it was immune under

17   CDA § 230 and that the plaintiff failed to state a claim under Section 1595(a).  *Id.* at 1244-1245.

18   In addressing what the plaintiff was required to allege to fall under the FOSTA exemption

19   to CDA § 230, the court in *Kik* acknowledged that in the context of sex trafficking at hotels, courts

20   have found that plaintiffs need not satisfy the definitions that apply to criminal prosecutions under

21   Section 1591(a) to establish civil liability under Section 1595(a) but concluded that under FOSTA,

22   a plaintiff who asserts such a claim against an interactive computer service *is* required to satisfy

23   those more demanding requirements.  *Id.* at 1248-51.

24   The court in *Kik* reasoned as follows:

25          Significantly, because the hotel defendants were not interactive
        computer service providers, neither FOSTA nor CDA immunity were
26      considered. The present case presents a different scenario, because
        Congress – in balancing the needs of protecting children and
27      encouraging "robust Internet communication" – enacted a statute
        protecting interactive computer service providers from liability for
28      their users' content and conduct. If it were not for FOSTA,

Defendants in this case would be completely immune from liability under the CDA. 47 U.S.C. § 230(c)(5); *MySpace*, 528 F.3d 413.

To resolve Defendants' Motion to Dismiss, this Court must consider the extent to which FOSTA has affected the immunity provided by the CDA. Again, FOSTA states that "[n]othing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit ... any claim in a civil action under section 1595 of Title 18, *if the conduct underlying the claim constitutes a violation of section 1591 of that title*." 47 U.S.C. § 230(e)(5)(A) (emphasis added). Plaintiff argues that as a result of FOSTA, "the exacting standard of 'actual knowledge' and 'overt act' employed in a criminal prosecution under § 1591 is replaced by [a] 'constructive knowledge' standard when a civil recovery is sought under the TVPA." (DE [29], p. 21). But this argument would have the Court disregard the plain language and structure of FOSTA. "A statute should be interpreted so that no words shall be discarded as meaningless, redundant, or mere surplusage." *United States v. DBB, Inc*., 180 F.3d 1277, 1285 (11th Cir. 1999) (quotation omitted).

Defendants argue that the Congressional history of FOSTA shows that Congress only intended to create a narrow exception to the CDA for "openly malicious actors such as Backpage where it was plausible for a plaintiff to allege actual knowledge and overt participation." (DE [33], p. 5) and that a finding of actual knowledge and overt participation in a venture of sexual trafficking is required to defeat CDA immunity. This is consistent with the language of FOSTA. By its terms, FOSTA did not abrogate CDA immunity for all claims arising from sex trafficking; FOSTA permits civil liability for websites only "if the conduct underlying the claim constitutes a violation of section 1591." And section 1591 requires knowing and active participation in sex trafficking by the defendants. *Afyare*, 632 Fed. Appx. at 286; *see also Geiss v. Weinstein Co. Holdings, LLC*, 383 F. Supp. 3d 156, 169 (S.D. N.Y. 2019) ("aiders and abettors of sex trafficking are liable under the TVPA only if they knowingly 'benefit[ ], financially or by receiving anything of value from participating in a venture which has engaged in' sex trafficking") (quoting 18 U.S.C. § 1591(a)); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D. N.Y. 2018) ("Plaintiff must allege specific conduct that furthered the sex trafficking venture. Such conduct must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture. In other words, some participation in the sex trafficking act itself must be shown.").

*Id.* at 1250–51 (emphasis in original). The court went on to conclude that the plaintiff in that case had not pled a violation under Section 1591(a)(2) under the definitions and requirements that apply to criminal claims and therefore, that her claim did not fall within FOSTA's exemption to Section 230 immunity. *Id.* at 1251.

The undersigned respectfully disagrees with the *Kik* court's analysis. In construing a statute, the Court starts with the language of the statute. *Bailey v. United States*, 516 U.S. 137,

145 (1995) ("We start, as we must, with the language of the statute.").  The Supreme Court has instructed, however, that context also matters and therefore, courts should "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *Id.* Further, where a statute is "remedial," it "should be liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65 (1968).  There is no question that FOSTA is a remedial statute in that it carves out exceptions to CDA § 230 immunity, thereby affording remedies to victims of sex trafficking that otherwise would not have been available.  Moreover, the broader statutory framework suggests that the *Kik* court's reading of FOSTA improperly adopted the most restrictive possible reading of that provision when there is an equally (or more) plausible reading of the plain language of FOSTA.

FOSTA consists of two clauses, with the first clause ("[n]othing in this section . . .  shall be construed to impair or limit . . . any claim in a civil action under section 1595 of Title 18") modified by the second clause ("if the conduct underlying the claim constitutes a violation of section 1591 of that title").  47 U.S.C. § 230(e)(5)(A). The *Kik* court concluded that the second clause, on its face, not only limits civil claims that fall outside of CDA § 230 immunity to claims asserted under Section 1591 but that it *also* allows for liability on only a *subset* of the civil claims that may be brought under Sections 1595 and 1591, namely, those that can meet the more stringent burden that applies to criminal prosecutions under Section 1591.  The implication of this reading is that a sex trafficking victim who seeks to impose civil liability on an ICS provider on the basis of beneficiary liability faces a higher burden than a victim of sex trafficking who seeks to impose such liability on other types of defendants.   Had Congress intended such a limitation on Section 1595 liability as applied to interactive computer services, it could have clearly stated as much, but it did not do so.

