Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

| | | |
|---|---|---|
| JOHN DOE #1 AND JOHN DOE #2, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | **No. C 21-485 JCS** |
| | ) | |
| TWITTER, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | San Francisco, California |
| | | Friday, August 6, 2021 |

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**

**APPEARANCES**:  (via Zoom Webinar)

For Plaintiffs:

NATIONAL CENTER ON SEXUAL EXPLOITATION
1201 F St NW, Suite 200
Washington, District of Columbia 20004
BY:  **PETER A. GENTALA, ESQ.**

THE HABA LAW FIRM, P.A.
1220 Commerce Park Drive, Suite 207
Longwood, Florida 32779
BY:  **LISA D. HABA, ESQ.**

THE MATIASIC FIRM, P.C.
4 Embarcadero Center, Suite 1400
San Francisco, California 94111
BY:  **PAUL A. MATIASIC, ESQ.**
**HANNAH E. MOHR, ESQ.**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
Official Reporter - U.S. District Court

**APPEARANCES:** (via Zoom Webinar; continued)

For Defendant:

                COOLEY LLP
                101 California Street, 5th Floor
                San Francisco, California 94111-5800
       BY:  **MICHAEL G. RHODES, ESQ.**
             **KYLE C. WONG, ESQ.**

1    **<u>Friday - August 6, 2021</u>**                              **<u>9:38 a.m.</u>**

2                        **P R O C E E D I N G S**

3                          **---oOo---**

4          **THE CLERK:**  We are calling case number 21-cv-0485, Doe

5    versus Twitter.  Counsel, please raise your hands.

6        Appearances, please, first, starting with the plaintiffs.

7          **MR. MATIASIC:**  Good morning, Your Honor.  Paul

8    Matiasic on behalf of the plaintiffs.

9          **MS. HABA:**  Good morning, Your Honor.  Lisa Haba on

10   behalf of the plaintiffs.

11         **THE COURT:**  Good morning.

12         **MR. GENTALA:**  Good morning, Your Honor.  Peter Gentala

13   on behalf of the plaintiffs.

14         **THE COURT:**  Good morning.

15         **MS. MOHR:**  Good morning, Your Honor.  Hannah Mohr also

16   on behalf of the plaintiffs.

17         **THE COURT:**  Good morning.

18         **THE CLERK:**  And for the defendants.

19         **MR. RHODES:**  Good morning, Your Honor.  Michael

20   Rhodes, of Cooley, on behalf of Twitter.  Nice to see you.

21         **THE COURT:**  Good morning.  Good to see you.

22         **MR. WONG:**  Good morning, Your Honor.  Kyle Wong, of

23   Cooley, on behalf of the defendant.

24         **THE COURT:**  Good morning.

25         **MR. WONG:**  Good morning.

1        **THE COURT:**  So thank you, all.

2        On the motion to dismiss, obviously, I've read your briefs

3   on it.  And the matter is not uncomplicated, but I do

4   appreciate all the work you put into it.

5        I had a few questions that I want you to address

6   specifically.  I'm not going to hide the ball; I'll tell you my

7   tentative ruling.  But, most importantly, I want you to address

8   the following questions when you talk to me because they are

9   questions on which I don't have a firm answer, I would say.

10       The first two questions are related, and it's the question

11  of -- I guess I'll put them this way, to address the question

12  of whether what occurred here, posting child pornography, at

13  least that's how its pled, on Twitter is sex trafficking under

14  the statute.

15       You know, we're talking about a TVPRA claim.  Is it --

16  whether the defendant participated in a venture or benefited

17  from an venture or whatever it is that would cause plaintiffs

18  to engage in a commercial sex act, and does this qualify as a

19  commercial sex act or something that would cause a plaintiff

20  to, and the related question of whether or not the plaintiffs

21  have adequately or can adequately allege that this, whatever it

22  was, would cause the victims to engage in a commercial sex act

23  within the meaning of the statute.

24       Obviously, it's horrible, and what happened to these kids

25  should never happen and is unforgivable, and we should all do

1   whatever we can to make sure it doesn't happen to anyone else.

2   But the question -- the narrow question is whether this is

3   related to the commercial sex act requirements under the

4   statute, number one.

5         Number two is, I want you to address here the question

6   that's raised in the *Kik* case and other cases about whether

7   FOSTA's including of the language *if the conduct underlying the*

8   *claim constitutes a violation of 1951* limits or changes the

9   *mens rea* of 1595.  Key issue.

10        You've addressed it some in your briefs, and I'd like to

11  have some discussion today about it.  But I wanted to throw out

12  the idea that if that was what someone wanted to do, this is a

13  pretty opaque way of doing it.

14        It's not obvious to me that that's what Congress intended,

15  and maybe a more natural reading of the statute is that, with

16  respect to 1595, Congress wanted to limit the immunity

17  exception to claims based on 1595 -- brought under 1595, which

18  were based on 1591, and did not intend to extend that immunity

19  to other claims brought under 1595, because that statute allows

20  for civil claims based on any sections within the chapter.  And

21  there are lots of sections in the chapter; peonage, slavery,

22  transportation of -- you know, lots of things that don't have

23  to do with sex acts.

24        But that's one -- I wanted you to -- since you addressed

25  that some in your brief and I had this possible way of

1   interpreting, I wanted you to address that.

2       Next I want you to address -- and I'm not sure it's

3   directly germane, because this is a pleading motion, but I'm

4   interested in the relationship between viewings and re-tweets

5   and ad revenue for Twitter.

6       So my tentative is as follows:  As to the TVPRA, I don't

7   think there's a claim for direct sex trafficking.  It was a

8   lovely argument to try to make, but I think that's obviously

9   not correct here.

10      On the claim under TVPRA, under (a)(2), which requires a

11  knowing benefit from participation in a venture engaged in sex

12  trafficking, knowing the person was involved as a minor and

13  caused to engage, et cetera, et cetera, my tentative thought is

14  that that claim survives.

15      And it is my thought for a couple of reasons.  One is, I

16  think the -- because you can tell from my previous suggestion

17  that I think the *knew or should have known* standard of 1595 is

18  the relevant *mens rea* here and that given the proceedings

19  there's sufficient allegation, subject to our discussion about

20  what constitutes a commercial sex act.

21      In terms of participation in a venture, you know, since

22  I'm using the *knew or should have known*, it's not about

23  satisfying the criminal code or putting up an overt act or any

24  of those sorts of things.  It's about sufficient allegations to

25  infer that there was tacit agreement one way or another to

1   allow this to continue.

2       And there are many allegations about that.  Enabling sex

3   trafficking by making it hard to report; permitting a large

4   amount of it to occur.  The allegation is there's an ability to

5   monitor it, and they still let it happen.

6       In this particular case there's no question that Twitter

7   was repeatedly told about this exploitation.  I mean, this is a

8   unique -- maybe it's not unique, but there's a set of facts

9   here that make this case plausible.  And that is, Twitter was

10  repeatedly told about this exploitation, in great detail, and

11  first failed to remove it then refused to remove it, and

12  delayed removing it even after the Department of Homeland

13  Security was called.  You know, even though one of the accounts

14  was posted -- the post of the video was subject to a prior

15  complaint, the content is the content, but the allegation is

16  it's obvious child porn.  So, you know, these repeatedly

17  ignoring or denying requests suggests that they knew or should

18  have known that they were participating in a venture that was,

19  if this is commercial sex act, satisfying participation in a

20  venture.

21      The benefits -- you know, the benefits is an interesting

22  question.  And I will say, with respect to all of this, I'm

23  thinking about this as a pleading motion, of course, and I

24  don't have a preconceived idea about where this comes out to if

25  and when we get to a summary judgment motion, of course.  And

1    the receipt of a benefit is a particular example of that.

2         I mean, there's all sorts of things pled about the

3    benefits received, you know, and the views and re-tweets and

4    bringing up advertisements and all sorts of things.  You know,

5    they've certainly pleaded, you know, increase in advertising

6    and users, and that sort of thing, which would be benefits

7    under the statute.  And then so, you know, with those

8    conclusions, I think it fits within the statute of both FOSTA

9    and 1595.