Furthermore, the more natural reading of the second phrase of Section 230(e)(5)(A) is simply that it creates an exemption to Section 230 immunity for civil sex trafficking claims under Section 1591 and *not* as to other sections of Title 18 that can give rise to civil liability under Section 1595.  In particular, Section 1595 is found in Chapter 77 of Title 18, entitled "Peonage, Slavery, and Trafficking in Persons," and creates civil liability for "[a]n individual who is a victim

of a violation of *this chapter*."  18 U.S.C. § 1595(a) (emphasis added).  As the title of the chapter suggests, it prohibits a host of conduct including "hold[ing] or return[ing] any person to a condition of peonage" (§ 1581), "[e]nticement into slavery" (§ 1583), and "benefit[ing], financially or . . . receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of [forced] labor" (§ 1589).  This more straightforward reading does not limit FOSTA's exemption to a narrow subset of civil sex trafficking claims but rather, makes available to victims of sex trafficking the same civil remedies against an ICS provider under Section 1591(a)(2) as are available in cases involving other types of defendants.  The Court finds that this reading is consistent with the broad language used in the first clause of FOSTA as well as the remedial purpose of FOSTA.[4]

Nor does the undersigned find persuasive the *Kik* court's finding that the legislative history supports its interpretation of FOSTA. The two isolated statements cited by the *Kik* court provide little guidance as to the very specific question of statutory interpretation presented here.  Further,

---

[4] At oral argument, Twitter argued, for the first time, that the narrow interpretation of FOSTA adopted in *Kik* is also consistent with 47 U.S.C. § 230(e)(5)(B), which provides that Section 230 should not be construed to "impair or limit . . . any charge in a criminal prosecution brought under State law *if the conduct underlying the charge would constitute a violation of section 1591 of Title 18*."  47 U.S.C. § 230(e)(5)(B) (emphasis added). The emphasized phrase mirrors the one used in 47 U.S.C. § 230(e)(5)(A), permitting claims under Section 1595 "if the conduct underlying the claim constitutes a violation of section 1591 of that title." According to Twitter, to the extent that subsection (B) presumably was intended to exempt state law criminal prosecutions only if the higher *mens rea* requirement of Section 1591 is satisfied, the same meaning must be given to this phrase in subsection (A).  Thus, Twitter contends, subsection (A) must limit civil liability under Section 1595 to claims that meet the requirements for criminal liability under Section 1591.   The Court does not find this argument persuasive.  First, the Court notes that the *Kik* court did not rely on this line of reasoning.  More importantly, there is no authority one way or the other as to whether subsection (B) permits a state law criminal prosecution for sex trafficking to be brought against an ICS provider under a statute with a less stringent *mens rea* requirement than has been found to apply to Section 1591(a) claims.  Thus, the language of subsection (B) provides little guidance in resolving the proper construction of subsection (A).  Finally, as the court in *M.A.* explained, there are exceptions to the general presumption that words have the same meaning in a statute.  425 F. Supp. 3d at 969 ("[T]his presumption does not apply where 'there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.' "(*quoting Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932)).  Even assuming that subsection (B) was not intended to allow state sex trafficking prosecutions of an ICS provider under state statutes with a lower *mens rea* requirement than exists for federal criminal prosecutions, that is a very different matter than allowing civil claims for sex trafficking under a *federal* law, namely, Section 1595, that expressly lowered the *mens rea* requirement for such claims.  Therefore, the Court rejects Twitter's reliance on subsection (B) in support of its restrictive reading of FOSTA.

the parties and amici have pointed to numerous statements in the legislative history, often seeming to support conflicting conclusions, highlighting the risks of relying on statements made prior to passage of a bill to interpret the statute that was actually enacted. Here, the Court concludes that this issue is better resolved on the basis of the language of FOSTA as it fits with the broader statutory framework of the TVPRA.

For these reasons, the Court concludes that Plaintiffs' Section 1595 claim against Twitter based on alleged violation of Section 1591(a)(2) is not subject to the more stringent requirements that apply to criminal violations of that provision. Having reached that conclusion, the Court now must address whether Plaintiffs have adequately alleged: 1) that Twitter knowingly participated in a venture; 2) that it received a benefit from its participation; and 3) it knew or should have known that Plaintiffs were victims of sex trafficking.

a. Participation in a Venture

A "venture" is defined as "any group of two or more individuals associated in fact." 18 U.S.C. § 1591(e)(6). As discussed above, Plaintiffs are not required to allege an "overt act" of participation in the sex trafficking itself. Nor does " 'participation' under § 1595 . . . require actual knowledge of participation in the sex trafficking itself." *M.A.*, 425 F. Supp. 3d at 970. Nonetheless, to the extent that Plaintiffs allege that Twitter  has participated in a sex trafficking venture "by allowing Twitter to become a safe haven and a refuge for, 'minor attracted people,' human traffickers, and discussion of 'child sexual exploitation as a phenomenon,' to include trade and dissemination of sexual abuse material[,]" FAC ¶ 9, they must "allege at least a showing of a continuous business relationship between the trafficker and [Twitter] such that it would appear that the trafficker and [Twitter] have established a pattern of conduct or could be said to have a tacit agreement." *Id.* Thus, for example, in *M.A.,* this element was sufficiently alleged because the plaintiff alleged "that Defendants rented rooms to people it knew or should have known were engaged in sex trafficking." *Id.*[5]