10        On the other hand, I think all the other remaining claims

11   are barred.  There's no prior cause of action under 2258A and B

12   of the criminal code.

13        As to the other claims, they're all founded on the idea

14   that this content posted on a website caused an injury and that

15   without the content there would be no injury, and that they

16   should have done something or structured their platform

17   differently to make sure the content didn't show up so easily.

18        Whatever it is, it's all about the content.  And it

19   doesn't matter whether you're putting -- talking about putting

20   it up or taking it down or it's contraband or whether the flaw

21   in that platform makes it easy to put up or difficult to

22   challenge or difficult to take down it seems to me that all the

23   claims are barred by 203 under that -- with respect to that.

24        But that's my tentative.  And I think that what -- I'm

25   particularly interested in your thoughts on the first few

1    things I talked about, and I'll first turn to the moving party.

2              **MR. RHODES:**  Good morning, Your Honor.  May I be

3    heard?

4              **THE COURT:**  Yes, of course.

5              **MR. RHODES:**  Thank you.  For the court reporter's

6    benefit, I'm Michael Rhodes representing Twitter.

7         So, Your Honor, my analysis would take us this way.  Let's

8    take a look, for a second, at 230 subsection (e), because I

9    think within the architecture of that statute we will find the

10   answer to what claim, under this particular pattern of facts,

11   can go forward and what the elements of the claim is.

12        If you take a look at (c)(1), which states no effect on

13   criminal law, you see in the *Gonzalez versus Google* case, at

14   page 890, they say that's limited to criminal prosecutions.

15   Then we go to Section 5, which talks about the trafficking

16   laws, and there are three subsections; capital A, capital B and

17   capital C.

18        I note that capital B and C are specifically constrained

19   to criminal prosecutions.  And it was interesting to me to look

20   at subpart B because the carve-out for criminal prosecutions

21   under state law again cites to a charge, quote, that would

22   constitute a violation of Section 1591, not 1595.  So they

23   limited the state law criminal remedy what -- meeting the

24   elements of 1591.

25        And, of course, our argument -- and I understand what the

1   Court's position is, but our argument is that if you look at

2   the text of subpart A, the only claim against an electronic

3   computer service under 230 that is allowed to survive is one

4   that meets the definitions under 1591.

5        1595 is the more omnibus civil remedy provision.  And if

6   you look at that *Kik* case, recognizing it's not controlling but

7   it's another case under a similar fact pattern out of Florida,

8   what the court says there is 1595 will apply to offline

9   behavior, like the hotel cases that the parties cited, and when

10  you're dealing with an online interactive computer service, as

11  we are here, the only claim that can go forward is 1591.

12       And so you're allowed to bring the claim under 1595, but

13  you have to meet the strictures and elements of 1591.  And I

14  think that there are four elements that are required for a 1591

15  claim.

16          **THE COURT:**  Can I --

17          **MR. RHODES:**  Yes.

18          **THE COURT:**  Obviously, that was a piece that I wanted

19  to talk about, just what you just said.

20          **MR. RHODES:**  Yes.

21          **THE COURT:**  I want to ask you a little bit about it

22  because they didn't say for claims that you have to -- they

23  didn't say that they meant to change the elements of a claim

24  under the civil statute, 1595, which is the vehicle by which

25  you're allowed to bring a 1591 claim.  They didn't say that.

1   Your point is that they indirectly said it by having -- by

2   saying so long as, et cetera, et cetera.

3       I'm wondering why I should -- they could just -- they

4   could have said something different.  They could have said:

5   And we mean, and, therefore, we're abrogating the 1595 to the

6   extent that it's inconsistent with the elements of 1591,

7   because it is.  I mean 1595, a case brought under 1595 doesn't

8   have to show, even though it's based on 1591, the same

9   *mens rea*.  It seems like an odd way to do it to me.

10      And why isn't my reading of it a more natural reading,

11   that there are lots of different claims you could bring against

12   an Internet service provider based under 1595, but they only

13   wanted you to be able to bring this one because they were

14   particularly concerned, and that's the one thing we can agree

15   about the legislative history, about sex trafficking, not, you

16   know, the other forms of -- abhorrent forms of -- that's kind

17   of redundant, abhorrent forms of slavery that occur.

18      Why doesn't that make more sense?

19          **MR. RHODES:**  I think there are two answers, Your

20   Honor.

21      First, the express language of subpart A, and let's parse

22   it.  The first clause says *Any claim in a civil action brought*

23   *under 1595 of this title*.  Title 18.  If you put a period

24   there, I think the Court's reasoning might obtain.  But there's

25   not a period there.  It goes on.

1      **THE COURT:**  No.  My reasoning wouldn't work.  If there

2  was a period there and they didn't have the next phrase --

3      **MR. RHODES:**  Look at the next phrase with me, Your

4  Honor.

5      **THE COURT:**  I'm just saying --

6      **MR. RHODES:**  Yeah.

7      **THE COURT:**  -- if there was a period there and you

8  didn't have the next phrase, then you could bring a claim

9  against an Internet service provider for peonage or

10  transporting slaves or the other things that fall within the

11  chapter.  But that's not what they did.  It's not --

12      **MR. RHODES:**  They --

13      **THE COURT:**  So a period wouldn't change it.

14      **MR. RHODES:**  But the phrase is *conduct*.  I think this

15  is important.  It doesn't say if the elements -- it says *if the*

16  *conduct underlying the claim*.  So the thing that has to be

17  satisfied is you have to demonstrate the conduct of the claim

18  has to say 1591.  They repeated that a second time in subpart B

19  for carving out state criminal prosecutions.

20      My argument is, if they had intended to allow claims at

21  the lower intent or, as you call it, the lower *mens rea* level

22  under 1595, which is the *known or should have known* standard,

23  why are they specifically saying the conduct has to satisfy

24  1591?

25      The one case that dealt with that directly is *Kik*.  They

1    conclude that we were correct and Your Honor's construction is

2    not correct.  I accept that that's not binding on you.  But

3    what I'm saying is, if you look at the language, why would they

4    repeat that phrase *if the conduct*?

5         Then if we go to 1591, Your Honor, it says the conduct has

6    to satisfy 1591, twice in 1591, both in sort of the very

7    beginning of subpart A, where it says *whoever knowingly*, and

8    then you've got the 1 and 2 claims.  The 2 claim, as you point

9    out, which is the one that we would attach to here, in the

10   definition of participation and venture, we once again find the

11   word *knowingly*.

12        So I think the architecture of the statute is very clear

13   that they were trying to identify a class of websites.  We know

14   what they were because, remember, before this amendment

15   Backpage and others were getting off the hook on 230, and they

16   tried to design something.

17        But they used the phrase *knowingly* in the statute in 1591

18   twice, and then they say you've got to satisfy the conduct of a

19   1591 claim.  They don't say the conduct of a 1595 claim.

20        And I argue that you're making that second phrasing --

21        **THE COURT:**  They couldn't say conduct satisfying a

22   1595 claim because conduct satisfying a 1595 claim would go

23   beyond -- would go beyond sex trafficking.

24        **MR. RHODES:**  I agree with you.  But I'm just saying

25   if -- if the only claim that survives in this context -- in

1    fact, you know, the *Kik* case says this explicitly.  They say

2    explicitly, in the sex trafficking context the only claim that

3    gets to be brought against an interactive computer service is a

4    1591 claim, and you have to show knowledge and overt acts.  And

5    the complaint doesn't allege knowledge and overt acts here.

6         And, for one thing, a 1591 claim has a very interesting

7    subpart which has a temporal aspect to it.  If you look at

8    subpart 3, you asked about commercial sex acts in your

9    preamble, and there it says it means *any sex act on account of*

10   *which anything of value is exchanged*, and then it goes on to

11   say the venture is -- and the syntax is important -- *knowingly*

12   *assisting, supporting, facilitating a violation*.