---

[5] In the Motion, Twitter misstates the facts of *M.A.*, stating that in that case "the court found a 'venture' because the plaintiff alleged she saw the beneficiary defendant and her trafficker exchanging high-fives . . . while speaking about 'getting this thing going again.'" Motion at 13. Actually, these are the facts of *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017), a case which the

United States District Court
Northern District of California

United States District Court
Northern District of California

The Court concludes that Plaintiffs' allegations are sufficient to meet this requirement.  In addition to the general allegations that Twitter enables sex trafficking on its platform, *see, e.g.,* FAC ¶¶ 58-59 (alleging Twitter makes it hard for users to report CSAM and has received a lower rating than other platforms for its reporting structure); 61 ("Twitter permits large amounts of human trafficking and commercial sexual exploitation material on its platform, despite having both the ability to monitor it, and actual and/or constructive knowledge of its posting on the platform"); ¶¶ 64-69 (alleging that the number of reports by Twitter  to the National Center on Missing and Exploited Children ("NCMEC") of apparent child sexual abuse material on its platform is low compared to what other platforms report); ¶¶ 74-79 (alleging that Twitter hashtags help users find CSAM and that it rarely removes hashtags it knows are associated with CSAM); ¶¶ 80-84 (alleging that Twitter's search suggestion feature makes it easier for users to find CSAM), Plaintiffs also include specific allegations that support an inference that Twitter participated in a "venture" involving these Plaintiffs.

In particular, the FAC alleges that Twitter was specifically alerted that the Videos contained sexual images of children obtained without their consent on several occasions but either failed or refused to take action.  First, John Doe # 1 and his mother both allegedly reported the CSAM through Twitter's content reporting interface. FAC ¶¶ 110, 112.  Further, when Twitter responded to John Doe #1's complaint by asking for further information, John Doe #1 sent Twitter a copy of his driver's license (reflecting that he was a minor) and stated in his responses that the Videos had been taken three years before "from harassment and being threatened" and that a police report had been filed.  FAC ¶ 114.  John Doe #1's mother allegedly made two more complaints, including one specifically complaining about the user account @StraightBross, which was one of the accounts that provided links to the videos." FAC ¶ 115.  Subsequently, after receiving only form responses, John Doe #1's mother emailed Twitter to inquire about the status of the complaints.  FAC ¶ 119.

Two days later, Twitter allegedly sent John Doe #1 a response stating, "We've reviewed

---

court in *M.A.* found was consistent with its own conclusions.

the content, and didn't find a violation of our policies, so no action will be taken at this time." *Id.* ¶ 120. John Doe #1 allegedly responded as follows:

> What do you mean you don't see a problem? We both are minors right now and were minors at the time these videos were taken. We both were 13 years of age. We were baited, harassed, and threatened to take these videos that are now being posted without our permission. We did not authorize these videos AT ALL and they need to be taken down. We have a case number with the [Law Enforcement Agency] for these videos and this incident. Please remove this video ASAP and any videos linked to this one. There is a problem with these videos and they are going against my legal rights and they are again at (sic) the law to be on the internet. (capitalized emphasis in original).

FAC ¶ 123. The Videos allegedly remained on Twitter another seven days. FAC ¶ 124. Notably, Plaintiffs also allege that the user account @StraightBross, one of the accounts that allegedly posted the Videos, had been the subject of a citizen complaint in December 2019 alerting Twitter that this account carried links to "OBVIOUS CHILD PORN" but no action was taken on that complaint. FAC ¶ 101.

The Court finds that these allegations are sufficient to allege an ongoing pattern of conduct amounting to a tacit agreement with the perpetrators in this case to allow them to post videos and photographs it knew or should have known were related to sex trafficking without blocking their accounts or the Videos. Therefore, Plaintiffs have adequately alleged participation in a venture under Section 1595 in support of their beneficiary liability claim against Twitter. [6]

### b. Receipt of a Benefit

"To state a claim under a section 1595(a) beneficiary theory," Plaintiffs "must allege facts from which the Court can reasonably infer that" Twitter "knowingly benefit[ted] financially or by receiving anything of value[.]" *B.M.* at *4. In *B.M.*, the court rejected the defendant's argument that the " 'benefit' must derive directly from, and be knowingly received in exchange for,

---

[6] The Court rejects Twitter's argument that the venture was already over when the Videos were posted on Twitter and therefore Plaintiffs have not adequately alleged that Twitter knew that Plaintiffs would, in the future, be victims of sex trafficking as a result of Twitter's conduct. At oral argument, Twitter conceded that the posting of child pornography is a commercial sex act. Thus, regardless of when the Videos were created, the allegations that the Videos were being retweeted on a massive scale while they remained on the Twitter platform raise a plausible inference that Twitter's failure to remove the Videos would result in *future* commercial sex trafficking.

United States District Court
Northern District of California

participating in a sex-trafficking venture[,]" finding that this approach improperly "reads a requirement for 'actual knowledge' of criminal sex trafficking into the civil statute, [and] read[s] out the 'should have known' language." *Id.*  Instead, the court found that "[t]he 'knowingly benefit' element of section 1595 'merely requires that Defendant knowingly receive a financial benefit' " from its relationship with the sex trafficker. *Id.* (citing *H.H. v. G6 Hosp.*, LLC, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019).  The undersigned agrees that this is the correct standard and finds that Plaintiffs' allegations are sufficient as to this requirement.