13        And if you look back to the original part of the

14   beneficial or beneficiary claim after subpart 2, there's

15   another unnumbered paragraph, okay.  And it also uses the

16   phrase *knowingly*, and it talks about the minor being under 18,

17   and then it says *will be caused to engage*.

18        I mean, one of the elements that's missing here for a 1591

19   claim is not just the knowledge and the overt acts and any

20   connective tissue between just posting the video generally and

21   boosting it generally -- which *Gonzalez* says is not enough

22   under a nonFOSTA case -- but you have this temporal aspect that

23   your action is going to cause this to occur in the future.

24        So our argument is --

25             **THE COURT:**  Well, not necessarily your action.  The

1    venture --

2            **MR. RHODES:**  The venture, correct.

3            **THE COURT:**  -- will cause it to occur in the future.

4            **MR. RHODES:**  I agree with that.

5            **THE COURT:**  And I guess the argument on the venture

6    is, well, you know, that's what child pornography is all about.

7    Posting leads to reposting, leads to trading, leads to selling

8    of this, and that's the commercial sex acts that occur

9    naturally in the future from the first posting and from the

10   second posting and from the third posting.

11       Why isn't that enough for a commercial sex act?

12           **MR. RHODES:**  Because they're talking about

13   participation in a venture, and that has been construed by the

14   cases as to having some connection.  It's not necessarily a

15   conspiracy per se.

16       But here Twitter doesn't know who these people are.

17   There's no allegation that we were aware of them.  It's simply

18   the content.  The content got posted, and it's the fact you

19   didn't take it down quickly enough despite, as you point out,

20   the several notices.

21       It's still the underlying content.  You're treating this

22   as a (c)(1) publisher or speaker of the content.  And we

23   believe it's very clear in the statute that the only claim

24   that's allowed to go forward is a 1591 claim, which requires a

25   specific level of intent.

1          And if you look at that *Afyare* case that we cite, *U.S.*

2    *versus Afyare*, which is sort of the benchmark for what is the

3    elements of the claim, it's knowledge that you're intending to

4    facilitate this activity.

5          This already took place.  We're not intending to

6    facilitate it.  The argument really is, you made an error in

7    judgment in not taking it down quickly enough.  That's the

8    classic 230 situation.  That's not a 1591 violation.

9          And I think the *Kik* case got it right when they point out

10   the 1595 claim was built for the offline world, the situation

11   where you've got the motel manager who's aware that the

12   trafficking is taking place on premises based on their

13   observations, and they talk about, you know, what you're able

14   to see.  That's the *should have known* standard.

15         In the interactive computer service context, the only sex

16   trafficking claim that gets to go forward is one that meets the

17   strictures of 1591.  And our argument is that does require a

18   level of intent that's higher than the *should have known*

19   standard in 1595.

20         Otherwise, why would Congress, in multiple sections under

21   the carve-out for FOSTA, why would they use the phrase *the*

22   *conduct of the claim has to satisfy 1591*?  Why would they use

23   that phrase?

24              **THE COURT:**  I think it's an interesting argument.  And

25   we'll get the other side's response on it in a moment, but I

1    wanted to ask you one other question.

2         You were talking about the requirement that it cause to

3    engage in a commercial sex act regarding the venture.

4         So I guess you don't disagree that -- I'll put it in a

5    provocative fashion.

6              **MR. RHODES:**  Yes, Your Honor.

7              **THE COURT:**  You don't disagree that the -- you know,

8    leaving aside, for a moment, Twitter's intent with respect to

9    and knowledge with respect to the posting, but the posting of

10   child pornography falls within the definition of a conduct that

11   would cause plaintiffs to engage in a commercial sex act, you

12   don't disagree with that?

13             **MR. RHODES:**  In the abstract, I can see your point.

14   What I'm saying on the facts of this case -- let me give you an

15   analogy.

16             **THE COURT:**  There are two questions.  One is in the

17   abstract and then Twitter's participation.

18             **MR. RHODES:**  Yes.

19             **THE COURT:**  That's a different question.

20             **MR. RHODES:**  Yeah.  I agree with you.  I guess what

21   I'm hung up on is if you look at the most recent Ninth Circuit

22   articulation generally on 230, which is the *Gonzalez* case, they

23   specifically note in that instance that they accepted as a

24   premise that the platform was intentionally, as they put it,

25   intentionally recommending the offensive conduct, the

1   ISIS-created content, and that they were making it more easy to

2   see, more allowable.  And they said that's not enough to get

3   you outside of 230.

4       I think the analogy holds here too.  It's we have to have

5   an intent and knowledge that our action is facilitating the

6   violation of 1591, which has, as you point out, the commercial

7   sex trafficking activity, and the victims will be trafficked.

8   And I don't think that connection is made here on this record.

9       **THE COURT:**  So why isn't it made?  And I'm not sure I

10  agree that's the right way to look at the standard.

11      But why isn't it made by saying that you were told over

12  and over and over, in great detail, that this was child

13  pornography, the sources of the child's pornography, that it

14  was up there, that people who were posting it were child

15  pornographers?  Why isn't that enough to take you out of that

16  exception?

17      **MR. RHODES:**  Because you still have to show a

18  connection between your knowledge and the intent -- in the

19  venture definition, the second knowingly assisting the venture.

20      And what you've got here is in the language of the

21  original 230 case, *Zeran*, the *Goddard versus Google* case, and

22  that *Vimeo* case, I believe, out of the Second Circuit, they all

23  say perfection is not the standard.

24      So I think the record shows, Your Honor, that they took it

25  down after nine days.  And the totality of the circumstances

1     are clear that Twitter does not want this kind of content on

2     its website.

3          Under *Gonzalez*, we're not treating -- there's no

4     allegation that we treated this content specifically different.

5     It's you've got to do more than just have general platform or

6     that somehow you make money generally on content on your

7     platform.  We dispute that it's all content, but that's what

8     they allege.

9          And the point I'm making is, if you look at the cases

10    going back to even *Zeran* and even the Congressional intent, as

11    in the language of the Ninth Circuit in *Gonzalez*, Congress

12    didn't differentiate between criminal, dangerous, or obscene

13    content from innocuous content.

14         The question presented is, is my failure to retract the

15    offensive material, is my failure to retract over a nine-day

16    period, is that enough to satisfy the intent element of 1591?

17         Now, if you disagree with me as a threshold matter, if you

18    disagree with me that the only claim that can survive is one

19    built on 1591, as the language says, based on the conduct that

20    satisfies 1591, and you say that notwithstanding that we can

21    satisfy the claim by looking at 1595, then, yeah, I understand

22    that I'm more in trouble with you on that point.

23         But I think that's legally wrong, Your Honor, for the

24    textural language of the entire statute, the fact that the

25    first part is only limited to criminal prosecutions.  And in

1   multiple places in the FOSTA carve-out they said even for state

2   criminal prosecution the only thing that gets by for an

3   electronic computer service is a claim that satisfies 1591.

4   And there's no dispute that 1591 has higher and more stringent

5   elements than 1595.

6       So the question is, so why is that the case?  And what the

7   *Kik* case says is that the only commercial sex trafficking

8   activity that gets laid against an online computer service like

9   this is 1591.  And 1595 is meant to pick up the real world, the

10  non-online world of sex trafficking, and that's what those

11  hotel cases talk about.

12      That's the argument we're making, Your Honor, as the

13  gating item.  And, frankly, for me to win, you have to accept

14  that as a paradigm, and I understand that.

15          **THE COURT:**  Okay.  I get it.  I get it.  I get it.

16      So can you -- while I've got you, before I go to the other

17  side, and you can say anything else you'd like to, as well,

18  would you tell me a little bit about the relationship between

19  views and re-tweets and ad revenue for Twitter?  I mean, I have

20  to go by the pleadings, but I am interested in how that

21  actually works.