First, contrary to Twitter's repeated assertions, the FAC contains detailed allegations about how Twitter monetizes content, including CSAM, through advertising, sale of access to its API, and data collection. FAC ¶¶ 25, 30-41, 50-54.  It further alleges that searching for hashtags that are known to relate to CSAM brings up promoted links and advertisements, offering a screenshot of advertising that appeared in connection with one such hashtag.  FAC ¶ 76.  Plaintiffs also specifically allege that the Videos of Plaintiffs were "monetized by Twitter and it receive financial benefit from [their] distribution on its platform."  FAC ¶ 196.  While Twitter dismisses this allegation as conclusory, it is supported by allegation that the Videos were "viewed at least 167,000 times and retweeted 2,220 times for additional views," FAC ¶195, and that "[t]he videos remained live approximately another seven days, resulting in substantially more views and retweets." FAC ¶ 125. Read together, these allegations support a plausible inference that the Videos of Plaintiffs generated advertising and attracted users, both of which benefited Twitter.

The Court is not persuaded that either *Geiss* or *Kolbek*, cited by Twitter, requires a contrary result.  In *Geiss*, the court concluded that officers who worked at the company of film producer Harvey Weinstein could not be held liable on the basis of beneficiary liability under Section 1591(a)(2) simply because they received a benefit from working for the company where that benefit was unrelated to any conduct that facilitated the alleged sex trafficking by Weinstein. 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019).  The court reasoned that "there must be a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit, with actual or, in the civil context, constructive knowledge of that causal relationship."  *Id.*

45

Here, Plaintiffs allege that the benefit – increased advertising revenue and users – was the result of allowing the Videos to remain on Twitter, allowing for tens of thousands of views and retweets of the Videos.  Therefore, *Geiss* is not on point.

Twitter's reliance on *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc*., No. 10-CV-4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013) is also misplaced.  In that case, the plaintiffs had been forced as children to become "spiritual wives" of a church leader and brought claims against various defendants, including the church, for sex trafficking in violation of Section 1595, alleging that they had benefited from the sex trafficking under Section 1591(a)(2).  The court concluded that there was no evidence that the defendants were compensated for the sexual abuse and therefore, that plaintiffs failed to establish that they were the victims of "commercial sex trafficking" based on the definition of the term "commercial sex act" in Section 1591(e)(3).  2013 WL 6816174, at *16 (citing 18 U.S.C. § 1591(e)(3) (defining "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person.")).  Like the court in *Geiss*, the court in *Kolbek* found that to establish sex trafficking, there "needs to be a causal relationship between the sex act and an exchange of an item of value." *Id.*   Yet the only alleged financial benefit any of the defendants received was payment of the victim's living expenses by the perpetrator when they were on out-of-state trips.  *Id.*  The court concluded that these payments were not causally related to the sexual abuse and therefore did not establish commercial sex trafficking.  *Id.*   In contrast to the facts of *Kolbek*, the benefit Twitter is alleged to have received here was the result of the proliferation of retweets and large number of account users who viewed the Videos, as discussed above.  Moreover, Twitter conceded at oral argument that the tweeting and retweeting of child pornography is a "commercial sex act" under the TVPRA.

Therefore, the Court concludes that Plaintiffs' have adequately alleged receipt of a benefit for the purposes of their claim for beneficiary liability.

c.   Knew or Should Have Known the Venture Was Engaged in Trafficking

While Twitter need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for the purposes of Section 1595, Plaintiffs must allege

46

at least that Twitter knew or should have known that Plaintiffs were the victims of sex trafficking at the hands of users who posted the content on Twitter. *See B.M.*, 2020 WL 4368214, at *5. Twitter contends it had no way of knowing that the Videos might have been evidence of commercial sex trafficking, but this argument is hard to square with Plaintiffs' allegations that they alerted Twitter that the Videos were created under threat when Plaintiffs were children and provided evidence of John Doe #1's age in response to Twitter's request for further information. Plaintiffs also allege that other Twitter users used the word "twinks" to describe the children in the Videos, which was "another indication that Plaintiffs were minors, and that this fact was evident from their appearance in the Videos. FAC ¶ 37. According to FAC, that term is used to describe "young boys or men" with "certain boyish characteristics such as 'little to no body or facial hair; a slim to average build; and a youthful appearance.' " *Id.* (quoting Wikipedia). Therefore, the Court concludes this requirement is sufficiently alleged.

     ***

In sum, the Court finds that Plaintiffs have stated a claim for civil liability under the TVPRA on the basis of beneficiary liability and that the claim falls within the exemption to Section 230 immunity created by FOSTA.