22          **MR. RHODES:**  Right.  So there's sponsored tweets,

23  which are based algorithmically filtered, if you're looking at

24  a feed on a certain subject matter and then, simplistically

25  put -- and my apologies to my Twitter colleagues who are on the

1    Zoom.  I'll probably get this wrong.

2         But in concept, the company has sponsored tweets.  People

3    have paid for those tweets to get to your eyes, if you will.

4    And it's basically kind of content matching.

5         Now, what's interesting here is another one of our

6    arguments, one of our sub arguments here is -- and *again*

7    *Gonzalez* helps us understand this -- just because you have a

8    platform that monetizes user-generated content, including

9    dangerous, offensive, and criminal content, doesn't mean that

10   that takes you outside of the immunity; right.  It has to be

11   more than that.

12        So, for example, there's no allegation here that there was

13   a sponsored tweet for this content or that Twitter did anything

14   knowingly with respect to this particular content.

15        The allegation appears to be that, well, the content was

16   there, there was 171,000 views of it; and, therefore, that

17   monetization, if you will, to the extent there was a

18   monetization there, it may be indirect in the sense there was

19   more overall user engagement or something on the platform.

20        And, I think, if you go back and look at *Gonzalez* it's

21   very interesting because they talk about the monetization

22   concept, and they say just because -- even when you're kind of

23   boosting content or making it easier to find or easier to see

24   in the language of that case, it's not enough to take you out

25   of the 230 harbor.  You have to kind of entwine yourself with

1  the specific content for that principle to attach here.  It's

2  not enough to just simply say, you know, you're making money

3  because there's content.

4        And the reason I say that is you go back to the

5  legislative history -- look, I understand that's always a

6  dangerous argument for lawyers to make; right.  But if you look

7  at what motivated this and look at the congressional record,

8  they were talking about a specific set of websites, where the

9  entire website was designed to facilitate sex trafficking.

10       I argued these cases a lot before 2018, and I would always

11  have judges tell me:  I'm really disturbed by your citation to

12  the Grinder case or the Backpage case where the entire website

13  was designed with tools to anonymize conduct, make it hard to

14  find people, use coded language, facilitate payments, and all

15  those things.

16       Twitter is obviously meant to be a benign platform; right.

17  May not like some of the content, but it's meant to be a benign

18  platform.  They move heaven and earth to try to get this kind

19  content off of it.  What you can say here is, at best, someone

20  may have made a human error, and it was up for nine days.

21  Okay.  But that is a fundamental publisher function, trying to

22  retract offensive material.

23       And *Zeran* and *Goddard* and *Vimeo* and other cases say, look,

24  we understand we're not going to get perfection.  So if we're

25  going to take your immunity away, if we're going to take it

away, we're going to require more engagement with the

particular offensive content.

Go back to that *Kik* case.  They talk about this.  They

said the same thing there.  And remember, in *Kik* the

trafficking took place on the *Kik* platform.  The allegation

was:  You know those people are there; they met the victim

there; they contacted the victim there; they used your service

to connect with them and then get them to engage in the

trafficking off the platform.

And the Court said, yeah, but your venture is all about

just the generic money-making machine of that platform, that

user engagement drives economic uplift.  And the Court said

there's no allegation that *Kik* intended to facilitate the

trafficking of that particular person or to engage in an

economic relationship with the perpetrators who were targeting

that particular person.

And that's what 1591 captures differently than 1595.  And

that's why the gating concept I've given you suggests that

that's the right way of thinking about it, because you're still

trying to motivate these platforms to do the right thing and

self-police.  But they're not going to get it right every time.

And so if you take the immunity away because they screwed it up

in one instance like this, it becomes very challenging to the

underlying architecture of the whole thing.

And so we would argue that it's more than just you make

1   money because there's content and people are eyeballing it.

2   There's no allegation that I was trying to target Judge Spero

3   particularly and get people to look at Judge Spero's content

4   and make additional money on Judge Spero or, as Twitter does,

5   license data about Judge Spero, and so on and so forth.

6        It's really, if you look at it, the complaint says you

7   make money by having this kind of content there.  And if the

8   issue is we're knowingly acting, then why are we trying to take

9   down 400,000 accounts all the time?

10       I think what you really have here is you have that old

11  adage bad facts can lead to bad law.  It's a tough fact

12  pattern.  I get it.  But it doesn't change the fundamental

13  analysis that we had nothing to do with this other than

14  allowing it to be up there for nine days and didn't -- if the

15  Court accepts the plaintiffs' argument, didn't respond as

16  accurately and fast as we should have to the takedown notices.

17       It's still a retraction function.  It's still the

18  quintessential publisher behavior.

19       **THE COURT:**  Thank you very much.

20       Let me talk to the other side a little bit.  I want you

21  all to respond to what Mr. Rhodes has said, in particular in

22  addition to the *Gonzalez* case and the recent Ninth Circuit

23  opinions.

24       He says two things that resonate somewhat with me, and

25  that is, in FOSTA the reference using the same language in the

1    next subpart, in subpart B for state criminal proceedings, it's

2    a -- he suggests that that way of doing it means that they

3    really meant it as a limiting feature in the way that Twitter

4    is arguing.  And, secondly, that it refers to conduct

5    satisfying the elements of 1591, and that that is another --

6    additional evidence that they really meant to confine what was

7    encompassed within the allowable 1595 claim.

8        So if you would address those as well as the other things

9    that Mr. Rhodes stated and the things that I wanted stated, I

10   would appreciate it.

11       **MR. GENTALA:**  Thank you, Your Honor.  My name is Peter

12   Gentala, again, for the record --

13       **THE COURT:**  Welcome.

14       **MR. GENTALA:**  -- and I represent the plaintiffs.

15   Thank you.

16       Also with me is co-counsel Lisa Haba, and we had designed

17   our presentation so that I would speak to the trafficking

18   issues and Ms. Haba would essentially speak to the balance of

19   the claims in the complaint.  And I'm also prepared to speak to

20   2258A, which you've already indicated in your tentative that

21   you've made a tentative decision on.

22       We would be -- we'll go straight to the Court's concerns,

23   but we would like to be heard, if there's time, on some of

24   those issues that are outside of the tentative order.

25       **THE COURT:**  Of course.

1          **MR. GENTALA:**  Turning, Your Honor, just to your first
2    question, where you asked about the commercial sex act and
3    whether child sex abuse material -- and, with the Court's
4    permission, I'll just use that term.  I understand that the
5    term in the statute is *child pornography*, but the parlance in
6    the field is to really focus on what it actually is because it
7    does constitute a crime.
8          And the definition of the commercial sex act is any sex
9    act on account of which anything of value is given to or
10   received by any person.  There's a lot of *anys* in there, Your
11   Honor.  That's broad language.  Congress has swept,
12   essentially, any sex act where there's a knowledge component in
13   there.
14         So it's absolutely the case that child sex abuse material
15   can constitute a commercial sex act and that a commercial
16   benefit can be received from it after the fact.  The whole
17   point to child sex abuse material is that it's harmful in its
18   inception, but then it is also devastatingly harmful as it
19   continues to be spread over and over again, so much so that the
20   mere possession of it is criminalized.
21         So what we have here -- I heard what Mr. Rhodes said, and
22   I saw in the papers their argument about *any person*.  But the
23   relative phrase in these sex trafficking laws is not *any*
24   *person*, it's whoever commits one of the acts, let's say
25   maintaining or facilitating, and then it's *by any means a*

1     *person*.

2         And the means that has been used here is by a digital

3     creation and then recirculation of an abusive sex act that has

4     been committed against them.

5              **THE COURT:**  You have to go back to the language of the

6     statute.   The question is whether one recruits, entices,

7     harbors, transfers, provides, obtains, patronizes, or

8     solicited, right, a person.   And I'm wondering how this can be

9     that direct thing when Twitter has not done any of those

10    things.

11        You know, give them -- assume for the moment that they may

12    have some responsibility, ultimately, for not taking the

13    posting down, for after the fact getting some benefit from it,

14    et cetera, et cetera.   I'm still troubling -- you're talking

15    about the direct claim under (a)(1), I assume, that how that

16    could be that they've actually done one of these things with

17    respect to a person.