### C.    Whether the FOSTA Exemption is Limited to Claims Asserted under Sections 1591 and 1595

Before addressing Plaintiffs' remaining claims, the Court addresses Twitter's argument that when Congress enacted FOSTA, it intended to exempt from Section 230 immunity *only* claims asserted under Sections 1591 and 1595. This was the conclusion of the court in *Kik*, which found that the "plain language of [FOSTA] removes immunity only for conduct that violates 18 U.S.C. § 1591." 482 F. Supp. 3d at 1249. Similarly, the court in *M. L. v. Craigslist Inc.*, held that because "FOSTA contains no language about whether it amends the CDA to preclude immunity for state law civil actions" it exempts Section 1595 claims but not state law claims. No. C19-6153 BHS-TLF, 2020 WL 6434845, at *9 (W.D. Wash. Apr. 17, 2020), report and recommendation adopted, No. C19-6153 BHS-TLF, 2020 WL 5494903 (W.D. Wash. Sept. 11, 2020). In *J. B. v. G6 Hosp., LLC*, Judge Gilliam reached the same conclusion based on the plain language of

United States District Court
Northern District of California

1   FOSTA and further addressed the legislative history, concluding that even if it were appropriate to

2   look beyond the words of the statute to discern Congress's intent, "it is not clear that Congress

3   was concerned specifically with permitting civil claims under state law."  No. 19-CV-07848-HSG,

4   2020 WL 4901196, at *6 (N.D. Cal. Aug. 20, 2020).  The Court agrees that based on the plain

5   language of FOSTA, it exempts only claims under Sections 1595 and 1591.  Therefore, to the

6   extent that Plaintiffs' remaining claims fall within the ambit of Section 230 immunity, FOSTA

7   does not exempt Twitter from immunity as to those claims.

8       **D.      Claim Three (18 U.S.C. §§ 2258A and 2258B)**

9           Section 2258A establishes a duty on the part of electronic communication service

10   providers to report to the National Center for Missing & Exploited Children ("NCMEC") "facts or

11   circumstances from which there is an apparent violation of section 2251, 2251A, 2252, 2252A,

12   2252B, or 2260 that involves child pornography."  18 U.S.C. § 2258A;  *see also* 18 U.S.C. §

13   2258E (defining "provider", "NCMEC"). Section 2552A, in turn, makes it a criminal offense to,

14   *inter alia*, knowingly mail or transport, receive, distribute or reproduce child pornography.  (As

15   discussed above, Claim Four is based, in part, on Twitter's alleged violation of that provision.)

16   Section 2258B bars the imposition of liability on a provider in connection with its performance of

17   the duty established under Section 2258A except where the provider "(1) engaged in intentional

18   misconduct; or (2) acted, or failed to act--  (A) with actual malice; (B) with reckless disregard to a

19   substantial risk of causing physical injury without legal justification; or (C) for a purpose

20   unrelated to the performance of any responsibility or function under [Section 2258B], sections

21   2258A, 2258C, 2702, or 2703."  18 U.S.C. § 2258B.

22          Although Section 2258A establishes a duty to report under criminal law, that section does

23   not purport to establish a private right of action.  Rather, it provides that "knowing and willful

24   failure" to make a report will result in the imposition of fines on the provider of up to $300,000.

25   *See* 18 U.S.C. 2258A(e).  Section 2258B creates a safe harbor that prohibits the imposition of

26   criminal or civil liability based on failure to report unless the failure was the result of intentional

27   or reckless conduct.  Based on their plain language, neither of these provisions reflects a clear

28   intent on the part of Congress to establish a private right of action to enforce the reporting

United States District Court
Northern District of California

requirement found in Section 2258A.  *See Abcarian v. Levine*, 972 F.3d 1019, 1025 (9th Cir. 2020

("a cause of action may now be recognized under a statute only where the language Congress used

displays an intent to create not just a private right but also a private remedy." ) (internal quotation

and citation omitted).  Nor have Plaintiffs pointed to any authority suggesting that there is private

right of action under Section 2258A.  For this reason, the Court concludes that Plaintiffs' claim

under this section fails to state a claim and does not reach the question of immunity under CDA §

230.

**E.    Claim Four (Personal Injuries Related To Sex Trafficking And Receipt And Distribution Of Child Pornography Under 18 U.S.C. §§ 2252A, and 2255)[7]**

Section 2255 creates a civil remedy for violations of certain sections of the criminal code,

including Sections 2252A, providing as follows:

> **(a)  In general.** Any person who, while a minor, was a victim of a
> violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251,
> 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and
> who suffers personal injury as a result of such violation,
> regardless of whether the injury occurred while such person was
> a minor, may sue in any appropriate United States District Court
> and shall recover the actual damages such person sustains or
> liquidated damages in the amount of $150,000, and the cost of the
> action, including reasonable attorney's fees and other litigation
> costs reasonably incurred. The court may also award punitive
> damages and such other preliminary and equitable relief as the
> court determines to be appropriate.

18 U.S.C. § 2255(a).  Twitter does not argue that Plaintiffs have failed to allege a violation of

Section 2252A but contend this claim is barred by CDA § 230 immunity.  The Court agrees.

While there is not a great deal of authority on this question, at least two courts have

concluded that under Section 230, ICSs are immune from civil liability under 2252A and 2255.

*See Doe v. Bates,* No. 5:05-CV-91-DF-CMC, 2006 WL 3813758, at *4 (E.D. Tex. Dec. 27, 2006);

*M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1051 (E.D. Mo.

2011).  The *Bates* court relied on the reasoning in *Zeran v. Am. Online, Inc*., 129 F.3d 327, 329

---

[7] Although the FAC also relies on 18 U.S.C. § 1591 in support of Claim Four, Plaintiffs addressed
Twitter's argument only with respect to the alleged violation of 18 U.S.C. § 2252A.  Therefore,
the Court understands this claim to be based only on Sections 2252A and not on section 1591.