18             **MR. GENTALA:**  Your Honor, really, the commercial sex

19    act element is there in both the direct and the benefiting

20    claim under (a)(2).

21        But that predicate term *maintained* is in the direct

22    portion.   And the maintaining here would be at the point of

23    knowledge, once Twitter knows that this child sex abuse

24    material is on its platform.   And then we have in the record

25    paragraph 120, Twitter writing back to one of the victims and

saying:  We've reviewed the material; it doesn't violate our

policies; it's going to stay up on our website.  So that's the

maintaining.

But I understand we're going through the lens of 1595 and

that the standard is through that, and we agree with what

you've been saying about the knowledge standard that's from

there.

Your second question, I think, really gets to the

economics of Twitter and the value that can come from a

commercial sex act.

And here, Your Honor, I think it's important to note,

first of all, there was substantial user engagement with this

child sex abuse material.  The numbers that we were able to

document for the purpose of the First Amended Complaint, the

167,000 views, 2200 re-tweets, 6600 likes, that's all just

after two days after it was reported to Twitter.  It was active

at least another seven days on the platform.  So we really

can't tell, but it's a very, very substantial engagement with

the users.

And what does Twitter say to the business community, to

its investors, to the public, about the way it conducts its

business?  Simply stated, Twitter says, by its own description,

that it receives value from every account and every post on its

platform.  And whether that turns into immediately hard

currency and when it gets converted into revenue is not the

1   question because it's anything of value.

2       So look at, for example, just to give you a few paragraphs

3   that you can look at later, paragraph 31, in a letter to

4   shareholders Twitter says:

5           "Using our proprietary algorithms and understandings

6       of the interests of each account, we can deliver promoted

7       tweets that are intended to be relevant to a particular

8       account."

9       Again, paragraph 41 talks about an active usage model that

10  Twitter has put together to help its prospective business

11  partners and advertisers understand daily activity.  That's the

12  monetizable daily active usage program.

13      They're basically saying every account matters every day,

14  and we can track what happens on a use-by-user basis and on an

15  account-by-account basis.  That's value to Twitter, which they

16  turn around and turn into value in the marketplace.

17      And then, finally, paragraph 32, this is what Twitter

18  tells not advertisers and businesses but users themselves,

19  quote:

20          When you use Twitter to follow, tweet, search, view or

21      interact with tweets or Twitter accounts we may use these

22      actions to customize Twitter ads for you.  Unquote.

23      And it goes on at some length describing for users what it

24  is for the purpose of users appreciating how they track that

25  data.

1     Now, I heard Mr. Rhodes say that what there should be is

2  proof that this particular CSAM was monetized.  And that is not

3  in the statute.  The statute focuses on anything of value.  And

4  from the point of time that Twitter knew that that child sex

5  abuse material was on its platform, it also knew or should have

6  known that it was receiving value from it.  And the amount of

7  user engagement that we have pointed to, to the Court,

8  demonstrates that.

9     So that's the commercial benefit side.  It does not --

10  it's not a transactional transaction-by-transaction benefit.

11  It's anything of value, whether it's monetary or otherwise.

12     And just to give you one example, many courts have held,

13  for example, that offenders in the child pornography space

14  receive something of value when they just get the image,

15  because it's valuable to them for their own personal

16  possession, whether they convert that into currency afterwards.

17  So that's the kind of value that we're talking about overall.

18     I just want to mention, the reference to the *Kik* case and

19  the *mens rea* with 1595, I think the -- you know, the relative

20  analysis there that was done by Judge Freeman in the *BM* case

21  and Judge Orrick in the *JC* case, both of which are in the

22  pleadings, in the papers before you, point out that basically

23  the argument that Twitter is making here would completely

24  nullify the *should have known* standard that appears in 1595.

25  And at the pleading stage, here you have two different judges

1  that have said they're not prepared to do that.

2          **THE COURT:**  I understand.  I have to decide for

3  myself.

4          And I want you to address the two arguments that he

5  brought up, that I hadn't focused on in as great a detail, and

6  that is the language that he says changes the *mens rea* from the

7  1595 standard to the 1591 standard in FOSTA is the same in

8  subpart B for state criminal prosecutions, suggesting that they

9  intended to limit those things in the same way.  And the only

10  way you can understand that if they're in the same way is if

11  it's the same kind of limitation; and, secondly, the reference

12  to conduct.

13          But those are the two things I need you to address that

14  Mr. Rhodes mentioned on this *mens rea* part.

15          **MR. GENTALA:**  Sure.  So the context is a

16  sex-trafficking-focused piece of legislation.  So your take is

17  correct that what Congress was doing was coming in and carving

18  out sex trafficking from the rest of the Trafficking Victims

19  Protection Act, which focuses on employment trafficking,

20  peonage, et cetera.  And so that's how they're singling that

21  out in the language of FOSTA, they're focusing on it has to be

22  a violation of a 1591 claim that is the initial conduct.

23          I want to point out something here.  The conduct doesn't

24  necessarily have to be Twitter's.  In fact, in this case the

25  initial conduct was not Twitter.  It was the initial trafficker

1    who trafficked these young men.  And then there were subsequent

2    traffickers who posted the material onto the Twitter platform.

3    We don't know who they are.

4         But what Congress accomplished in FOSTA was by

5    specifically noting 1595, which has the *should have known*

6    standard in there.  It was allowing trafficking victims to come

7    forward and basically have access to discovery so that they

8    would have a chance to prove a claim when it's predicated on an

9    original 1591 violation.

10        **THE COURT:**  So you're not answering my question.  My

11   question is, what about the fact that subpart B for state

12   criminal prosecutions has the same language?  That's the

13   question.

14        And I think the argument is -- and I'm just making it up

15   off the top of my head; Mr. Rhodes will correct me when I'm

16   wrong -- is that you don't think that in putting it in subpart

17   B for state criminal prosecutions, do you, that if the state

18   criminal prosecution had a lesser standard, it had a lesser

19   standard for conviction of a sex trafficking crime than was

20   required for 1591, that the state could still prosecute someone

21   and the immunity would go away, do you?

22        And if you agree with me on that or you agree with

23   Mr. Rhodes on that, then it's the same language with respect to

24   the subpart regarding 1595.  So that's, as I understand it, the

25   issue with respect to it's the same language in two subparts of

1    FOSTA and how can you square your view of it with the second

2    subpart.

3              MR. GENTALA:  I understand.  Thank you.

4        I don't think -- I think it's an apples-and-oranges

5    comparison or analogy.  Here we have Congress specifically

6    pointing to a civil cause of action statute that rests on top

7    of the criminal statutes.

8        And it would be a different matter if Congress also

9    decided to point out state civil causes of action that could

10   work in the sex trafficking area where they're creating civil

11   causes of action.  But that's not the case there.  So --

12             THE COURT:  No, but did --

13             MR. GENTALA:  -- alignment on the criminal side and

14   civil side -- sorry.

15             THE COURT:  Maybe I'm not being clear.

16       Assume with me when the Congress says what you say they

17   say, that when they say that the conduct satisfying the

18   elements of 1591, that that is not meant to restrict or in any

19   way change the *mens rea* requirement of the phrase that's before

20   it, which is the broader category of things that are allowed to

21   be brought, in the subpart we're talking about, that's 1595,

22   has a particular *mens rea*.  And it's not Congress's intent by

23   saying so long as the conduct meets the elements of 1591 to

24   change the *mens rea* requirement of 1595.  That's your argument.

25   That's the point.

1          If you go into subpart B, where it says you can proceed

2     with state criminal prosecutions, and then says so long as, et

3     cetera, et cetera, et cetera, what's the implication for that?

4          If we go with what you're saying, then if a state has a

5     criminal prosecution for sex crimes that has a lower *mens rea*

6     than 1591, that it doesn't -- state criminal prosecution is

7     allowed; right?  The state criminal prosecution is allowed even

8     though it has a lower -- I think that's the way the argument

9     goes -- a lower *mens rea* than 1591.  That would be your

10    argument.