United States District Court
Northern District of California

1    (4th Cir. 1997), explaining:

> The *Zeran* court . . . noted the Congressional purpose of removing disincentives to self-regulation by internet service providers. If internet service providers such as Yahoo! could be liable for reviewing materials but ultimately deciding to allow them, they would likely chose not to regulate at all.  Further, even simply responding to notices of potentially obscene materials would not be feasible because the sheer number of postings on interactive computer services would create an impossible burden in the Internet context.  To the extent an internet service provider actually makes choices about its content, without immunity they would be faced with ceaseless choices of suppressing controversial speech or sustaining prohibitive liability. While the facts of a child pornography case such as this one may be highly offensive, Congress has decided that the parties to be punished and deterred are not the internet service providers but rather are those who created and posted the illegal material[.]

2006 WL 3813758, at *4 (internal quotations and citations omitted). Thus, in *Bates*, the court

concluded that while the exemption in Section 230(e)(1) does not prohibit the government from

prosecuting an ICS provider under 18 U.S.C.  § 2252A (which is found in chapter 110 of Title 18,

the section of Title 18 that is expressly carved out from Section 230 under subsection (e)(1)), the

exemption does not extend to civil claims asserted under that section.  *Id.* at *4-5; *see also M*.A,

809 F. Supp. 2d at 1055 (holding that plaintiff's claim seeking to impose civil liability on internet

service based on alleged violation of 18 U.S.C. § 2252A was barred by Section 230 immunity).

      In *Zeran*, the plaintiff sued AOL based on its alleged delay in taking down offensive posts

by an unknown third party that included the plaintiff's telephone number and were resulting in the

plaintiff being harassed and receiving death threats.  129 F.3d at 329.  The plaintiff alleged that he

repeatedly called AOL requesting that the posts be removed and was told that they would be, but

that AOL failed to take them down for many days.  *Id.*  AOL asserted that it was immune from the

plaintiff's claims under Section 230 and the court agreed, rejecting the plaintiff's argument that

the fact that AOL *knew* about the offending posts deprived AOL of immunity.  *Id.*  at 332-33.  The

court reasoned:

> [O]nce a computer service provider receives notice of a potentially defamatory posting, it is thrust into the role of a traditional publisher. The computer service provider must decide whether to publish, edit, or withdraw the posting. In this respect, Zeran seeks to impose liability on AOL for assuming the role for which § 230 specifically proscribes liability—the publisher role.

United States District Court
Northern District of California

*Id.*

Plaintiffs argue that *Bates* was wrongly decided because *Zeran* involved defamatory speech rather than child pornography. According to Plaintiffs, unlike defamatory speech, child pornography "is at once contraband, beyond the covering of First Amendment speech protection, evidence of criminal child abuse, and an ongoing sexual crime against a child" and therefore, requiring ICS providers to remove pornography does not require them to exercise "traditional editorial functions." Opposition at 23. While this argument has some force, it does not square with Ninth Circuit authority, which has found that "[t]o avoid chilling speech, Congress 'made a policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.' " *Gonzalez v. Google LLC*, 2 F.4th 871, 886 (9th Cir. 2021) (*citing Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (quoting *Zeran,* 129 F.3d at 330)). In *Carafano*, for example, the third-party content was not only defamatory but also included the creation of a fake profile that resulted in threats to the plaintiff and her son. 339 F.3d at 1122. The Ninth Circuit recognized that the plaintiff had been the victim of a "cruel and sadistic identity theft" but concluded, "despite the serious and utterly deplorable consequences that occurred in this case, . . . that Congress intended that service providers such as Matchmaker be afforded immunity from suit." *Id.* at 1121, 1125.[8]

The undersigned therefore finds the reasoning and holding of *Bates* and *M.A. ex rel. P.K. v. Vill. Voice Media Holdings* on this question to be in line with Ninth Circuit authority and

---

[8] Plaintiffs also point to CDA § 230(e)(1) in support of their argument that their claim under Section 2255 is exempt from immunity. Opposition at 24. As discussed above, that section provides that the immunity established under subsection (a) "shall [not] be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute." While Section 2255, which created civil liability for certain criminal offenses, is contained in chapter 110, it was enacted two years after Section 230. Thus, at the time Congress enacted Section 230(e)(1), the exemption it created in that section applied only to *criminal* enforcement of the provisions in chapter 110. Further, while Plaintiffs suggest that the bill adopting section 2255, the Protection of Children from Sex Predators Act of 1998, PL 105–314, 112 Stat 2974 (1998), reflected an intent on the part of Congress to abrogate Section 230 immunity as to ICS providers with respect to civil claims asserted under Section 2255, they have pointed to no language in Section 2255 or any specific legislative history to support that conclusion. Therefore, the Court concludes that CDA § 230(e)(1) does not exempt Plaintiffs' claim under Section 2255 from immunity under Section 230.

concludes that immunity under Section 230 is not defeated by the fact that the third-party content at issue is illegal child pornography.  Therefore, the Court concludes that this claim fails under Section 230.