11         But that seems like an odd thing in the criminal context,

12    when they said the conduct has to fall within a criminal

13    statute to be accepted and allowed for a criminal prosecution

14    in the state area.

15         I mean, that's the argument, in any event.

16         **MR. GENTALA:**  I understand.  It is an odd -- it would

17    be odd, and Congress didn't do that.  Congress has a specific

18    civil carve-out here.

19         And so when I see the -- I don't understand why when

20    Congress moves in with a scalpel and focuses on a specific

21    civil cause of action in federal law and then in a separate

22    vein moves over to talk about the kind of criminal *mens rea*

23    that would apply on the criminal side of things, why the two

24    are completely linked together or would have to be linked

25    together.

1     That phrase *if the conduct underlying the claim*

2  *constitutes* really is very similar to what we're talking about

3  in 1595, where there's a victim of the chapter and -- and they

4  knew or should have known that they have engaged in an act that

5  is in violation of the chapter.

6     And so Congress is saying, among this chapter let's focus

7  on 1591, and if there is a 1591 claim then we can focus in

8  specifically on the state of knowledge, and we're going to give

9  a civil plaintiff the benefit of the *should have known*

10 standard.

11    Your Honor, I don't want to get lost with that because we

12 believe that we satisfy the direct knowledge standard --

13         **THE COURT:**  No, I appreciate.

14    **MR. RHODES:**  -- and, certainly, the reckless disregard

15 standard as well.

16         **THE COURT:**  Yeah.

17    **MR. GENTALA:**  Your Honor, I had a point about

18 participation in the venture and the *Afyare* case.  Are you

19 satisfied with our discussion of following up on Mr. Rhodes's

20 points?

21         **THE COURT:**  Yes, I think I am.  I think I need you to

22 finish up your argument though.  I've got a -- unfortunately,

23 I'm doing the criminal calendar for the district for -- the

24 morning criminal calendar for the district, and I need to get

25 to that pretty soon.  But I want you to finish up your argument

 1   and make any additional arguments you wanted to make pretty

 2   quickly if you could.

 3         **MR. GENTALA:**  Sure.  I'll be very brief then.

 4         With regard to participation in a venture, the *Afyare* case

 5   is of no value because it was decided by the Sixth Circuit in

 6   2016 before Congress conveyed a specific definition for

 7   participation in a venture.

 8         Congress included that in the package of changes that were

 9   made with FOSTA-SESTA in 2018.  So *Afyare* is not -- I saw it

10   called, a couple of times in the pleading, a seminal case.

11   It's a case that really doesn't provide any value when it comes

12   to participation in the venture.

13         With regard to the nexus between sex trafficking and

14   sexually explicit photos and videos, one case that wasn't in

15   the pleadings, that addresses a specific offense made by a

16   criminal defendant under 1591, is *United States versus Marcus*.

17   That cite is 487 F.Supp.2d 289.  487 F.Supp.2d 289.

18         And there you have a criminal defendant making the

19   argument you need a tangible person and it doesn't apply to

20   pornography.  And the Court rejects that defense in the context

21   of 1591.  And the Court specifically notes that when the

22   Trafficking Victim Protection Act was passed in 2000, among the

23   congressional findings was a concern about sexual exploitation

24   through pornography.  And that's with the *Marcus* case.

25         With regard to this concept *will be caused*, that the verb

1   tense matters there, it's broad language.  And as the Court's

2   have looked at 1591 and -- both direct and beneficiary

3   trafficking, they have ruled that it's broad enough to cover

4   even when a sexual act has not yet taken place, even if it

5   never takes place, even in police sting situations where there

6   is no minor.

7       But here we have the children.  The initial sexual act has

8   taken place, and the commercial sex act was ongoing on the

9   Twitter platform, and Twitter had knowledge of that and left it

10  there.

11      And without the benefit of discovery, we won't know the

12  full footprint or the impact of that.  It still may be there

13  now for all we can know.  But we need to have a chance to get

14  to the bottom of these issues under the trafficking statute.

15      With that, Your Honor, I just want to give my co-counsel a

16  chance to raise any issues touching the balance of the

17  complaint.

18          **THE COURT:**  That's fine.  But I do -- please make it

19  as concise as you can.

20          **MS. HABA:**  Your Honor.  Lisa Haba on behalf of John

21  Does 1 and 2.  Thank you for your time, Your Honor.  I'll be

22  brief.

23      I'm going to talk about three of our other causes of

24  action very briefly.  The first one being 2252A and 2255, the

25  second one being the common law claims, and the third being the

1  product liability.

2      We believe that all three of them -- I know Your Honor's

3  preliminary ruling was they fall outside.  Within CDA 230, we

4  would respectfully assert they fall outside CDA 230 for the

5  following.  I'm going to talk first about the 2255.  This deals

6  with child pornography.

7          THE COURT:  So can I ask you a question?

8          MS. HABA:  Yes, sir.

9          THE COURT:  With respect to 2255A and B, I said

10  there's no cause of action for those claims.  No private right

11  of action.  What's your response to that?

12          MS. HABA:  There is a cause of action for 2255 and

13  2252A.

14      2252A created a cause of action in 2255.  That was created

15  when the civil cause of action came into existence in 1998,

16  under the Children From Sexual Predators Act of 1998, and

17  that's when 2255 created the civil remedy.

18      So that was two years after CDA 230 was codified.

19  Congress, knowing of CDA 230's immunity provision, then

20  codified the civil cause of action allowing child pornography

21  to come into effect.

22      It's referred to as Masha's law as the common phrase

23  that's being used throughout the circuits.

24          THE COURT:  Okay.

25          MS. HABA:  Under Masha's Law, in that civil cause of

1    action, we're dealing with a unique situation that's not been

2    addressed and would be a matter of first impression here in the

3    Ninth Circuit.

4         Matter of first impression would be the following.  There

5    are a couple of cases that deal with CDA 230 immunity.  None of

6    them deal with child pornography.  And it falls outside of that

7    because in other situations all the other scenarios that we've

8    been talking about in the case law and the jurisprudence deal

9    with matters of discussing different criminal activity.

10        This is criminal activity.  Trading child pornography on

11   Twitter's platform is criminal activity.  They're participating

12   in criminal activity as opposed to discussing it.

13        For example, if you said, I'd like to sell you drugs on

14   Twitter's platform, and there's a conversation about that, and

15   the drug sale takes place offline, that's a very different

16   scenario than actually trading the illicit, illegal material

17   through the platform.  And Twitter, when they acknowledge that,

18   becomes a part of that crime.

19        When they allowed --

20             **THE COURT:**  So is there any case law that says that?

21   I mean, for example, is there a case that says if you post --

22   if you're a person with security clearance and you post

23   national security information on Twitter, Twitter is

24   responsible because the act of posting that is itself a crime?

25             **MS. HABA:**  To my knowledge, Your Honor -- and I've

1    looked ostensibly for a case that would say that -- I don't

2    think there is one.

3         THE COURT:  So what about that source?  So you think

4    that if somebody gets on Twitter and posts something that's a

5    crime, Twitter is responsible for it?

6         MS. HABA:  If they have knowledge.  So Twitter got --

7    I don't think it's in a vacuum.  I don't think it's a scenario

8    where --

9         THE COURT:  Okay.  So they have knowledge.  They're

10   told about it, and nine days later they take it down,

11   hypothetically.  Do you think they can be held liable, that

12   there's a civil or criminal claim against them for that?

13        MS. HABA:  Well, there's a middle piece that makes it

14   the civil liability.  That's when they reviewed it and they

15   chose not to remove it.  They made a definitive act to say, I

16   refuse to remove this, I refuse to act on this, with the full

17   knowledge of the criminal context of what I'm looking at.  And

18   I refuse to act, allowing it to continue to be distributed by

19   my platform, knowing that this criminal material is being

20   distributed and knowing that I'm profiting from it.