### F.   Plaintiffs' State Law Claims

#### 1.   Claim Five (California Products Liability)

Plaintiffs' products liability claim is based on the theory that Twitter's platform is unreasonably dangerous and therefore defective because it is designed so as to make it easy for child predators and sex traffickers to quickly disseminate CSAM on a wide scale while making it difficult to report or block the dissemination of such material.  Plaintiffs attempt to avoid Section 230 on the ground that the claim is not based on Twitter's conduct as a publisher of information but instead, on a defective product, citing *Lemmon v. Snap, Inc*., 995 F.3d 1085, 1090 (9th Cir. 2021) in support of their position.  That case is distinguishable from the facts here, however.

In *Lemmon v. Snap*, the plaintiffs were parents of two boys who were killed in a high-speed car accident where it was alleged that a speed-filter offered by the defendant's smartphone application, Snapchat, played a role in the accident.  995 F.3d at 1087-90.  The speed filter allowed Snapchat users to superimpose a filter over photos or videos captured through Snapchat recording their real-life speed, and it was alleged that the speed filter incentivized young drivers to drive at high speeds because it was suspected by Snapchat users that logging a speed of over 100 MPH in a user video would result in "rewards" from Snapchat.  *Id.* at 1088-89.  It was further alleged that the defendant was aware of the danger of the speed filter because there had been a "series of news articles about this phenomenon; an online petition that 'called on Snapchat to address its role in encouraging dangerous speeding'; at least three accidents linked to Snapchat users' pursuit of high-speed snaps; and at least one other lawsuit against Snap based on these practices."  *Id.* at 1089-90.

The plaintiffs in *Lemmon* brought a products liability claim based on negligent design against Snap, the company that owns Snapchat, and Snap asserted that it was entitled to immunity under Section 230.  *Id.*  at 1090.  The district court agreed but the Ninth Circuit reversed, finding that the plaintiffs' claims did not treat the defendant as a publisher or speaker.  *Id.* at 1091.  The

United States District Court
Northern District of California

1   court reasoned as follows:

2       It is . . . apparent that the Parents' amended complaint does not seek
        to hold Snap liable for its conduct as a publisher or speaker. Their
3       negligent design lawsuit treats Snap as a products manufacturer,
        accusing it of negligently designing a product (Snapchat) with a
4       defect (the interplay between Snapchat's reward system and the
        Speed Filter). Thus, the duty that Snap allegedly violated "springs
5       from" its distinct capacity as a product designer. *Barnes*, 570 F.3d at
        1107. **This is further evidenced by the fact that Snap could have**
6       **satisfied its "alleged obligation"—to take reasonable measures to**
        **design a product more useful than it was foreseeably dangerous—**
7       **without altering the content that Snapchat's users generate**.
        *Internet Brands*, 824 F.3d at 851. Snap's alleged duty in this case thus
8       "has nothing to do with" its editing, monitoring, or removing of the
        content that its users generate through Snapchat. *Id*. at 852. . . . That
9       Snap allows its users to transmit user-generated content to one another
        does not detract from the fact that the Parents seek to hold Snap liable
10      for its role in violating its distinct duty to design a reasonably safe
        product. . . . Though publishing content is "a but-for cause of just
11      about everything" Snap is involved in, that does not mean that the
        Parents' claim, specifically, seeks to hold Snap responsible in its
12      capacity as a "publisher or speaker."

13  *Id.* at 1092 (emphasis added).

14          Here, as in *Lemmon*, Plaintiffs' products liability claim is based on the allegation that the

15  design of the Twitter platform is unreasonably dangerous.  The facts here differ, however, from

16  those in *Lemmon* because the nature of the alleged design flaw in this case – and the harm that is

17  alleged to flow from that flaw – is directly related to the posting of third-party content on Twitter.

18  In particular, Plaintiffs allege that Twitter's design, which is aimed at "enabling its users to

19  disseminate information very quickly to large numbers of people" through such features as

20  hashtags and algorithms,  also enables "sex traffickers to distribute CSAM on a massive scale."

21  FAC ¶¶ 179-181.  Conversely, they allege, Twitter is *not* "designed to enable its users to easily

22  report CSAM, nor is it designed so that CSAM is immediately blocked pending review when

23  reported."  *Id.* ¶ 182.  Nor does Twitter "consistently deploy IP blocking, or other measures, to

24  prevent users suspended by Twitter for disseminating CSAM from opening new accounts under

25  different names[,]" Plaintiffs allege.  These flaws, in essence, seek to impose liability on Twitter

26  based on how well Twitter has designed its platform to prevent the posting of third-party content

27  containing child pornography and to remove that content after it is posted. In other words, to meet

28  the obligation Plaintiffs seek to impose on Twitter on this claim, Twitter would have to alter the

United States District Court
Northern District of California

53

content posted by its users, in contrast to the design defect alleged in *Lemmon*.   Therefore, the

Court concludes that *Lemmon* is not on point and that Plaintiffs' products liability claim fails on

the basis that Twitter is entitled to immunity as to that claim under Section 230 immunity.[9]

### 2.   Claims Six through Nine (Negligence Claims)

Twitter challenges all of Plaintiffs' negligence claims on the grounds that it is immune

from liability on those claims under Section 230.  It further asserts that the negligence per se and

negligent infliction of emotional distress claims (Claims Eight and Nine) are not independent

causes of action and that the remaining negligence claims (Claims Six and Seven) fail because

Twitter does not owe Plaintiffs any duty.  The Court finds that these claims fall within the scope of

Section 230 and therefore does not reach Twitter's remaining arguments.