21        With those facts in mind, yes, there is civil liability

22   for them, and that -- we have adequately pled that in our

23   pleadings.

24        THE COURT:  Okay.

25        MS. HABA:  The authority I would state to is in the

1    *Roommates* case, Your Honor.  *Roommates* has two pieces in it

2    that I think are very instructive on this.

3        On page 1164 they say that unlawful conduct, when posed

4    face to face or by telephone does not magically become lawful

5    when accessed electronically online.  The communications

6    Decency Act is not meant to create a lawless no man's land on

7    the Internet.

8        In the same *Roommates* case, the Ninth came forward and

9    talked about in the context of discussing 230 immunity.  And

10   they came down on the district court and they said this is not

11   a blanket immunity.  This is absolutely not something that

12   should be across the board if it's online we can't touch it.

13       They actually found fault with the district court for

14   doing that.  And that's going to be cited on 1175 in the

15   *Roommates* case.  And what the line says, when Congress passed

16   Section 230, it did not intend to prevent the enforcement of

17   all laws online.  There's no case in the Ninth that says child

18   pornography is permissible to be traded and be given immunity

19   of any kind for participating in criminal conduct.

20       And I think another piece of *Roommates* that's incredibly

21   important is that they talk about:  We believe, in the context

22   of discussing total immunity versus participating in criminal

23   conduct, the message to website operators is clear.  If you

24   don't encourage illegal content, you will be immune.

25       We believe this distinction, again in the context of legal

1    versus illegal participation, is consistent with the intent of

2    Congress to preserve the free-flowing nature of Internet speech

3    and commerce without unduly prejudicing the enforcement of

4    other state and federal laws.

5        Well, Your Honor, Twitter violated the criminal laws that

6    prohibit the distribution and possession of child pornography.

7    At the very least, when Your Honor is interpreting this, at the

8    moment it was uploaded to their platform they were in

9    possession of child pornography.  Every single time it's been

10   re-tweeted at a massive rate and scale this rampant

11   distribution of child pornography has been their distribution

12   of child pornography.

13       THE COURT:  Well, but they clearly don't meet the *mens*

14   *rea* at that point in time; right?

15       MS. MOHR:  Correct.  But then there was a point in

16   time when John Doe's mother and himself contacted them and said

17   this is happening.  And they responded back and said --

18   acknowledging their *mens rea*, and said, we know; we see this;

19   we've reviewed the material, and we refuse to remove it.  And

20   that's at the moment when they are not only possessing and

21   redistributing child pornography with full knowledge, in

22   violation --

23       THE COURT:  No, I appreciate that.  I'm very troubled

24   by the idea that there's some distinction between civil and

25   criminal here.

1      So did you have something else you want -- because I've

2  got a bunch of people on the criminal calendar that are waiting

3  to get on, including, I hope, the jail.

4        **MS. HABA:**  No, I appreciate that.  And if you can

5  indulge me, very, very brief, I'd like to talk very briefly

6  about the CDA 230 immunity provision.

7      I think it's very important just to look at the language

8  of the statute.  We talk about Twitter being either a publisher

9  or a provider.

10      In the provider context, they only get immunity if certain

11  predicate acts are met.  Those predicate acts being they have

12  to take a voluntary good-faith act to restrict material or they

13  have to have -- they have to basically take certain actions.

14      Well, Twitter has alleged that they acted in good faith

15  and that they took voluntary good-faith acts, but there is no

16  evidence in the pleadings that --

17        **THE COURT:**  I know.  Mr. Rhodes is relying on the

18  publisher immunity.

19        **MR. RHODES:**  Yes, Your Honor.

20        **THE COURT:**  He's not relying on that for this

21  pleading.

22        **MS. HABA:**  Okay.  Well, then, I'll address the

23  publisher immunity very briefly as well.  Publisher immunity is

24  as follows.  There was --

25        **THE COURT:**  I know what the publisher immunity is.

1    If you have a specific thing you want to argue about a

2    specific cause of action you should do it because I'm going to

3    cut off the argument in about two minutes.

4        **MS. HABA:**  Yes, Your Honor.  I will move on to the

5    products liability claim, and then I'll be finished, Your

6    Honor.

7        Our products liability claim does not fall under CDA 230

8    either.  Our products liability claim talks about the actions

9    of Twitter itself.  Twitter created an algorithm, an API, and a

10   software network that creates the Twitter and Twitter

11   platforms.  That is the product that they created, and, as

12   such, they have a duty to create a safe product that's fully

13   independent of different things within it that would cause

14   danger to its users.

15       Let's talk about what we've pled in terms of --

16       **THE COURT:**  Why doesn't that swallow the immunity?

17       So every single provider of this sort has a platform and

18   has algorithms, and so anytime anybody puts on offensive

19   conduct that hurts someone -- that's the definition that needs

20   to be here for products liability -- they can always say it was

21   the way you designed the platform and, therefore, there's no

22   publisher immunity whatsoever because there would never be

23   publisher immunity.

24       **MS. HABA:**  Well, publisher immunity talks more about

25   what the third parties are posting on the platform.  What I'm

1  talking about is actual creation of the platform.

2         **THE COURT:**  I know.  I understand that.  But your

3  clients were hurt by what was posted on the platform; right?

4         **MS. HABA:**  Correct.

5         **THE COURT:**  So that's a necessary part of the element

6  of the claim of products liability here; right?

7         **MS. HABA:**  Yes.

8         **THE COURT:**  As a result of the product, the structure

9  of this product, this material was allowed to be posted on the

10 platform; and, therefore, it hurt our client.  Which it did

11 horribly.  That's the claim; right?

12        **MS. HABA:**  That is the claim as well as the way that

13 the product was manufactured --

14        **THE COURT:**  No, of course.  Of course.

15        **MS. HABA:**  Yes.

16        **THE COURT:**  But every provider has that flaw.

17        **MS. HABA:**  Well, I can't say that.  I mean --

18        **THE COURT:**  I can.  I can.  Every provider has a

19 platform.

20        **MS. HABA:**  Yes.

21        **THE COURT:**  Every provider has algorithms.  Every

22 provider that allows postings has algorithms that allow

23 particular posting or doesn't allow other particular postings,

24 or screens or doesn't screens.  And if you do it so that it

25 allows something harmful to get on, say, for example, some

1   defamation that hurt someone terribly by saying something

2   completely false, or child pornography, or anything else, that

3   means any publication that hurts someone is evidence of a

4   product -- if it hurt someone, is evidence that the product is

5   dangerous, and there should be a product liability claim.

6       Why doesn't that swallow the publisher liability

7   completely?

8           **MS. HABA:**  Well, I think it's a little bit different,

9   Your Honor, because the way the platform exists.

10      If we were just in a world where the publisher's

11  manufactured platform doesn't contribute to illegal content

12  being disseminated on their platform -- I'm not talking about

13  defamation, I'm talking about our separate scenario with child

14  pornography and illegal material -- if we're dealing with

15  something like that it's different and separate and apart.

16      I'll give you an example.  We've alleged in our

17  complaint -- I believe it's paragraph 82 -- that there's a

18  search term feature.  So users can create hashtags.  Twitter

19  allows their algorithm to take those hashtags and pair it with

20  words to help a user find in their search term what they're

21  looking for.

22      So there are certain hashtags that are known for only

23  being related to child pornography.  There's no other

24  legitimate purpose to them.  So #megalinks is one such hashtag.

25  *#S2R*, send to receive, another one.  When you type into your

1   search terms *#megalinks*, it gives you suggestions for how you

2   can find what you're looking for.  It suggests pairing the

3   phrase *young* with *#megalinks*.

4        Twitter's algorithm also suggests pairing hashtag send to

5   receive with #megalinks so you can better find the child

6   pornography you're looking for, if you're the kind of person

7   looking for that material.  That is an inherent defect on that

8   platform.

9        So John Doe 1 and John Doe 2, their image, against their

10  will, is put on this platform.  Twitter is made aware of it.