The essence of these claims is that Twitter breached a duty to Plaintiffs – and violated

various criminal statutes –by failing to remove the Videos after being notified of them and instead

allowing them to be broadly disseminated on Twitter.  These claims seek to treat Twitter as a

publisher of information, which is prohibited under Section 230.  *See In re Facebook, Inc.,* No. 20-

*0434, 2021 WL 2603687*, at \*9 (Tex. June 25, 2021) (finding that negligence claims against

Facebook based on its failure to protect plaintiffs from sex traffickers who used its platform were

barred under Section 230).  Therefore, the Court finds that Plaintiffs' negligence claims fail under

Section 230.

### 3.   Claim Ten (Distribution of Private, Sexually Explicit Material Under Cal. Civ. Code section 1708.85)

California Civil Code section 1708.85(a) provides:

> A private cause of action lies against a person who intentionally
> distributes by any means a photograph, film, videotape, recording, or
> any other reproduction of another, without the other's consent, if (1)
> the person knew that the other person had a reasonable expectation
> that the material would remain private, (2) the distributed material
> exposes an intimate body part of the other person, or shows the other
> person engaging in an act of intercourse, oral copulation, sodomy, or
> other act of sexual penetration, and (3) the other person suffers
> general or special damages as described in Section 48a.

---

[9] The Court assumes without deciding that Plaintiffs' products liability claim is otherwise
adequately alleged.

United States District Court
Northern District of California

1    Cal. Civ. Code section 1708.85(a).  Section 1708.85 exempts from liability, however, a "person

2    distributing material under subdivision (a)" where "[t]he distributed material was previously

3    distributed by another person."  Cal. Civ. Code section 1708.85(c)(6).  Based on the plain

4    language of these provisions, the Court concludes Plaintiffs have failed to state a claim.

5          Liability under section 1708.85(a) requires that Twitter *intentionally* distributed the

6    Videos.  Even assuming that Twitter's conduct amounted to intentional distribution once it was

7    put on notice of the Videos, the allegations in the FAC make clear that at that point these Videos

8    had already been posted by "another person," namely, the owners of the user handles

9    @StraightBross and @fitmalesblog.  *See* FAC ¶¶ 89, 91, 99.  Plaintiffs have not cited any contrary

10   authority or even addressed Twitter's argument in their Opposition.  Therefore, the Court

11   concludes that Plaintiffs fail to state a claim under section 1708.85(a).  Further, to the extent that

12   this claim seeks to hold Twitter liable for failing to remove third-party content from its platform,

13   the Court concludes that the claim is barred under CDA § 230 because it treats Twitter as a

14   publisher.

15                **4.   Claim Eleven (Intrusion Into Private Affairs)**

16          The tort of intrusion into private affairs has two elements: "(1) intrusion into a private

17   place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Shulman v.*

18   *Grp. W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998), as modified on denial of reh'g (July 29, 1998).

19   Twitter does not argue in the Motion that Plaintiffs fail to state a claim for intrusion into private

20   affairs and therefore, the Court assumes that Plaintiffs adequately allege such a claim.

21   Nonetheless, the basis for this claim is Twitter's "role as a 'republisher' of material posted by a

22   third party," and therefore, the claim is barred by CDA § 230.   *Caraccioli v. Facebook, Inc.*, 700

23   F. App'x 588, 590 (9th Cir. 2017) (holding that claim against Facebook for intrusion into private

24   affairs based on Facebook's refusal to remove private photos and videos of the plaintiff from

25   Facebook was barred under Section 230).

26                **5.   Claim Twelve (Invasion of Privacy Under California Constitution)**

27          To establish an invasion of privacy claim under the California Constitution, a plaintiff

28   must demonstrate three elements: "(1) a legally protected privacy interest; (2) a reasonable

55

expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th 1, 39–40 (1994). Again, Twitter has not argued that Plaintiffs fail to state a claim as to this claim and the Court assumes that their claim is sufficiently alleged, but like the claim for intrusion into private affairs, this claim is based on Twitter's role as a "republisher" of third-party content and therefore is barred under CDA § 230.

### 6. Claim Thirteen (UCL Claim)

Twitter asserts that Plaintiffs do not have standing to assert their UCL claim and that they fail to state a claim because they have not alleged any statutory violation or, to the extent the claim is based on alleged misrepresentations by Twitter, any reliance on those misrepresentations. It also contends the claim is barred by CDA § 230. The Court assumes without deciding that Plaintiffs have adequately alleged standing. It also finds that Plaintiffs have adequately alleged an "unlawful" practice under the UCL for the same reasons it finds that Plaintiffs have stated a claim for beneficiary liability under Section 1595 and 1591(a)(2). The gravamen of the UCL claim, however, is that Twitter engaged in an unlawful and unfair practice by failing to ensure that the Videos were blocked from Twitter or at least, removed promptly. As such, this claim seeks to impose liability on Twitter as a publisher of third-party content and is therefore barred by Section 230.

## IV.   CONCLUSION

For the reasons stated below, the Motion is DENIED as to Plaintiffs' TVPRA claim based on beneficiary liability (Claim Two). The Motion is GRANTED as to Plaintiffs' remaining claims, which are dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: August 19, 2021

JOSEPH C. SPERO
Chief Magistrate Judge