11  Their inherent algorithms help people find it and view it.  And

12  every view is a harm to our plaintiffs.

13       Furthermore, Twitter alleged in their own pleadings that

14  they had 500,000 times they removed child porn off their

15  employing last year.  I think they meant it as a celebration of

16  good faith of what they're doing.  But, in reality, what it

17  shows this Court is that they are inherently aware of the

18  dangers of their platform.

19       They had to remove it 500,000 times.  And instead of doing

20  what's necessary to remove the hashtags that are only geared

21  towards child porn, to remove such search term pairings that

22  make it inherently dangerous to users, they've chose to

23  maintain --

24            **THE COURT:**  But that's not relevant to your argument

25  about products liability, which doesn't have an intent element;

1   right?

2          **MS. HABA:**  I'm sorry, I didn't hear that.

3          **THE COURT:**  That's got nothing to do with your

4   products liability claim, because there's no intent element for

5   products liability.

6          **MS. HABA:**  Well, it's not that there's no intent

7   argument, Judge.  I think when they created it they have a

8   duty -- I mean, they obviously have a duty to protect their

9   users, to create a safe product.

10      And I think it goes to show that they're even aware of

11   their own danger in their manufactured product.  They're aware

12   of their own danger in their algorithm, and they continue to

13   act on the status quo.

14          **THE COURT:**  Okay.  Anything else?

15          **MR. RHODES:**  Your Honor, may I have 30 seconds to

16   respond?

17          **THE COURT:**  When I'm done with Ms. Haba's argument,

18   you can have 30 seconds to respond.

19      Go ahead.  Anything further?

20          **MS. HABA:**  No, Your Honor.  That would be my entire

21   argument.  Thank you for your time.

22          **THE COURT:**  Okay.  Mr. Rhodes, 30 seconds.

23          **MR. RHODES:**  I will be brief.

24      Let me read to you a passage from the *Kik* case.  Again.

25   It's not controlling, but I think it's persuasive.  Quote:

1          By its terms FOSTA did not abrogate CDA immunity for

2      all claims arising from sex trafficking.  FOSTA permits

3      civil liability for websites only if the conduct

4      underlying the claim constitutes a violation of 1591.

5          And then the Court goes on to say you'd have to show the

6      defendants knowingly participated in the sex trafficking

7      venture involving her, the named plaintiff.

8          I would then refer you back to the *Gonzalez* case where

9      they say specifically that, quote, the publication involves the

10     decision to take down -- response to takedown.  So takedown

11     notice decision-making is part of the publishing construct.

12         I will also then cite you the same case where they talk

13     about the carve-out in 23(e)(1) as being limited to criminal

14     prosecution.  We cited the *Doe versus Barnes* case on your 2255A

15     arguments and why you're right there.

16         And then last, but not least, let me give you another cite

17     for what the knowledge requirement is in the Ninth Circuit on

18     1591.  And this is a case called *United States versus Todd*, 627

19     F.3d 329.  If you're interested in what the Ninth Circuit says

20     the standard is, you'll find it there.

21         You have correctly summarized to my adversary what our

22     argument is.  We're saying they added that clause.  I go back

23     to putting a period there before that other phrase.  Why would

24     they say the conduct underlying the claim satisfies 1591, which

25     clearly has a higher level of *mens rea*, if they didn't mean it

1   for both civil claims in A and state law criminal prosecution

2   in B?

3        With that, Your Honor, I submit.  And I appreciate your

4   time.

5        **THE COURT:**  Thank you, all.  Thank you, all, for your

6   argument.  I very much appreciate the briefing and the argument

7   in this case.

8        I take it that -- just by listening to this argument, and

9   maybe I shouldn't take this, but there was suggestion that the

10  parties wanted to discuss whether or not sometime soon there

11  might be an appropriate time to have settlement discussions or

12  ADR.

13       It doesn't sound like we're there yet, but if someone

14  disagrees, I'd love to hear it.  But it doesn't sound like

15  we're there yet.

16       **MR. RHODES:**  I don't think we're there yet, Your

17  Honor, speaking on behalf of Twitter.  And I'm also

18  disappointed that if you're going to be the adjudicating judge

19  I won't be able to come see you in that regard, because you're

20  very effective in that setting.

21       **THE COURT:**  You know -- yeah, okay.  Thank you.

22       Well, in any event, okay.  So I'll get this order out.

23  I've got to look at a number of things again -- it will take a

24  little bit of time -- and then we'll get it out.  I'm going

25  to -- and then we'll take it from there.

1    I'm going to set a case management conference 90 days out,

2    just as a protective matter.  And then we'll -- and then we'll

3    see what we can do.

4    I guess, assuming that I sustain my tentative and say that

5    these allegations are insufficient under 203, with respect to

6    all of the claims, except that the -- the benefiting claim

7    under the TVPRA, I assume that plaintiff has alleged what they

8    can with respect to that, and there's no reason to give leave

9    to amend to cure the 203 problems with the remaining claims.

10    But I thought I'd ask you that one last question, either

11    Mr. Gentala or Ms. Haba.

12    **MR. GENTALA:**  Your Honor, I'm not sure we could assume

13    that at this stage.  For example, we did not talk about 2258A

14    and B.  But there might be some allegations there that could be

15    added depending on how that works.  I mean, there is a standard

16    that's in 2258B.

17    **THE COURT:**  I mean with respect to the immunity.  If I

18    say they're all barred by the immunity, what's your -- what's

19    your opinion on whether there's any way to amend it?

20    I don't want to go through this more than we have to.  If

21    you think there are legitimate things one can add to this that

22    give more detail, that would show that all these other claims,

23    state law claims, are not subject to the immunity, then -- more

24    than what you've already said -- great.  I think, just looking

25    at it, I didn't see that.

1      **MR. GENTALA:**  Your Honor, I appreciate the question.

2   I think we'd just like to reserve the right to review your

3   order and see --

4      **THE COURT:**  Well, all right.  I may do it without

5   leave to amend.  You know, if you've got a good argument on new

6   facts that could be alleged, why that would justify the filing

7   an amended complaint, you could bring a motion to that effect.

8      **MR. GENTALA:**  And just one point.  I understood the

9   Court that the 1591 direct trafficking claim would also be

10  barred, and there might be places there where we could add

11  allegations that could support our 1591(a) piece.

12     **THE COURT:**  Maybe.  But I think I'll handle that the

13  same way.  If you find some facts that you can, you can talk to

14  Mr. Rhodes, meet and confer.  If you can't reach agreement with

15  him on what you want to do, then bring a motion before me for

16  permission to file an amended complaint.

17     **MR. GENTALA:**  Thank you, Your Honor.

18     **THE COURT:**  Yeah, okay.

19     All right.  Karen, 90 days.

20     **THE CLERK:**  November 5th, at 2:00 p.m.  Does that work

21  for the parties?

22     **THE COURT:**  Does that work for everyone's calendars?

23     **MR. RHODES:**  Yes, Your Honor.

24     **THE COURT:**  Does that work for the plaintiffs?

25     **MR. GENTALA:**  Just one moment, Your Honor.

1        **THE COURT:**  Yeah, no problem.

2        **MS. HABA:**  That works for my calendar, Your Honor.

3        **MR. GENTALA:**  Yes, it works for mine as well.

4        **THE COURT:**  Okay.  Thank you, all.

5     So give me an updated joint statement one week in advance

6  of that.  But -- and, otherwise, I'll get out the order in the

7  next, you know, 30, 45 days, and then we'll take it from there.

8  Okay.

9     Thank you, all.

10        **MR. RHODES:**  Thank you, Your Honor.

11        **MR. MATIASIC:**  Thank you, Your Honor.

12     (At 10:54 a.m. the proceedings were adjourned.)

13                        - - - - -

14

15

16                  **CERTIFICATE OF REPORTER**

17     I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19  DATE: Sunday, August 22, 2021

20

21

22

23  _____

24     Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

25